PARIENTE, J.
With the goal of reforming this state’s legislative apportionment process, in 2010, the Florida voters approved an amendment to the Florida Constitution establishing stringent new standards for the once-in-a-decade apportionment of legislative districts. These express new standards imposed by the voters clearly act as a restraint on the Legislature in drawing apportionment plans. After the Legislature draws the apportionment plans, this Court is required by the Florida Constitution to review those plans to ensure their compliance with the constitution. In this review, we are obligated to interpret and apply these standards in a manner that gives full effect to the will of the voters. In order to do so, our review necessarily becomes more extensive than in decades past.
For the reasons set forth in this opinion, we declare the plan apportioning districts for the Florida House of Representatives to be constitutionally valid under the Florida Constitution. We declare the plan apportioning the districts for the Florida *598 Senate to be constitutionally invalid under the Florida Constitution. The Legislature is now tasked by the Florida Constitution with adopting a new joint resolution of apportionment “conforming to the judgment of the supreme court” as set forth in article III, section 16(d).
I. INTRODUCTION
The once-in-a-decade process of redistricting follows the United States Census Bureau’s release of new census data. Article III, section 16, of the Florida Constitution expressly entrusts the Legislature with the obligation to redraw this state’s legislative districts and expressly entrusts this Court with the mandatory obligation to review the Legislature’s decennial apportionment plans. The Florida House of Representatives and the Florida Senate must adopt a joint resolution apportioning the legislative districts in accordance with federal and state constitutional requirements. Id. After the Legislature adopts a joint resolution of apportionment, the Florida Constitution requires the Attorney General to petition this Court for a declaratory judgment to determine the validity of the Legislature’s apportionment plans as enacted. Art. Ill, § 16(c), Fla. Const. Within thirty days of receiving the Attorney General’s petition, and after permitting adversary interests to present their views, the Court has a mandatory obligation under the Florida Constitution to render a declaratory judgment determining the validity of the Legislature’s apportionment plans. Id.
Before 2010, this Court held that Florida’s constitutional requirements guiding the Legislature during the apportionment process were “not more stringent than the requirements under the United States Constitution.” In re Constitutionality of House Joint Resolution 1987 (In re Apportionment Law-2002), 817 So.2d 819, 824 (Fla.2002). Under this construction of the Florida Constitution, we reviewed legislative apportionment plans to determine whether those plans complied with (1) the general provisions of the United States Constitution, which set forth the one-person, one-vote standard under the Equal Protection Clause, and (2) the specific provisions of the state constitution, article III, section 16(a), requiring districts to be “consecutively numbered” and to consist of “contiguous, overlapping or identical territory.”
On November 2, 2010, the voters approved Amendment 5 (Fair Districts Amendment) for inclusion in the Florida Constitution, greatly expanding the standards that govern legislative apportionment.[1] When approving the Fair Districts Amendment for placement on the 2010 ballot, this Court explained that the “overall goal” of the Amendment was twofold: “[T]o require the Legislature to redistrict in a manner that prohibits favoritism or discrimination, while respecting geographic considerations” and “to require legislative districts to follow existing community lines so that districts are logically drawn, and bizarrely shaped districts ... are avoided.” Advisory Op. to Atty. Gen. re Standards for Establishing Legislative Dist. Boundaries, 2 So.3d 175, 181, 187-88 (Fla.2009) (plurality opinion). After its passage, the Fair Districts Amendment was codified as article III, section 21, of the Florida Constitution.
With the advent of the Fair Districts Amendment, the Florida Constitution now imposes more stringent requirements as to apportionment than the United States Constitution and prior versions of the state *599 constitution. The new standards enumerated in article III, section 21, are set forth in two tiers, each of which contains three requirements. The first tier, contained in section 21(a), lists the following requirements: (1) no apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent; (2) districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and (3) districts shall consist of contiguous territory. The second tier, located in section 21(b), lists three additional requirements, the compliance with which is subordinate to those listed in the first tier of section 21 and to federal law in the event of a conflict: (1) districts shall be as nearly equal in population as is practicable; (2) districts shall be compact; and (3) where feasible, districts shall utilize existing political and geographical boundaries. See art. Ill, § 21(b), Fla. Const. The order in which the constitution lists the standards in tiers one and two is “not [to] be read to establish any priority of one standard over the other within that [tier].” Art. Ill, § 21(c), Fla. Const.
These express new standards imposed by the voters clearly act as a restraint on legislative discretion in drawing apportionment plans. In this original declaratory judgment proceeding, we must define these new standards for the first time since the passage of the Fair Districts Amendment. Although this Court’s role is unquestionably circumscribed by the extremely short time frame set forth in article III, section 16(c), of the Florida Constitution, such a limitation cannot deter the Court from its extremely weighty responsibility entrusted to us by the citizens of this state through the Florida Constitution to interpret the constitutional standards and to apply those standards to the legislative apportionment plans.
When interpreting constitutional provisions, this Court endeavors to ascertain the will of the people in passing the amendment. We follow the approach that has been consistently undertaken when interpreting constitutional provisions:
The fundamental object to be sought in construing a constitutional provision is to ascertain the intent of the framers and the provision must be construed or interpreted in such manner as to fulfill the intent of the people, never to defeat it. Such a provision must never be construed in such manner as to make it possible for the will of the people to be frustrated or denied.
Pleus v. Crist, 14 So.3d 941, 944-45 (Fla.2009); Zingale v. Powell, 885 So.2d 277, 282 (Fla.2004) (quoting Gray v. Bryant, 125 So.2d 846, 852 (Fla.1960)); Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm’n, 838 So.2d 492, 501 (Fla.2003).
This Court’s duty to measure the Legislature’s apportionment plans with the yardstick of express constitutional provisions arises from the “well settled” principle that “the state Constitution is not a grant of power but a limitation upon power.” In re Apportionment Law Senate Joint Resolution No. 1305, 1972 Regular Session (In Re Apportionment Law-1972 ), 263 So.2d 797, 805 (Fla.1972). With the recent addition of section 21 to article III of the Florida Constitution, the Legislature is governed by a different and more comprehensive constitutional measurement than before — the limitations on legislative authority in apportionment decisions have increased and the constitutional yardstick has more measurements.
In addition to measuring the Legislature’s compliance with these standards, we *600 recognize the crucial role legislative apportionment plays with respect to the right of citizens to elect representatives. Indeed, the right to elect representatives — and the process by which we do so — is the very bedrock of our democracy. To ensure the protection of this right, the citizens of the state of Florida, through the Florida Constitution, employed the essential concept of checks and balances, granting to the Legislature the ability to apportion the state in a manner prescribed by the citizens and entrusting this Court with the responsibility to review the apportionment plans to ensure they are constitutionally valid. The obligations set forth in the Florida Constitution are directed not to the Legislature’s right to draw districts, but to the people’s right to elect representatives in a fair manner so that each person’s vote counts equally and so that all citizens receive “fair and effective representation.” Once validated by the Court, the apportionment plans, which redraw each of the 40 Senate districts and each of the 120 House districts, will have a significant impact on the election of this state’s elected representatives for the next decade.
On February 9, 2012, the Legislature passed Senate Joint Resolution 1176 (Joint Resolution), apportioning this state into 120 House districts and 40 Senate districts. The next day, the Attorney General fulfilled her constitutional obligation by filing a petition in this Court for a declaratory judgment to determine the validity of the legislative apportionment plans contained within the Joint Resolution. Following the Attorney General’s filing, this Court “permit[ted] adversary interests to present their views” as required by article III, section 16(c). Under this Court’s plenary authority to review legislative apportionment plans, we now have “jurisdiction to resolve all issues by declaratory judgment arising under article III, section 16(c), Florida Constitution.” In re Apportionment Law Appearing as Senate Joint Resolution 1 E, 1982 Special Apportionment Session (In re Apportionment Law-1982 ), 414 So.2d 1040, 1045 (Fla.1982).
We have carefully considered the submissions of both those supporting and opposing the plans.[2] We have held oral argument. For the reasons more fully explained below, we conclude that the Senate plan is facially invalid under article III, section 21, and further conclude that the House plan is facially valid. We agree with the position of the House that the House plan can be severed from the Senate plan. In accordance with article III, section 16(c), of the Florida Constitution, the Court enters a declaratory judgment determining that the apportionment plan for the House of Representatives as contained in Senate Joint Resolution 1176 is constitutionally valid and determining that the apportionment plan for the Sen *601 ate as contained in Senate Joint Resolution 1176 is constitutionally invalid.
II. HISTORICAL EVOLUTION OF ARTICLE III OF THE FLORIDA CONSTITUTION
In order to provide context for our present task of determining the validity of the House and Senate apportionment plans, we first review the historical evolution of the constitutional provisions pertinent to the Legislature’s decennial apportionment.
Before 1968, there was no process by which challengers to the Legislature’s apportionment plans could seek direct and immediate review of the apportionment plans by the Supreme Court of Florida. Under the Florida Constitution of 1885, which was in effect until the adoption of the 1968 Constitution, litigation surrounding the validity of the Legislature’s adopted apportionment plans proliferated. Indeed, “[f]rom the years 1955 through 1966, no fewer than seven apportionment plans were formulated by the state legislature, all of which were determined eventually to be invalid by the federal judiciary.” In re Apportionment Law-1982, 414 So.2d at 1048 & n. 4 (citing Swann v. Adams, 208 F.Supp. 316 (S.D.Fla.1962); Swann v. Adams, 214 F.Supp. 811 (S.D.Fla.1963), rev’d, 378 U.S. 553, 84 S.Ct. 1904, 12 L.Ed.2d 1033 (1964); Swann v. Adams, 258 F.Supp. 819 (S.D.Fla.1965), rev’d, 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966); Swann v. Adams, 258 F.Supp. 819 (S.D.Fla.1965), rev’d, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); Swann v. Adams, 263 F.Supp. 225 (S.D.Fla.1967)).
In some cases, litigation over a particular plan literally spanned a period of several years, infusing the apportionment and the electoral process with uncertainty. The end product of the Legislature’s attempt to avoid further apportionment litigation was the drafting of article III, section 16. In 1968, the citizens of Florida approved article III, section 16, for inclusion in the Florida Constitution, which provided a mechanism whereby the Supreme Court of Florida was given mandatory and express jurisdiction to determine the validity of the Legislature’s enacted apportionment plan under a strict thirty-day time limit. See id. at 1048; see also art. Ill, § 16(c), Fla. Const.[3]
The affirmative decision of the voters to place the apportionment responsibility squarely in the state judiciary rather than leave it to the federal judiciary was in line with the United States Supreme Court’s recognition of that preference:
The power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such eases has been specifically encouraged. State of Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 676 [84 S.Ct. 1429, 12 L.Ed.2d 595] (1964); City of Scranton v. Drew, 379 U.S. 40 [85 S.Ct. 207, 13 L.Ed.2d 107] (1964), citing Butcher v. Bloom [415 Pa. 438], 203 A.2d 556 (1964); Jackman v. Bodine [43 N.J. 453], 205 A.2d 713, 724 (1964). See also Kidd v. McCanless [200 Tenn. 273], 292 S.W.2d 40 (1956), and discussion thereof in Baker v. Carr, 369 U.S. 186, 235-236 [82 S.Ct. 691, 7 L.Ed.2d 663] (1962).
Scott v. Germano, 381 U.S. 407, 409, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965) (parallel citations omitted).
*602 In addition, article III, section 16, required the Legislature to comply with federal and state constitutional standards:
The legislature ... shall apportion the state in accordance with the constitution of the state and of the United States into not less than thirty nor more than forty consecutively numbered senatorial districts of either contiguous, overlapping or identical territory, and into not less than eighty nor more than one hundred twenty consecutively numbered representative districts of either contiguous, overlapping or identical territory.
Art. Ill, § 16(a), Fla. Const. In every apportionment decision since the adoption of article III, section 16, this Court has reviewed the validity of the Legislature’s joint resolution of apportionment consistent with the language of that provision, examining criteria such as population disparities between legislative districts (federal equal protection standard of one-person, one-vote), territorial boundaries (contiguity), and numbering issues (consecutiveness).[4]
In 2002, this Court discussed the scope of the Legislature’s duty in relation to the constitutional standards, explaining that “the requirements'under the Florida Constitution [were] not more stringent than the requirements under the United States Constitution.” In re Apportionment Law-2002, 817 So.2d at 824 (citing In re Apportionment Law-1972, 263 So.2d at 807-08). Limited by a construction of Florida’s constitution that was not more extensive than the United States Constitution, the Court declined to require the Legislature to adopt an apportionment plan using the following four objective standards proposed by Common Cause Florida and the Florida League of Women Voters:
[A]ll districts should (1) have equal population as closely as possible; (2) be drawn to be compact and contiguous and respect local political boundaries; (3) not dilute the voting strength of any racial, ethnic, or minority group; and (4) be drawn neutrally without regard to the incumbent or political party.
Id. at 832. Other challengers, including the Attorney General, “questioned the Legislature’s decision not to articulate objective standards that guided its redistricting process.” Id. at 831. The Court rejected all of these arguments, making the following observation:
The only standards that the Legislature is constitutionally required to follow in redistricting are the equal protection standard of “one-person, one-vote,” the Florida Constitutional requirement that legislative districts be “either contiguous, overlapping, or identical territory,” and the requirement not to discriminate against any racial or language minority or political group. See [Davis v.] Bandemer, 478 U.S. [109,] 118-27, 106 S.Ct. 2797 [92 L.Ed.2d 85 (1986) ]; In re Senate Joint Resolution 2G, 597 So.2d at 278-80. While the other “standards” advocated by the opponents have been traditional considerations in the redistricting process, they are not constitutionally required. See Shaw v. Reno, 509 U.S. [630,] 647, 113 S.Ct. 2816 [125 L.Ed.2d 511 (1993) ]; Gaffney v. Cum *603 mings, 412 U.S. [735] 752 n. 18, 93 S.Ct. 2321 [37 L.Ed.2d 298 (1973) ]. Hence, we decline the Attorney General’s and other parties’ requests to return the plan to the Legislature to create standards. As explained above, for those standards that can be fully addressed in this opinion, we conclude that the Legislature has complied with the requirements set forth by the federal and state constitutions.
Id. at 832.
Under the state constitutional framework, while the Florida Constitution grants the Legislature the authority to apportion the legislative districts every ten years, the authority is circumscribed by the right of the people to instruct their representatives on the manner in which apportionment should be conducted. As this Court stated in 1972:
When the people of Florida adopted the Constitution of 1968 they reserved to themselves the right to instruct their representatives and, at the same time, authorized the election of these representatives in senatorial and representative districts which may be “either contiguous, overlapping or identical territory.”
In re Apportionment Law-1972, 263 So.2d at 807.
In 2010, with the passage of the Fair Districts Amendment, the people of Florida increased the instructions to their representatives to provide additional constitutional imperatives for their elected representatives to follow when drawing the senatorial and representative districts. Our conclusion in 2002 that the above criteria were not constitutionally required has been expressly overridden by a constitutional amendment approved by the voters of Florida on November 2, 2010.
The ballot summary for the Fair Districts Amendment on which Florida citizens voted stated:
Legislative districts or districting plans may not be drawn to favor or disfavor an incumbent or political party. Districts shall not be drawn to deny racial or language minorities the equal opportunity to participate in the political process and elect representatives of their choice. Districts must be contiguous. Unless otherwise required, districts must be compact, as equal in population as feasible, and where feasible must make use of existing city, county and geographical boundaries.
Standards for Establishing Legislative Dist. Boundaries, 2 So.3d at 179. Proposed by initiative petitions that the organization FairDistrictsFlorida.org sponsored, this constitutional amendment is now codified in article III, section 21, of the Florida Constitution and imposes additional substantive standards with which the Legislature must comply in carrying out its constitutional duties in establishing legislative district boundaries. See art. Ill, § 21, Fla. Const.
As approved by Florida voters, article III, section 21, provides in full:
In establishing legislative district boundaries:
(a) No apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.
(b) Unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or -with *604 federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.
(c) The order in which the standards within subsections (a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.
Art. Ill, § 21, Fla. Const, (footnotes omitted).
In contrast to the standards that guided the Legislature during prior apportionment cycles, the standards governing the instant apportionment process are now more stringent than the requirements under the United States Constitution and prior versions of the Florida Constitution. It is our task to interpret these new constitutional standards, together with the previous constitutional standards, against the apportionment plans contained within the Joint Resolution. Through our interpretation of these provisions, we necessarily determine the validity of both the House and Senate legislative apportionment plans.
In making these determinations, we first set forth the applicable standard of review. We next discuss each of the separate constitutional requirements imposed by the Florida and United States Constitutions and how the requirements are to be analyzed both individually and collectively. Then, in light of challenges raised by the opponents of the plans, we examine whether the Legislature’s apportionment plans are facially consistent with these requirements.
III. ANALYSIS

A. Standard and Scope of Review

The overarching question to be considered by the Court in this declaratory judgment proceeding is the constitutional validity of the plans contained within the Legislature’s joint resolution of apportionment. See In re Apportionment Law-2002, 817 So.2d at 824; In re Apportionment Law-1982, 414 So.2d at 1052. The validity of the joint resolution is determined by examining whether the Legislature has operated within the constitutional limitations placed upon it when apportioning the state’s legislative districts. The newly added constitutional standards are directly related to ensuring that the process by which citizens choose their elected officials is fair.
Like Florida, other states have recognized that legislative redistricting is fundamental to ensuring that citizens choose their elected officials in an equitable manner. The Supreme Court of Pennsylvania stressed this very principle when it recently invalidated the Pennsylvania 2012 apportionment plan, stating that “[ljegislative redistricting ‘involves the basic rights of the citizens ... in the election of their state lawmakers.’ ” Holt v. 2011 Legislative Reapportionment Comm’n, 7 MM 2012, — Pa. -, 38 A.3d 711, 716 (Pa. Jan. 25, 2012) (quoting Butcher v. Bloom, 415 Pa. 438, 203 A.2d 556, 559 (1964)). The Supreme Court of Colorado has similarly emphasized that “[t]he basic purpose of the constitutional standards for reapportionment is to assure equal protection for the right to participate in the ... political process and the right to vote.” In re Reapportionment of Colo. Gen. Assembly, 45 P.3d 1237, 1241 (Colo.2002).
The recognition of the critical importance of redistricting in ensuring the basic rights of citizens to vote for the representatives of their choice is highlighted by a series of voting cases from the United States Supreme Court, most notably in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964):
*605 [T]he right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized ....
[[Image here]]
... To the extent that a citizen’s right to vote is debased, he is that much less a citizen.
Id. at 561-62, 567, 84 S.Ct. 1362.
In explaining the goal of legislative apportionment in terms of the rights of voters, the United States Supreme Court in Reynolds emphasized:
Since the achieving of fair and effective representation for all citizens is con-cededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race....
Id. at 565-66, 84 S.Ct. 1362.
In describing the significance of its prior jurisprudence in Reynolds, the United States Supreme Court emphasized the importance of the right of voters to fair representation:
Furthermore, in formulating the one person, one vote formula, the Court characterized the question posed by election districts of disparate size as an issue of fair representation. In such cases, it is not that anyone is deprived of a vote or that any person’s vote is not counted. Rather, it is that one electoral district elects a single representative and another district of the same size elects two or more — the elector’s vote in the former district having less weight in the sense that he may vote for and his district be represented by only one legislator, while his neighbor in the adjoining district votes for and is represented by two or more.
Bandemer, 478 U.S. at 123, 106 S.Ct. 2797. In Bandemer, the United States Supreme Court recognized that fairness in voting under the federal constitution extended to dilution of the right to vote based on districts that were drawn in a manner that favored a political party.
With fairness in drawing the legislative districts as the focus, article III, section 21, imposes additional standards upon the Florida Legislature to follow in apportionment proceedings. Article III, section 21, also provides Florida citizens with additional constitutional protections to ensure that their right to fair and effective representation is not impaired by the manner in which the legislative districts are drawn. These constitutional constraints imposed on the Legislature in drawing legislative districts are designed to “maximize electoral possibilities by leveling the playing field” for the increased protection of the rights of Florida’s citizens to vote and elect candidates of their choice. Brown v. Sec’y of State, 668 F.3d 1271, 1285 (11th Cir.2012).
Throughout these proceedings, the Attorney General, the Senate, and the House have asserted that the Legislature should have full discretion in balancing the constitutional criteria that apply to apportioning legislative districts. However, when addressing similar arguments that state legislatures should have full discretion in considering such matters, the United States Supreme Court in Reynolds eloquently stated: “We are cautioned about the dan *606 gers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us.” 377 U.S. at 566, 84 S.Ct. 1362.
Although the advent of new constitutional requirements undoubtedly increases the Legislature’s apportionment obligations, the House and Senate plans still come to this Court with an initial presumption of validity. In re Apportionment Law-2002, 817 So.2d at 824-25. This presumption serves to recognize the deference initially owed to legislative acts upon passage. Thus, what was true in 1972 regarding the respective roles of the Court and the Legislature in the apportionment process still holds true today:
[W]e emphasize that legislative reapportionment is primarily a matter for legislative consideration and determination. Judicial relief becomes appropriate only when a legislature fails to reapportion according to federal and state constitutional requisites. If these requisites are met, we must refrain, at this time, from injecting our personal views into the proposed reapportionment plan. Even though we may disagree with the legislative policy in certain areas, the fundamental doctrine of separation of powers and the constitutional provisions relating to reapportionment require that we act with judicial restraint so as not to usurp the primary responsibility for reapportionment, which rests with the Legislature.
In re Apportionment Law-1972, 263 So.2d at 799-800; see also In re Apportionment Law-2002, 817 So.2d at 824 (same).
Even though we continue to recognize the presumption of validity that governs ordinary legislative acts, the operation of this Court’s process in apportionment cases is far different than the Court’s review of ordinary legislative acts, and it includes a commensurate difference in our obligations. Challenges to the constitutionality of ordinary legislative acts passed by the Legislature must be brought in a trial court and then reviewed by a district court of appeal. This Court has mandatory jurisdiction in those circumstances only if the legislative act is found to be unconstitutional. See art. V, § 3(b)(1), Fla. Const.
In contrast, the Court’s mandatory review to determine the validity of apportionment plans every ten years derives from a different provision of the constitution: article III, section 16(c). The constitution specifies that the Attorney General “shall” file a petition for a declaratory judgment and that this Court “shall permit adversary interests to present their views.” Art. Ill, § 16(c), Fla. Const. In this type of original proceeding, the Court evaluates the positions of the adversary interests, and with deference to the role of the Legislature in apportionment, the Court has a separate obligation to independently examine the joint resolution to determine its compliance with the requirements of the Florida Constitution. Because it is the obligation of this Court to enter a judgment declaring the joint resolution valid or invalid, the Court has routinely accepted that judicial relief would be warranted where the Legislature has “failfed] to reapportion according to federal and state constitutional requisites.” In re Apportionment Law-2002, 817 So.2d at 824 (quoting In re Apportionment Law-1972, 263 So.2d at 800).
This Court in In re Apportionment Law-1972, 263 So.2d at 806, while cognizant that “[t]he propriety and wisdom of legislation are exclusively matters for legislative determination,” also recognized that the Legislature’s authority was not unbridled. The Court observed that, al *607 though “in accordance with the doctrine of separation of powers, [it would] not seek to substitute its judgment for that of another coordinate branch of the government,” pursuant to that same constitutional doctrine, the Court was also responsible for measuring legislative acts “with the yardstick of the Constitution.” Id.
Unlike 2002, when “the requirements under the Florida Constitution [were] not more stringent than the requirements under the United States Constitution,” In re Apportionment Law-2002, 817 So.2d at 824, now, the Florida Constitution imposes a higher standard on the Legislature when formulating the state’s apportionment plans. The citizens of Florida mandated additional constitutional imperatives for their elected representatives to follow when redrawing senatorial and representative districts.
The new requirements dramatically alter the landscape with respect to redistricting by prohibiting practices that have been acceptable in the past, such as crafting a plan or district with the intent to favor a political party or an incumbent. By virtue of these additional constitutional requirements, the parameters of the Legislature’s responsibilities under the Florida Constitution, and therefore this Court’s scope of review, have plainly increased, requiring a eommensurately more expanded judicial analysis of legislative compliance.
It is this Court’s duty, given to it by the citizens of Florida, to enforce adherence to the constitutional requirements and to declare a redistricting plan that does not comply with those standards constitutionally invalid. We reject the assertions of the Attorney General and the House that a challenger must prove facial invalidity beyond a reasonable doubt. While there have been decisions of this Court reciting that principle with regard to legislative enactments, such as Crist v. Florida Association of Criminal Defense Lawyers, Inc., 978 So.2d 134, 139 (Fla.2008), cited by the House, that principle of statutory construction was stated only once in an apportionment decision and was made in the context of an attack on multi-member districts. See In re Apportionment Law-1972, 263 So.2d at 805-06. Since 1972, we have never used that principle of statutory construction when enunciating the standard for our review of legislative apportionment, including our last comprehensive statement in 2002. Therefore, to use the standard of beyond a reasonable doubt would be a departure from our precedent in legislative apportionment jurisprudence.[5]
We conclude that the beyond a reasonable doubt standard is ill-suited for an original proceeding before this Court in which we are constitutionally obligated to enter a declaratory judgment on the validity of the legislative plans. Unlike a legis *608 lative act promulgated separate and apart from an express constitutional mandate, the Legislature adopts a joint resolution of legislative apportionment solely pursuant to the “instructions” of the citizens as expressed in specific requirements of the Florida Constitution governing this process.
Because “legislative reapportionment is primarily a matter for legislative consideration and determination,” In re Apportionment Law-1972, 263 So.2d at 799-800, this Court will defer to the Legislature’s decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements. With an understanding that the Court’s responsibility is limited to ensuring compliance with constitutional requirements, and endeavoring to be respectful to the critically important role of the Legislature, the Court has previously acknowledged that its duty “is not to select the best plan, but rather to decide whether the one adopted by the legislature is valid.” In re Apportionment Law-1992, 597 So.2d at 285.
This principle is in keeping with the United States Supreme Court’s decision in Perry v. Perez, — U.S. -, 182 S.Ct. 934, 941, 181 L.Ed.2d 934 (2012), which stated that “redistricting ordinarily involves criteria and standards that have been weighed and evaluated by the elected branches in the exercise of their political judgment.” In Perez, when it became clear that a state’s redistrieting plan would not obtain preclearance under Section 5 of the Voting Rights Act, a federal district court drew an interim redistricting plan without giving deference to the state’s policy choices. In reversing the federal court’s drawing of the plan, the Supreme Court explained that a federal district court may not wholly disregard policy choices made by a state’s legislature, where those policy choices are not inconsistent with the United States Constitution or the Voting Rights Act. Id. at 943. The Supreme Court held that a “state plan serves as a starting point” for a federal district court because “[i]t provides important guidance that helps ensure that the district court appropriately confines itself to drawing interim maps ... without displacing legitimate state policy judgments with the court’s own preferences.” Id. at 941.
Perez is in conformity with the federal judiciary’s strong preference to yield to states in making initial redistricting decisions as long as there is no violation of either the United States Constitution or the Voting Rights Act. As was emphasized in Scott v. Germano over 45 years ago, the “power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by [the United States Supreme] Court but appropriate action by the States in such cases has been specifically encouraged.” Germano, 381 U.S. at 409, 85 S.Ct. 1525,
Any attempt to use Perez in support of an argument that the state judiciary is constrained in performing its constitutionally mandated review takes the holding of Perez out of context. In contrast to Perez, this Court’s initial review of the Legislature’s joint resolution of apportionment does not require any balancing of concerns for federal versus state sovereignty. Nor is this Court engaged at this point in redrawing the plans. Rather, this Court is required by the state constitution to evaluate whether the Legislature’s apportionment plans conflict with Florida’s express constitutional standards. See art. Ill, § 16(c), Fla. Const. The Supreme Court’s concerns in Perez regarding judicial overreach by the federal court in redrawing the state’s apportionment plan do not apply to this original state proceeding, dur *609 ing which this Court is mandated to assess the Legislature’s compliance with constitutional standards. At this juncture, the Court plays no role in drawing the Legislature’s apportionment plans, and the deference owed by the federal courts to the state in the drawing of the plan is not implicated.
In our initial review of the Legislature’s plan, we recognize the limitations of this Court’s responsibilities. At the same time, we acknowledge and accept our paramount responsibility in apportionment, as set forth by the Florida Constitution, to ensure that the adopted plans comply with the constitutionally required mandates. “In other words, it is this Court’s duty to enforce adherence to the constitutional requirements and to declare a redistricting plan that does not comply with those standards unconstitutional.” In re Legislative Districting of State, 370 Md. 312, 805 A.2d 292, 316 (2002).
Where the legislative decision runs afoul of constitutional mandates, this Court has a constitutional obligation to invalidate the apportionment plan. To accept the Legislature’s assurances that it followed the law without any type of inquiry or any type of meaningful review by this Court would render the Court’s review of the new constitutional standards, and whether the Legislature complied with the new standards, essentially meaningless. To accept the Legislature’s and Attorney General’s position that this Court should not undertake a meaningful review of compliance with the new constitutional standards in this proceeding, but instead await challenges brought in trial courts over a period of time, would be an abdication of this Court’s responsibility under the Florida Constitution. This approach would also create uncertainty for the voters of this state, the elected representatives, and the candidates who are required to qualify for their seats.[6]
The question then becomes how this Court will accomplish its review in a meaningful way given the nature of this constitutionally required proceeding. Undoubtedly, this Court is limited by time to be able to relinquish for extensive fact-finding as we have undertaken in other original proceedings,[7] or to appoint a commissioner to receive testimony and refer the case back to the appellate court together with findings that are advisory in nature only.[8] A review of prior reapportionment decisions from 1972, 1982, and 1992 reveals that in the past, the Court has retained exclusive state jurisdiction to allow challenges to be later brought, and then, on one occasion, the Court appointed a commissioner to conduct fact-finding on a specific challenge pursuant to our apportionment original jurisdiction.[9]
In light of two distinct developments, our past approach is not determinative of our review in this post-2010 case. The first development, as mentioned above, is that in 2010, the voters imposed upon the Legislature explicit, additional state constitutional standards. In contrast to 2002, *610 where the challenges exceeded our limited scope of review because they were based on violations of federal law, the challenges in 2012 are based specifically on allegations that the plans facially violate the requirements of the new provisions of our state constitution.
The second development is that technology has continued to advance in the last decade, allowing this Court to objectively evaluate many of Florida’s constitutionally mandated criteria without the necessity of traditional fact-finding, such as making credibility determinations of witnesses. In furtherance of the goal to conduct an objective evaluation of the plans, the Court required all plans, including alternative plans, to be submitted electronically in .doj format, allowing for every party and the Court to evaluate the plans using the same statistical analysis and data reports. To ensure that the Court would have the means to objectively evaluate the plans, the Court specified in its order the manner in which the House and Senate plans should be submitted to the Court in .doj format:
For each plan file submitted for the newly created apportionment plans, the Attorney General is directed to specify the software used to create the plan, the data and criteria used in drafting the plan, the source of the data used in drafting the plan, and any other relevant information. The Attorney General is also directed to file along with the plan statistical reports for both the new plans and the last legally enforceable plans in searchable Portable Document Format (PDF), which include at a minimum the following from the 2010 Census: the population numbers in each district, the total voting age population (VAP) in each district, and the VAP of each racial and ethnic group in each district. Reports with additional information and statistics (e.g., compactness measurements), and reports for prior apportionment plans, may also be submitted in searchable PDF format.
The Attorney General is also directed to provide the Court with maps of the House and Senate apportionment plans depicting the new districts, which shall include maps depicting the entire state as well as regional maps. In addition to the maps depicting the districts, the Attorney General may also file maps depicting the apportionment plans with data overlays. For each such map, the Attorney General is directed to specify the data depicted in the data overlay and the source of that data. The Attorney General may also file maps other than maps depicting the new apportionment plans, including maps of prior apportionment plans with or without any data overlays.
In re Joint Resolution of Legislative Apportionment, No. SC12-1 (Fla. Sup.Ct. order filed Jan. 25, 2012). As for parties, the Court permitted the filing of alternative plans and ordered the parties to comply with the following requirements:
Parties submitting alternative plans must submit the alternative plans electronically in .doj format....
For each plan file submitted, the submitting party must specify the software used to create the plan, the data and criteria used in drafting each plan, the source of the data used in drafting the plan, and any other relevant information. The submitting party shall also specify whether the alternative plan is a partial or complete plan, and the population deviation for each district in the plan; if a partial plan is submitted, the submitting party must specify what county or counties are included in the partial plan. Parties may also submit *611 statistical reports related to each submitted plan in searchable PDF format.
For each submitted alternative plan, the submitting party must file map(s) depicting the alternative plan districts ■with this Court. At least one map shall be filed that reflects the entire alternative plan. The submitting party may file additional maps showing regions or areas of interest. In addition to maps depicting the districts of the alternative plan, the submitting party may also file maps depicting the apportionment plans with data overlays, including maps of the prior plans. Each such map shall specify the data depicted in the data overlay and the source of that data. For each map filed with the Court, the submitting party shall file the map in electronic PDF format and provide the Court with fifteen (15) color paper copies.
Id. The only opponent in this case to submit an alternative plan was the Coalition, which submitted two alternative plans to this Court: an alternative Senate plan and an alternative House plan.[10]
The Court permitted alternative plans because alternative plans may be offered as relevant proof that the Legislature’s • apportionment plans consist of district configurations that are not explained other than by the Legislature considering impermissible factors, such as intentionally favoring a political party or an incumbent.[11] The Legislature is not obligated to accept alternative plans; this Court, however, may review them to evaluate whether the Legislature’s adopted plans are contrary to law. See, e.g., Holt, 38 A.3d at 755, 2012 WL 360584, at *36 (explaining that alternative plans may be used as proof that the final plan “contained subdivision splits that were not absolutely necessary”).
In furtherance of our goal to ensure that the Court had complete information, at the Court’s direction, the Attorney General filed an appendix to the petition for declaratory judgment and filed the apportionment plans electronically in .doj format, which would allow this Court and the challengers to perform an objective statistical analysis of the plans submitted by using standard redistricting software. The House and Senate each developed and utilized its own web-based redistricting software, MyDistrictBuilder and District Builder, respectively. This Court had access to both MyDistrictBuilder and District Builder as well as the data in the House program, which included census data, American Community Survey data, and voter registration and elections data. We have also received the incumbent ad *612 dresses upon which the challengers based their claims that districts were drawn to favor incumbents.[12]
The type of information available for this original review is objective data.[13] In performing its objective analysis of the data, the Court did not rely on the figures or statistical analysis contained in the appendices filed by the FDP or the Coalition. Instead, the Court utilized the MyDistrictBuilder and District Builder software applications to evaluate the Legislature’s apportionment plans and the Coalition’s alternative plans. The Court utilized both software applications to evaluate voting-age population[14] and to conduct a visual inspection of the districts. All of the maps depicting districts contained in this opinion were obtained using District Builder, except for a map depicting the City of Lakeland. This Court utilized MyDistrictBuilder when analyzing undisputed voter registration and election data because MyDistrictBuilder contained that data, but District Builder did not.[15] Specifically, this Court utilized the registration and election data to conduct an analysis of minority voting behavior in evaluating challenges to individual districts. Further, this Court utilized this data to examine the overall political composition of the House and Senate plans, as well as the political composition of each challenged district.
The Court additionally acquired Mapti-tude for Redistricting and inputted into Maptitude the voter registration, political, and elections data utilized by MyDistrict-Builder. The Court also inputted the incumbent addresses into Maptitude. The Court utilized Maptitude to conduct addi *613 tional evaluation of the plans, such as the location of incumbents’ addresses and calculations of the percentage of prior population retained by a district. This Court also examined graphical data overlays of voting-age population using Maptitude in evaluating certain challenged districts. Finally, the Court used ESRI Redistricting, also acquired by the Court, to generate compactness scores using compactness measurements of Reock and Area/Convex Hull, compactness measures that were used by the House in its plan data reports.
The controversy between the parties, set forth primarily by the House and Senate, is that no conclusion as to intent to favor a political party or incumbent can be made. The challengers contend that this Court is able to perform its review based on an assessment of statistical analysis, a visual examination of the plans, and an evaluation of legislative history. The challengers contend that this evidence will enable the Court to discern intent to favor or disfavor a political party or an incumbent because intent can be inferred from effect. We will discuss these arguments in more detail when we analyze the specific standards and apply them to the House and Senate plans.
Finally, we have the guidance of the many state courts that have similar provisions providing their respective state supreme courts with original jurisdiction.[16] Those courts have, over the years, both validated and invalidated plans based on many of the same criteria now contained in Florida’s constitution.[17] As in those states, the Florida Constitution “expressly entrusts to this Court the responsibility, upon proper petition, to review the constitutionality of districting plans prepared and enacted by the political branches of *614 government and the duty to provide appropriate relief when the plans are determined to violate the United States and [Florida] Constitutions.” In re Legislative Districting of State, 370 Md. 312, 805 A.2d 292, 316 (2002).
With our important responsibility to ensure that the joint resolution of apportionment comports with both the United States and Florida Constitutions, and with full awareness of the inherent limitations in the process set out in the state constitution, we undertake our constitutionally mandated review of the facial validity of the Senate and House plans contained within Senate Joint Resolution 1176.

B. The Standards Governing Our Analysis

Although this is the fifth time the Court has had the responsibility to undertake its constitutionally mandated review of legislative apportionment, it is the first time that the Court has been charged with defining and applying the criteria of article III, section 21. This Court’s interpretation of the language contained in sections 16(a) and 21 of article III begins with the basic principles spelled out by this Court in its 1972 apportionment decision:
Every word of the Florida Constitution should be given its intended meaning and effect. In construing constitutions, that construction is favored which gives effect to every clause and every part of it. A construction which would leave without effect any part of the language used should be rejected if an interpretation can be found which gives it effect.
In re Apportionment Law-1972, 263 So.2d at 807.
In accord with those tenets of constitutional construction, this Court “endeavors to construe a constitutional provision consistent with the intent of the framers and the voters.” Zingale, 885 So.2d at 282 (quoting Caribbean Conservation Corp., 838 So.2d at 501). In ascertaining the intent of the voters, the Court may examine “the purpose of the provision, the evil sought to be remedied, and the circumstances leading to its inclusion in our constitutional document,” In re Apportionment Law-1982, 414 So.2d at 1048, with the view that a constitutional amendment must be assessed “in light of the historical development of the decisional law extant at the time of its adoption.” Jenkins v. State, 385 So.2d 1356, 1357 (Fla.1980).
Guided by both this Court’s precedent and a proper construction of the pertinent provisions contained within article III, we must determine whether the Legislature’s joint resolution is facially consistent with the specific constitutionally mandated criteria under the federal and state constitutions. The Federal Equal Protection Clause requires that districts conform to the one-person, one-vote standard. Article III, section 16(a), requires the Legislature to apportion both the Senate and the House in “consecutively numbered ... districts of either contiguous, overlapping or identical territory.”[18]
The new standards enumerated in article III, section 21, are set forth in two tiers, each of which contains three requirements. The first tier, contained in section 21(a), lists the following requirements: (1) no apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent; (2) districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process *615 or to diminish their ability to elect representatives of their choice; and (3) districts shall consist of contiguous territory. See art. Ill, § 21(a), Fla. Const. The second tier, located in section 21(b), enumerates three additional requirements in drawing district lines, the compliance with which is subordinate to those listed in the first tier of section 21 and to federal law in the event of conflict: (1) districts shall be as nearly equal in population as is practicable; (2) districts shall be compact; and (3) where feasible, districts shall utilize existing political and geographical boundaries. See art. Ill, § 21(b), Fla. Const. The order in which the constitution lists the standards in tiers one and two is “not [to] be read to establish any priority of one standard over the other within that [tier].” Art. Ill, § 21(c), Fla. Const.
We interpret the specific constitutional directive that tier two is subordinate to tier one in the event of conflict to mean that the Legislature’s obligation is to draw legislative districts that comport with all of the requirements enumerated in Florida’s constitution. However, should a conflict in application arise, the Legislature is obligated to adhere to the requirements of section 21(a) (tier one) and then comply with the considerations in section 21(b) (tier two) to the extent “practicable” or “feasible,” depending on the wording of the specific constitutional standard. With this basic framework in mind, we interpret the standards, beginning with the newly enacted tier-one standards and then moving to the newly enacted tier-two standards. After we explain and interpret the standards, we set forth how the standards interact for purposes of evaluating the apportionment plans.

1. Tier-One Standards

a. Intent to Favor or Disfavor a Political Party or an Incumbent
The first of the new and significantly different requirements in our state constitution is the provision in article III, section 21(a), providing that “[n]o apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent.” Although this requirement is entirely new to this state, at least five other states share a similar constitutional or statutory requirement.[19] Florida’s constitutional provision, like the constitutional provision requiring protection of racial and language minorities against discrimination, is a tier-one requirement under the state constitution, meaning that the voters placed this constitutional imperative as a top priority to which the Legislature must conform during the redistricting process.
This new requirement in Florida prohibits what has previously been an acceptable practice, such as favoring incumbents and the political party in power. See, e.g., In re Apportionment Law-1992, 597 So.2d at 285. The desire of a political party to provide its representatives with an advantage in reapportionment is not a Republican or Democratic tenet, but applies equally to both parties.[20] Thus, in 1992, when *616 the Democrats were in control of the Legislature and, by default, the redistricting process, we rejected a claim of impermissible political gerrymandering, stating in full:
Finally, several of the opponents observe that the Joint Resolution is nothing more than a gerrymandering effort by the Democratic majority of the legislature to protect Democratic incumbents. We have little doubt that politics played a large part in the adoption of this plan. However, the protection of incumbents, standing alone, is not illegal, and none of the opponents seriously contend that the Joint Resolution is invalid because of political gerrymandering.

Id.

A decade later, when faced with a claim that the Republican majority of the Legislature had improperly limited input from Democratic members, the United States District Court for the Southern District of Florida similarly observed that the “raw exercise of majority legislative power does not seem to be the best way of conducting a critical task like redistricting, but it does seem to be an unfortunate fact of political life around the country.” Martinez v. Bush, 234 F.Supp.2d 1275, 1297 (S.D.Fla.2002).
“The term ‘political gerrymander’ has been defined as ‘[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition’s voting strength.’” Vieth v. Jubelirer, 541 U.S. 267, 271 n. 1, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion) (quoting Black’s Law Dictionary 696 (7th ed. 1999)). While some states have sought to minimize the political nature of the apportionment process by establishing independent redistricting commissions to redraw legislative districts,[21] Florida voters have instead chosen to place restrictions on the Legislature by constitutional mandate in a manner similar to the constitutions of other states.
The Florida Constitution now expressly prohibits what the United States Supreme Court has in the past termed a proper, and inevitable, consideration in the apportionment process. See, e.g., Vieth, 541 U.S. at 286, 124 S.Ct. 1769 (plurality opinion) (“[Pjartisan districting is a lawful and common practice.... ”); Miller v. Johnson, 515 U.S. 900, 914, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (“[Rjedistricting in most cases will implicate a political calculus in which various interests compete for recognition....”).
Florida’s express constitutional standard, however, differs from equal protection political gerrymandering claims under either the United States or Florida Constitutions. Political gerrymandering claims under the Equal Protection Clause of the United States Constitution focus on determining when partisan districting as a permissible exercise “has gone too far,” Vieth, 541 U.S. at 296, 124 S.Ct. 1769 (plurality opinion), so as to “degrade a voter’s or a group of voters’ influence on the political process as a whole.” Bandemer, 478 U.S. at 132, 106 S.Ct. 2797 (plurality opinion); see also Fla. Senate v. Forman, 826 So.2d 279 (Fla.2002) (relying on the Bandemer test for political gerrymandering claims *617 under Florida’s equal protection clause and overturning trial court finding of political gerrymandering).
In contrast to the federal equal protection standard applied to political gerrymandering, the Florida Constitution prohibits drawing a plan or district with the intent to favor or disfavor a political party or incumbent; there is no acceptable level of improper intent. It does not reference the word “invidious” as the term has been used by the United States Supreme Court in equal protection discrimination cases, see, e.g., Brown v. Thomson, 462 U.S. 835, 842, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), and Florida’s provision should not be read to require a showing of malevolent or evil purpose. Moreover, by its express terms, Florida’s constitutional provision prohibits intent, not effect, and applies to both the apportionment plan as a whole and to each district individually.
We recognize that any redrawing of lines, regardless of intent, will inevitably have an effect on the political composition of a district and likely whether a political party or incumbent is advantaged or disadvantaged. In fact, a plurality of the Supreme Court has quoted “one of the foremost scholars of reapportionment” as observing that “every line drawn aligns partisans and interest blocs in a particular way different from the alignment that would result from putting the line in some other place.” Bandemer, 478 U.S. at 129 n. 10, 106 S.Ct. 2797 (quoting Robert G. Dixon, Jr., Fair Criteria and Procedures for Establishing Legislative Districts 7-8, in Representation and Redistricting Issues (Bernard Grofman, et al. eds. 1982)). In short, redistricting will inherently have political consequences, regardless of the intent used in drawing the lines. Thus, the focus of the analysis must be on both direct and circumstantial evidence of intent. See, e.g., Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).
The Senate argues that “it is a Sisyphean task to discern whether the Legislature had ... an [improper] intent.”[22] To the extent that the Senate argues that our task is futile, endless, or impossible, we reject this argument. Rather, the Senate’s approach to permit each trial court to define the standards in a discrete proceeding, to make findings of fact based on the trial court’s interpretation of the standards, and to eventually have the cases work their way up to this Court would itself be an endless task.
This Court has before it objective evidence that can be reviewed in order to perform a facial review of whether the apportionment plans as drawn had the impermissible intent of favoring an incumbent or a political party. While we agree that the standard does not prohibit political effect, the effects of the plan, the shape of district lines, and the demographics of an area are all factors that serve as objective indicators of intent. See, e.g., Diaz v. Silver, 978 F.Supp. 96, 104 (E.D.N.Y.1997) (concluding that because of the lack of compactness and the fact that incumbents were protected in 87% of the new districts, “[d]espite its conspicuous absence from any direct discussion, incumbency appears to have been the unacknowledged third-most-significant factor used when redistricting”), aff'd, 522 U.S. 801, 118 S.Ct. 36, *618 139 L.Ed.2d 5 (1997), and aff'd sub nom. Acosta v. Diaz, 522 U.S. 801, 118 S.Ct. 86, 139 L.Ed.2d 5 (1997), and aff'd sub nom. Lau v. Diaz, 522 U.S. 801, 118 S.Ct. 36, 139 L.Ed.2d 5 (1997). One piece of evidence in isolation may not indicate intent, but a review of all of the evidence together may lead this Court to the conclusion that the plan was drawn for a prohibited purpose.
With respect to intent to favor or disfavor an incumbent, the inquiry focuses on whether the plan or district was drawn with this purpose in mind. As explained by the Eleventh Circuit Court of Appeals in upholding this specific constitutional provision as applied to Florida’s congressional redistricting, “the incumbency provision is neutral on its face, explicitly requiring that lines not be designed to help or handicap particular candidates based on incumbency or membership in a particular party. Far from ‘dictating] electoral outcomes,’ the provision seeks to maximize electoral possibilities by leveling the playing field.” Brown, 668 F.3d at 1285.
At the outset, objective indicators of intent to favor or disfavor a political party can be discerned from the Legislature’s level of compliance with our own constitution’s tier-two requirements, which set forth traditional redistricting principles. A disregard for these principles can serve as indicia of improper intent. See, e.g., Sims, 377 U.S. at 578, 84 S.Ct. 1362 (noting that a “desire to maintain integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory” undermines opportunities for political favoritism); Pearson v. Roster, 359 S.W.3d 35, 38 (Mo.2012) (stating that the purpose of the constitutional requirements that districts be contiguous, compact, and nearly equal in population is “to guard, as far as practicable, under the system of representation adopted, against a legislative evil, commonly known as ‘gerrymander’ ” (quoting State ex rel. Barrett v. Hitchcock, 241 Mo. 433, 146 S.W. 40, 61 (1912))).
The tier-two requirements of article III, section 21(b), are meant to restrict the Legislature’s discretion in drawing irregularly shaped districts; strict compliance with their express terms may serve to undercut or defeat any assertion of improper intent. Cf. Miller, 515 U.S. at 916, 115 S.Ct. 2475 (stating that in racial gerrymandering context where race-neutral considerations are the basis for redistricting, and are not subordinated to race, a State can “defeat a claim that a district has been gerrymandered on racial lines”); Vieth, 541 U.S. at 335, 124 S.Ct. 1769 (Stevens, J., dissenting) (stating in proposing a standard for political gerrymandering claims that “[j]ust as irrational shape can serve as an objective indicator of an impermissible legislative purpose, other objective features of a districting map can save the plan from invalidation”). However, where the shape of a district in relation to the demographics is so highly irregular and without justification that it cannot be rationally understood as anything other than an effort to favor or disfavor a political party, improper intent may be inferred.
In making this assessment, we evaluate the shapes of districts together with undisputed objective data, such as the relevant voter registration and elections data, incumbents’ addresses, and demographics, as well as any proffered undisputed direct evidence of intent. We note that the Court has access to the same voter registration and election data used by the House in its redistricting software.
Similar to the partisan inquiry, the inquiry for intent to favor or disfavor an incumbent focuses on the shape of the district in relation to the incumbent’s legal residence, as well as other objective evi *619 dence of intent. Objective indicators of intent may include such factors as the maneuvering of district lines in order to avoid pitting incumbents against one another in new districts or the drawing of a new district so as to retain a large percentage of the incumbent’s former district. When analyzing whether the challengers have established an unconstitutional intent to favor an incumbent, we must ensure that this Court does not disregard obvious conclusions from the undisputed facts.
The Court emphasizes that mere access to political data cannot presumptively demonstrate prohibited intent because such data is a necessary component of evaluating whether a minority group has the ability to elect representatives of choice — a required inquiry when determining whether the plan diminishes a protected group’s ability to elect a candidate of choice. See Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7470, 7471 (Feb. 9, 2011) (DOJ Guidance Notice) (United States Department of Justice guidance notice requiring a functional analysis of voting behavior to determine whether retrogression has occurred). Likewise, the fact that the Senate or House, or their staff, may or may not have had the incumbents’ addresses is not determinative of intent or lack of intent. And, as discussed in the challenges section below, the fact that there were more registered Democrats than registered Republicans in this state, but that there are more Republican-performing districts than Democratic-performing districts in both the newly drawn Senate and House plans, does not permit a conclusion of unlawful intent in this case. Rather, when the Court analyzes the tier-two standards and determines that specific districts violate those standards without any other permissible justification, impermissible intent may be inferred.
b. Minority Voting Protection
The next newly added provision in article III, section 21(a), provides that “districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice.” (Emphasis added.) The emphasized “or” separates two clauses in the preceding sentence, and each clause shares the same negative verb, “shall not be drawn.” As a plurality of this Court explained in Standards for Establishing Legislative District Boundaries, 2 So.3d at 189 (plurality opinion), “[t]his verb modifies both clauses, thereby indicating that both clauses impose a restrictive imperative, each of which must be satisfied.” Accordingly, this portion of section 21(a) imposes two requirements that plainly serve to protect racial and language minority voters in Florida: prevention of impermissible vote dilution and prevention of impermissible diminishment of a minority group’s ability to elect a candidate of its choice.
The dual constitutional imperatives “follow[] almost verbatim the requirements embodied in the [Federal] Voting Rights Act.” Brown, 668 F.3d at 1280. The first imperative, that “districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process,” art. Ill, § 21(a), Fla. Const., is essentially a restatement of Section 2 of the Voting Rights Act (VRA), which prohibits redistricting plans that afford minorities “less opportunity than other members of the electorate to participate in the political process.” 42 U.S.C. § 1973(b) (2006). Section 2 relates to claims of impermissible vote dilution.
Florida’s second imperative, that “districts shall not be drawn ... to diminish *620 [racial or language minorities’] ability to elect representatives of their choice,” art. Ill, § 21(a), Fla. Const., reflects the statement codified in Section 5 of the VRA prohibiting apportionment plans that have “the purpose of or will have the effect of diminishing the ability of any citizens ... on account of race or color ... to elect their preferred candidates of choice.” 42 U.S.C. § 1973c(b) (2006). Section 5 attempts to eradicate impermissible retrogression in a minority group’s ability to elect a candidate of choice. Although Section 5 applies only to “covered jurisdictions,” Florida’s constitutional prohibition applies to the entire state.
Consistent with the goals of Sections 2 and 5 of the VRA, Florida’s corresponding state provision aims at safeguarding the voting strength of minority groups against both impermissible dilution and retrogression. Interpreting Florida’s minority voting protection provision in this manner gives due allegiance to the principles of constitutional construction, under which the Court considers “the purpose of the provision, the evil sought to be remedied, and the circumstances leading to its inclusion in our constitutional document.” In re Apportionment Law-1982, 414 So.2d at 1048. Before its placement on the ballot and approval by the citizens of Florida, sponsors of this amendment, including the Florida State Conference of NAACP Branches (NAACP) and Democracia Aho-ra, acknowledged that Florida’s provision tracked the language of Sections 2 and 5 and was perfectly consistent with both the letter and intent of federal law. See Amici Curiae Br. of Fla. State Conference of NAACP Branches & Democracia Ahora, Inc., at 3-5, Roberts v. Brown, 43 So.3d 673 (Fla.2010) (No. SC10-1362). Those groups further contended that viewing “the requirements of [Florida’s provision as being] thoroughly consistent with the Voting Rights Act’s text and [placing an] emphasis on protecting the equal opportunities of minorities” did “not require extended analysis to see.” Id. at 8.
Moreover, all parties to this proceeding agree that Florida’s constitutional provision now embraces the principles enumerated in Sections 2 and 5 of the VRA. Because Sections 2 and 5 raise federal issues, our interpretation of Florida’s corresponding provision is guided by prevailing United States Supreme Court precedent. This approach not only corresponds to the manner in which this Court addressed Federal VRA claims in 1992, see In re Apportionment Law-1992, 597 So.2d at 280-82, but it squares with how other jurisdictions have interpreted comparable state provisions.[23]
Florida’s provision is unique among the states in that it incorporates language from the VRA but does not explicitly reference the VRA.[24] We therefore review the *621 language of Sections 2 and 5, and how each has been judicially interpreted, to give meaning to our state counterpart. The Court nonetheless recognizes our independent constitutional obligation to interpret our own state constitutional provisions.
In our review, we conclude that in applying the federal provisions to the challenges and legislative justifications, the Court must necessarily approach the application of each federal provision differently due to the manner in which the Court reviews Florida’s constitutional provisions in a facial review of the apportionment plans. For example, in this case, the House and Senate use Florida’s minority voting protection provision as a justification for the manner in which they drew specific districts. The challengers, on the other hand, urge the Court to conclude that many of the districts were drawn to impermissibly dilute the voting strength of minorities and, in turn, the voting strength of the Democratic Party.
In contrast to the posture of the ease in which this Court reviews Florida’s minority voting protection provision, Section 2 claims under the VRA are brought by plaintiffs who challenge the apportionment plan on the grounds of impermissible vote dilution. Section 5 of the VRA applies only to covered jurisdictions that must obtain preclearance by the Department of Justice before an apportionment plan goes into effect; in Florida, only five counties are covered, not the entire state.
As explained by the United States Supreme Court, the VRA “was designed by Congress to banish the blight of racial discrimination in voting,” South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), and to help effectuate the Fifteenth Amendment’s guarantee that no citizen’s right to vote shall “be denied or abridged ... on account of race, color, or previous condition of servitude.” Voinovich v. Quitter, 507 U.S. 146, 152, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (quoting U.S. Const, amend. XV). Sections 2 and 5 of the VRA “combat different evils,” Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 477, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997), and “differ in structure, purpose, and application.” Georgia v. Ashcroft, 539 U.S. 461, 478, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003) (quoting Holder v. Hall, 512 U.S. 874, 883, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (plurality opinion)). Section 2, specifically, applies nationwide and provides that “[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.” 42 U.S.C. § 1973(a) (2006).
A denial or abridgement of the right to vote in violation of Section 2 occurs when
based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
Id. § 1973(b). Section 2 thus prohibits any practice or procedure that, when “ ⅛-teract[ing] with social and historical conditions,’ impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters.” Voinovich, *622 507 U.S. at 153, 113 S.Ct. 1149 (quoting Thornburg v. Gingles, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)). Importantly, Section 2 employs a “results” test, under which proof of discriminatory intent is not necessary to establish a violation of the section. Chisom v. Roemer, 501 U.S. 380, 395, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991); see also Bossier Parish Sch. Bd., 520 U.S. at 482, 117 S.Ct. 1491 (“[P]roof of discriminatory intent is not required to establish a violation of Section 2.”).[25]
The United States Supreme Court has commonly referred to one such prohibited practice or procedure under Section 2 as “vote dilution,” which is the practice of reducing the potential effectiveness of a group’s voting strength by limiting the group’s chances to translate the strength into voting power. Shaw, 509 U.S. at 641, 113 S.Ct. 2816. “[T]he usual device for diluting the minority voting power is the manipulation of district lines” by either fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them or “packing” them into one or a small number of districts to minimize their influence in adjacent districts. Voinovich, 507 U.S. at 153-54, 113 S.Ct. 1149. For instance, under the interpretation of federal law, impermissible “packing” might occur when a minority group has “sufficient numbers to constitute a majority in three districts” but is “packed into two districts in which it constitutes a super-majority.” Id. at 153, 113 S.Ct. 1149.
The Supreme Court’s leading case interpreting Section 2, Gingles, 478 U.S. at 50, 106 S.Ct. 2752, set out three “necessary preconditions” that a plaintiff is required to demonstrate before he or she can establish that a legislative district must be redrawn to comply with Section 2. These preconditions require an individual challenging the plan to show that: (1) a minority population is “sufficiently large and geographically compact to constitute a majority in a single-member district”; (2) the minority population is “politically cohesive”; and (3) the majority population “votes sufficiently as a bloc to enable it ... usually to defeat the minority’s preferred candidate.” Id. at 50-51, 106 S.Ct. 2752. When the three Gingles preconditions are met, courts must then assess the totality of the circumstances to determine if the Section 2 “effects” test is met — that is, if minority voters’ political power is truly diluted. Johnson v. De Grandy, 512 U.S. 997, 1013, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994).
A successful vote dilution claim under Section 2 requires a showing that a minority group was denied a majority-minority district that, but for the purported dilution, could have potentially existed. See id. at 1008, 114 S.Ct. 2647 (“[T]he first Gingles condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice.”). Majority-minority districts are ones “in which a majority of the population is a member of a specific minority group.” Voinovich, 507 U.S. at 149, 113 S.Ct. 1149; see also Bartlett v. Strickland, 556 U.S. 1, 13, 129 S.Ct. *623 1231, 173 L.Ed.2d 178 (2009) (plurality opinion) (“In majority-minority districts, a minority group composes a numerical, working majority of the voting-age population”).
By contrast, a crossover or coalition district “is one in which minority voters make up less than a majority of the voting-age population” but are, at least potentially, “large enough to elect the candidate of [their] choice with help from voters who are members of the majority and who cross over to support the minority’s preferred candidate.” Bartlett, 556 U.S. at 13, 129 S.Ct. 1231. Influence districts are districts in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected. Id.
The showing of either an additional minority influence district or a crossover district, as opposed to an actual majority-minority district, is insufficient for Section 2 purposes; what is required is that “the minority population in the potential election district [be] greater than 50 percent.” Id. at 19-20, 129 S.Ct. 1231. Moreover, while “there is no § 2 right to a [minority] district that is not reasonably compact, the creation of a noncompact district does not compensate for the dismantling of a compact [minority] opportunity district.” League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 430-31, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006). As the United States Supreme Court has explained, “[t]he practical consequence of drawing a district to cover two distant, disparate communities is that one or both groups will be unable to achieve their political goals.” Id. at 434, 126 S.Ct. 2594. Therefore, with respect to the compactness inquiry for Section 2 purposes specifically, there would be “no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first Gingles condition contemplates.” Id. at 433, 126 S.Ct. 2594.
Most recently, in Perez, 132 S.Ct. at 944, an eight-justice majority of the Supreme Court cited to the plurality decision in Bartlett, 556 U.S. at 13-15, 129 S.Ct. 1231 (declining to recognize a Section 2 claim where the district was composed of only 39% black voting-age population), to hold that a federal district court would have no basis for drawing a districting plan to create a “minority coalition opportunity district.” The Perez decision is of course binding precedent only as to the interpretation of Section 2 jurisprudence under the VRA and was specifically concerned with limiting the circumstances under which a federal district court could draw an interim apportionment plan.
Unlike the posture of a Section 2 VRA claim before a federal court, the Florida Supreme Court is charged with analyzing the apportionment plan to determine compliance with all constitutional provisions. Florida’s provision now codifies these Section 2 principles, but the question is whether those principles set a floor, as well as a ceiling, for our interpretation of Florida’s constitution — whether there would be a violation of Florida’s minority protection provision with respect to vote dilution if the plan could be drawn to create crossover districts or even influence districts. The challengers assert that by overly packing minorities into single districts, the Legislature has acted to minimize the influence of not only minorities, but also Democrats in the surrounding districts. Where that claim has been made, we will consider that specific argument when reviewing the district challenges below.
In contrast to vote dilution claims under Section 2, Section 5 of the VRA is limited to particular “covered jurisdictions” and *624 relates to claims of retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise. Ashcroft, 539 U.S. at 478, 123 S.Ct. 2498. Section 5 “suspend[s] all changes in state election procedure,” including redistrieting plans, in jurisdictions covered by the VRA “until they are submitted to and approved by a three-judge Federal District Court in Washington, D.C., or the Attorney General” of the United States. Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 129 S.Ct. 2504, 2509, 174 L.Ed.2d 140 (2009); see also Beer v. United States, 425 U.S. 130, 133, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). Florida is not a covered jurisdiction for the purposes of Section 5, but the state does include five covered counties: Collier, Hardee, Hendry, Hillsborough, and Monroe. Florida’s new constitutional provision, however, codified the non-retrogression principle of Section 5 and has now extended it statewide. In other words, Florida now has a statewide non-retrogression requirement independent of Section 5.
Preclearance under Section 5 is granted only if the change “neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.” Nw. Austin, 129 S.Ct. at 2509, 129 S.Ct. 2504 (quoting 42 U.S.C. § 1973c(a) (2006)). A violation can be shown where the drawing of the district lines has “the purpose of or will have the effect of diminishing the ability of any citizens ... on account of race or color, or [membership in a language minority group], to elect their preferred candidates of choice.” 42 U.S.C. § 1973c(b).[26] The primary objective of Section 5 is to avoid retrogression. “[A] plan has an impermissible [retrogressive] ‘effect’ under § 5 only if it ‘would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.’ ” Bossier, 520 U.S. at 478, 117 S.Ct. 1491 (quoting Beer, 425 U.S. at 141, 96 S.Ct. 1357). The existing plan of a covered jurisdiction serves as the “benchmark” against which the “ ‘effect’ of voting changes is measured.” Id.
In its 2006 reauthorization, Congress amended Section 5 to add the express prohibition against “diminishing the ability” of minorities “to elect their preferred candidate” as a response to the United States Supreme Court’s 2003 decision in Ashcroft. This amended language mirrors the language of Florida’s provision. Before the amendment to Section 5, the Ashcroft Court concluded that Section 5 granted to covered jurisdictions the discretion to trade off “safe” districts with “influence or coalition districts,” particularly if the new plan did not “change[ ] the minority group’s opportunity to participate in the political process.” 539 U.S. at 482, 123 S.Ct. 2498.
Disagreeing with the United States Supreme Court’s interpretation, Congress overruled Ashcroft, concluding that “tradeoffs” that “would allow the minority community’s own choice of preferred candidates to be trumped by political deals struck by State legislators purporting to give ‘influence’ to the minority community while removing that community’s ability to elect candidates” were “inconsistent with the original and current purpose of Section 5.” H.R.Rep. No. 109-478, at 44 (2006). As Congress explained, the new “Section 5 [was] intended to be specifically focused on whether the electoral power of the minority community [was] more, less, or just as *625 able to elect a preferred candidate of choice after a voting change as before.” Id. at 46. That is, “[v]oting changes that leave a minority group less able to elect a preferred candidate of choice, either directly or when coalesced with other voters, cannot be precleared under Section 5.” Id. The United States Supreme Court has yet to interpret this aspect of Congress’s 2006 amendment.
Just as Section 2 jurisprudence guides the Court in analyzing the state vote dilution claims, when-we interpret our state provision prohibiting the diminishment of racial or language minorities’ ability to elect representatives of choice, we are guided by any jurisprudence interpreting Section 5. However, the Court must remain mindful that we are interpreting an independent provision of the state constitution.
Certainly, by including the “diminish” language of recently amended Section 5, Florida has now adopted the retrogression principle as intended by Congress in the 2006 amendment. Accordingly, the Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group’s ability to elect its preferred candidates. In other words, in addition to majority-minority districts, coalition or crossover districts that previously provided minority groups with the ability to elect a preferred candidate under the benchmark plan must also be recognized. See Texas v. United States, No. 11-1303 (TBG-RMC-BAH), 2011 WL 6440006, at *18-19, 831 F.Supp.2d 244, 265-68 (D.D.C. Dec. 22, 2011) (concluding that minority coalition districts are also included in the calculation of whether a new districting plan diminishes the ability of a minority group to elect a candidate of choice). We nonetheless conclude that under Florida’s provision, a slight change in percentage of the minority group’s population in a given district does not necessarily have a cognizable effect on a minority group’s ability to elect its preferred candidate of choice. This is because a minority group’s ability to elect a candidate of choice depends upon more than just population figures.
To undertake a retrogression evaluation requires an inquiry into whether a district is likely to perform for minority candidates of choice. This has been termed a “functional analysis,” requiring consideration not only of the minority population in the districts, or even the minority voting-age population in those districts, but of political data and how a minority population group has voted in the past. The United States Department of Justice (DOJ) has defined what a functional analysis of electoral behavior entails:
In determining whether the ability to elect exists in the benchmark plan and whether it continues in the proposed plan, the Attorney General does not rely on any predetermined or fixed demographic percentages at any point in the assessment. Rather, in the Department’s view, this determination requires a functional analysis of the electoral behavior within the particular jurisdiction or election district.[C]ensus data alone may not provide sufficient indicia of electoral behavior to make the requisite determination. Circumstances, such as differing rates of electoral participation within discrete portions of a population, may impact on the ability of voters to elect candidates of choice, even if the overall demographic data show no significant change.
Although comparison of the census population of districts in the benchmark and proposed plans is the important starting point of any Section 5 analysis, additional demographic and election data *626 in the submission is often helpful in making the requisite Section 5 determination .... Therefore, election history and voting patterns within the jurisdiction, voter registration and turnout information, and other similar information are very important to an assessment of the actual effect of a redistricting plan.
DOJ Guidance Notice, 76 Fed. Reg. at 7471; see also Texas, 831 F.Supp.2d at 262-66, 2011 WL 6440006, at *15-18 (proposing a functional test similar to that of the DOJ).
We recognize that in certain situations, compactness and other redistricting criteria, such as those codified in tier two of article III, section 21, of the Florida Constitution, will be compromised in order to avoid retrogression. Indeed, the DOJ has even noted that “compliance with Section 5 of the Voting Rights Act may require the jurisdiction to depart from strict adherence to certain of its redistricting criteria. For example, criteria that require the jurisdiction to ... follow county, city, or precinct boundaries ... or, in some cases, require a certain level of compactness of district boundaries may need to give way to some degree to avoid retrogression.” DOJ Guidance Notice, 76 Fed. Reg. at 7472. Tier two of article III, section 21, specifically contemplates this need, but only to the extent necessary. Therefore, as does the DOJ, in making our own assessment, we will rely upon “alternative or illustrative plans ... that make the least departure from [Florida’s] stated redistricting criteria needed to prevent retrogression.” Id. (emphasis added).
The Attorney General, the Senate, and the House all argue that an inquiry under Florida’s provision, like an inquiry under the Federal VRA, is too fact-intensive to be resolved in the instant original proceeding, which is limited to a narrow thirty-day window. In fact, the Senate takes the position that this Court should outright decline to review whether the Senate plan complies with this provision.
In oral argument, the attorney for the Senate stated that “[n]o rational person could expect seven appellate-court justices to resolve these extraordinarily tough factual issues.” This argument was in support of the Senate’s position that challenges based on the new constitutional provisions, including the minority voting protection provision, should await challenges brought in the trial court after validation of the plans.
We acknowledge that in 2002, this Court declined ruling on Federal VRA claims and race-based discrimination claims, instead leaving those claims to be brought on an “as-applied” basis. See In re Apportionment Law-2002, 817 So.2d at 825. Of course, as we have mentioned previously, at that time, there was no explicit state constitutional requirement, and it was entirely logical to defer such claims until after this Court determined the facial validity of the plans under the Florida Constitution.
Further, the Legislature, in its defense of the reason for drawing certain districts in a particular configuration, relies on the need to comply with the Federal VRA and the corresponding provision of the Florida Constitution. The Legislature asserts that it is far too difficult for this Court to review claims regarding diminishment of voting strength, but it nevertheless justifies the drawing of a number of districts on this basis.
If the Legislature is utilizing its interest in protecting minority voting strength as a shield, this Court must be able to undertake a review of the validity of that reason. Therefore, by the very nature of the challenges and the reasons advanced for the shape of the districts, it is necessary to perform a facial review and analyze the objective data that we have available. Be *627 cause a minority group’s ability to elect a candidate of choice depends upon more than just population figures, we reject any argument that the minority population percentage in each district as of 2002 is somehow fixed to an absolute number under Florida’s minority protection provision.
To hold otherwise would run the risk of permitting the Legislature to engage in racial gerrymandering to avoid diminishment. However, the United States Supreme Court has cautioned: “[W]e do not read ... any of our other § 5 cases to give covered jurisdictions carte blanche to engage in racial gerrymandering in the name of nonretrogression. A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression.” Shaw, 509 U.S. at 655, 113 S.Ct. 2816. This is especially true in light of the United States Supreme Court’s admonition:
Racial classifications of any sort pose the risk of lasting harm to our society. They reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin. Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters — a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire. It is for these reasons that race-based districting by our state legislatures demands close judicial scrutiny.
Id. at 657, 113 S.Ct. 2816.
In a manner consistent with what is required to determine whether a district is likely to perform for minority candidates of choice, the Court’s analysis of this claim and any defense for the manner in which the district was drawn will involve the review of the following statistical data: (1) voting-age populations; (2) voting-registration data; (3) voting registration of actual voters; and (4) election results history.[27] This approach is analogous to the review we undertook in 1992 of objective statistical data in order to facially decide Section 2 claims. There, when analyzing whether the joint resolution complied with Section 2 of the VRA, this Court held that its “analysis [would] include a consideration of all statistical data filed herein, including a breakdown of white, black, and Hispanic voting-age populations and voting registrations in the legislative districts contained in the Joint Resolution and in other proposed plans, none of which [were] disputed.” In re Apportionment Law-1992, 597 So.2d at 282 (footnotes omitted).
Based on the foregoing, we analyze Florida’s minority voting protection provision as safeguarding the voting strength of minority groups against impermissible dilution and retrogression.
c. Contiguity
The third of the tier-one standards is contiguity. The requirement that districts shall consist of contiguous territory exists in both sections 16(a) and 21(a) of article III.[28] By including this standard in the *628 first subsection of the new amendment, the voters made clear their intention to establish that the section 21(b) standards of compactness, nearly equal population, and utilizing political and geographical boundaries are subservient to the contiguity requirement.
This Court has defined contiguous as “being in actual contact: touching along a boundary or at a point.” In re Apportionment Law-2002, 817 So.2d at 827 (quoting In re Apportionment Law-1992, 597 So.2d at 279). “A district lacks contiguity ‘when a part is isolated from the rest by the territory of another district’ or when the lands ‘mutually touch only at a common corner or right angle.’ ” Id. (quoting In re Apportionment Law-1992, 597 So.2d at 279). No party has advocated that the interpretation of this constitutional provision has changed, and we interpret the clause in section 21(a) consistent with our previous interpretation of whether a district is contiguous under section 16(a).

2. Tier-Two Standards

We now turn to a discussion of the tier-two standards, which require that “districts shall be as nearly equal in population as is practicable,” that “districts shall be compact,” and that “districts shall, where feasible, utilize existing political and geographical boundaries.” Art. Ill, § 21(b), Fla. Const. Strict adherence to these standards must yield if there is a conflict between compliance with them and the tier-one standards.
a. As Nearly Equal in Population as Practicable
Although the express requirement of equal population is new to the Florida Constitution, this Court’s precedent establishes the importance of the federal one-person, one-vote requirement as both an apportionment principle and a proper starting point in judicial analysis. We evaluate this federal principle in conjunction with the newly enacted state constitutional requirement set forth in article III, section 21(b), requiring districts to be “as nearly equal in population as is practicable.”
As interpreted by the United States Supreme Court, the Equal Protection Clause of the Fourteenth Amendment mandates that “state legislatures be apportioned in such a way that each person’s vote carries the same weight — that is, each legislator represents the same number of voters.” In re Apportionment Law-1992, 597 So.2d at 278 (citing Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)). This concept, commonly referred to as the one-person, one-vote requirement, is determined “by analyzing the population figures in each district.” In re Apportionment Law-2002, 817 So.2d at 825. In construing the one-person, one-vote requirement, this Court explained:
The Constitutions of Florida and the United States require that one man’s vote in a district be worth as much as another. Mathematical exactness is not an absolute requirement in state apportionment plans; however, deviations, when unavoidable, must be de minimis. Whether a deviation is de minimis must be determined on the facts of each case.
In re Apportionment Law-1972, 263 So.2d at 802.
When discussing the one-person, one-vote requirement in 2002, this Court relied *629 on the United States Supreme Court and defined equal protection as
“requir[ing] that a State make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable.” [In re Senate Joint Resolution 2G, 597 So.2d at 279] (quoting Reynolds, 377 U.S. at 577, 84 S.Ct. 1362). In White v. Regester, 412 U.S. 755, 764, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Supreme Court held that “minor population deviations among state legislative districts [do not] substantially dilute the weight of individual votes in larger districts so as to deprive individuals in these districts of fair and effective representation.”
In re Apportionment Law-2002, 817 So.2d at 826 (emphasis added).
Although requiring mathematical exactness for congressional districts,[29] the United States Supreme Court has also explained that mathematical precision under the one-person, one-vote requirement is not paramount for state legislative districts when it must yield to other legitimate redistricting objectives, such as compactness and maintaining the integrity of political subdivisions:
[S]ome deviations from population equality may be necessary to permit States to pursue other legitimate objectives such as “maintain[ing] the integrity of various political subdivisions” and “providing] for compact districts of contiguous territory.” Reynolds, supra at 578 [84 S.Ct. 1362]. As the Court stated in Gaffney, “a[n] unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-today operation are important to an acceptable representation and apportionment arrangement.” 412 U.S. at 749 [93 S.Ct. 2321],
Brown v. Thomson, 462 U.S. 835, 842, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (alterations in original).
Applying that body of law during the 2002 apportionment cycle before the most recent constitutional amendment, this Court rejected the argument that the one-person, one-vote standard would require the Legislature to utilize advanced computer technology to design districts “in exactly the same numerical size.” In re Apportionment Law-2002, 817 So.2d at 826. We concluded that “[e]ven if the advent of computer-based redistricting software [had] lowered the maximum permissible deviation, ... the relatively minor deviation before us in [that] case [did] not lead to the conclusion that either the House or Senate plans [were] facially in violation of the one-person, one-vote requirement.” Id. at 827. There, the House plan had a maximum percentage deviation between the largest and smallest number of people per representative (statistical overall range) of 2.79%, and the Senate plan had a maximum percentage deviation between the largest and smallest number of people per representative (statistical overall range) of 0.03%. Id. at 826.
Now, the Florida voters have expressly spoken on the issue of population equality *630 in Florida’s redistricting process. Article III, section 21(b), requires districts to be “as nearly equal in population as is practicable.” To interpret this provision, we apply the principles governing constitutional construction. The Court “endeavors to construe a constitutional provision consistent with the intent of the framers and voters,” Zingale, 885 So.2d at 282, and in construing the language of the Florida Constitution, “[ejvery word of the Florida Constitution should be given its intended meaning and effect.” In re Apportionment Law-1972, 263 So.2d at 807.
Florida’s standard unmistakably uses the same language that the Supreme Court has used when interpreting the federal equal protection one-person, one-vote standard. See In re Apportionment Law-2002, 817 So.2d at 826 (describing the federal one-person, one-vote criteria as requiring the Legislature to construct districts “as nearly of equal population as is practicable” (quoting In re Apportionment Law-1992, 597 So.2d at 279)). Further, this Court has relied on Supreme Court precedent to interpret the one-person, one-vote standard in a like manner.
The FDP and the Coalition assert that Florida’s equal population requirement imposes a stricter standard than this Court has previously employed. The challengers’ assertion therefore raises the question of whether compliance with the standard under the Florida Constitution is measured differently than how it has been measured under the United States Constitution; in other words, whether the Legislature has less room for flexibility in population deviation among the legislative districts because the requirement is now enshrined in the Florida Constitution.
We resolve this question by concluding that the voters’ inclusion of this standard in the second tier of article III, section 21, recognizes that, as under the federal constitution, strict and unbending adherence to the equal population requirement will yield to other redistricting considerations, but that those considerations must be based on the express constitutional standards. The Florida Constitution embraces this construction, expressly mandating that the equal population requirement give way to contiguity, the prohibition against the intent to favor an incumbent or political party, and the need to comply with the minority-protection provision. In addition, article III, section 21, instructs that Florida’s equal population requirement be balanced with both compactness and the use of political and geographical boundaries.
The United States Supreme Court has long recognized that although the Equal Protection Clause requires state legislatures to make an “honest and good faith effort” to construct districts “as nearly of equal population as is practicable,” there are legitimate reasons for states to deviate from creating districts with perfectly equal populations, including maintaining the integrity of political subdivisions and providing compact and contiguous districts. Sims, 377 U.S. at 577, 84 S.Ct. 1362; see also Brown, 462 U.S. at 842, 103 S.Ct. 2690.
We imbue Florida’s provision with the same meaning, subject to this important caveat. Because obtaining equal population “if practicable” is an explicit and important constitutional mandate under the Florida Constitution, any deviation from that goal of mathematical precision must be based upon compliance with other constitutional standards. Accordingly, compliance with Florida’s equal population standard must be assessed in tandem with the other constitutional considerations,
b. Compactness
Compactness is the second of the tier-two standards. Because the requirement that districts “shall be compact” is a new *631 constitutional requirement, the Court begins by defining it. Before 2010, “neither the United States nor the Florida Constitution require[d] that the Florida Legislature apportion legislative districts in a compact manner.” In re Apportionment Law-2002, 817 So.2d at 831. Nov?, however, the Florida Constitution expressly requires that “districts shall be compact.” Art. Ill, § 21(b), Fla. Const. Although compactness is a new constitutional requirement in Florida, compactness is a well-recognized and long-standing constitutional standard in at least twenty state constitutions[30] and at least six state statutes.[31]
In defining this standard, as with the other standards, we start with the proposition that in interpreting constitutional provisions,
[f]irst and foremost, this Court must examine the actual language used in the constitution. “If that language is clear, unambiguous, and addresses the matter in issue, then it must be enforced as written.” The words of the constitution “are to be interpreted in their most usual and obvious meaning, unless the text suggests that they have been used in a technical sense.” Additionally, this Court “endeavors to construe a constitutional provision consistent with the intent of the framers and the voters.” Constitutional provisions “must never be construed in such manner as to make it possible for the will of the people to be frustrated or denied.”
Lewis v. Leon Cnty., 73 So.3d 151, 153-54 (Fla.2011). Thus, a fundamental tenet of constitutional construction applicable in. our analysis is that the Court will construe a constitutional provision in a manner consistent with the intent of the framers and the voters and will interpret its terms in their most usual and obvious meaning.
The Senate contends that this Court should not undertake to define compactness and instead leave that task to the Legislature. The Senate asserts that “compactness is ... the paradigmatic example of an elusive concept with no precise meaning.” However, as is universally recognized, it is the exclusive province of the judiciary to interpret terms in a constitution and to define those terms. See Lawnwood Medical Ctr., Inc. v. Seeger, 990 So.2d 503, 510 (Fla.2008) (“[I]t is the duty of this Court to determine the meaning of this constitutional provision.”); Stephenson v. Bartlett, 355 N.C. 354, 562 S.E.2d 377, 384 (2002) (noting during the review of a legislative apportionment plan that “it is emphatically the province and duty of the *632 judicial department to say what the law is” (quoting Marbury v. Madison, 5 U.S. (1 Crunch) 137, 177, 2 L.Ed. 60 (1803))).
This is particularly the case with the new constitutional standards on apportionment because the standards serve as a limit on the exercise of the Legislature’s authority. Further, it is incumbent upon this Court to define the term in accordance with the intent of the voters, which, in this case, was to require the Legislature to redistrict in a manner that prohibits favoritism or discrimination. See Ervin v. Collins, 85 So.2d 852, 855 (Fla.1956) (“We are called on to construe the terms of the Constitution, an instrument from the people, and we are to effectuate their purpose from the words employed in the document.”).
A compactness requirement serves to limit partisan redistricting and racial gerrymanders. In fact, as the Illinois Supreme Court recognized, “compactness is ‘almost universally recognized’ as an appropriate anti-gerrymandering standard.” Schrage v. State Bd. of Elections, 88 Ill.2d 87, 58 Ill.Dec. 451, 430 N.E.2d 483, 486 (1981) (quoting James M. Edwards, The Gerrymander and “One Man, One Vote”, 46 N.Y.U. L.Rev. 879, 893 (1971)); Pearson, 359 S.W.3d at 38, 2012 WL 131425, at *2 (holding that the purpose of the constitutional requirements that districts be contiguous, compact, and nearly equal in population is “to guard, as far as practicable, under the system of representation adopted, against a legislative evil, commonly known as ‘gerrymander’ ” (quoting Hitchcock, 146 S.W. at 61)).
Courts around the country have generally defined the term “compactness” on a geographical basis. See, e.g., Hickel v. Se. Conference, 846 P.2d 38, 45 (Alaska 1992) (defining compactness as “having a small perimeter in relation to the area encompassed”); Schrage, 58 Ill.Dec. 451, 430 N.E.2d at 486 (defining compactness simply as meaning “closely united”); Acker v. Love, 178 Colo. 175, 496 P.2d 75, 76 (1972) (defining the term as “a geographic area whose boundaries are as nearly equidistant as possible from the geographic center of the area being considered”); Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm’n, 211 Ariz. 337, 121 P.3d 843, 869 (App.2005) (“ ‘Compactness’ refers to length of the district’s borders. The shorter the distance around the district, the more compact the district.”); see also Kilbury v. Franklin Cnty. ex rel. Bd. of Cnty. Comm’rs, 151 Wash.2d 552, 90 P.3d 1071, 1077 (2004) (reviewing various legislative redistricting cases like Hickel and Acker, and concluding that the phrase “as compact as possible” does not mean “as small in size as possible,” but rather “as regular in shape as possible,” when reviewing a local government redistricting case).
Defining compactness geographically also conforms to the ordinary dictionary definition of the term. For example, the Merriamr-Webster’s Collegiate Dictionary defines the word “compact” as “having a dense structure or parts or units closely packed or joined.” Black’s Law Dictionary defines “compact” as “closely or firmly united or packed ... having a small surface or border in proportion to contents or bulk.” Black’s Law Dictionary 281 (6th ed. 1990).
The Senate asserts, however, that the term includes both a geographical component and a functional component and should be construed to include such concepts as communities of interest. The Senate further refers this Court to other courts that have analyzed the term by examining functional factors such as whether constituents in the district are able to relate to and interact with one another, whether constituents in the dis *633 trict are able to access and communicate with their elected representatives, or whether the district is united by commerce, transportation, and communication.[32]
Those cases defining compactness as a functional concept derive from states that, for the most part, have different constitutional provisions from those in Florida and discuss the numerous requirements in tandem, including contiguity, geographical compactness, and respecting communities of interest and common interests. See, e.g., Wilson, 4 Cal.Rptr.2d 379, 823 P.2d at 552 (discussing in tandem California’s state constitution’s requirements of contiguity and geographical compactness while also respecting communities of interest and considering constituents’ shared interests such as transportation facilities, similar work opportunities, and access to the same media of communication); In re 2003 Legislative Apportionment of House of Representatives, 827 A.2d 810, 815 (Me.2003) (analyzing a claim where by statute, the apportionment plan districts were required to be a “functionally contiguous and compact territory,” and to facilitate representation by minimizing impediments to travel within the district); In re Reapportionment of Towns of Hartland, Windsor & W. Windsor, 624 A.2d at 330-31 (addressing Vermont’s constitutional mandates that seek to maintain “geographical compactness and contiguity” together with additional statutory requirements to consider and maintain “patterns of geography, social interaction, trade, political ties and common interests”).
Moreover, this position appears to be at odds with the Legislature’s prior position that the term “compact” under the Fair Districts Amendment did not include factors regarding functional compactness, where courts look to transportation links, communication, jobs, and other aspects that involve a community of interest analysis. See Initial Brief at 13-14, Fla. Dep’t of State v. Fla. State Conference of NAACP Branches, 43 So.3d 662 (Fla.2010) (No. SC10-1375) (“A district that becomes less compact in order to promote a community of interest — or which deviates from a local boundary to further minority interests — might reflect a rational harmonization of such relative standards.” (emphasis added) (footnote omitted)).
We conclude that the language of the Florida Constitution does not give the term “compact” such an expansive meaning. If we were to include “communities of interest” within the term “compactness,” the Court would be adding words to the constitution that were not put there by the voters of this state. In construing the words used in the constitution, the Court is not at liberty to add words and terms that are not included in the text of the constitution. See Pleus, 14 So.3d at 945 (“We remain mindful that in construing a constitutional provision, we are not at liberty to add words that were not placed there originally or to ignore words that were expressly placed there at the time of adoption of the provision.”).
Expanding the definition of compactness to include factors such as the ability to access and communicate with elected officials and their ability to relate and interact with one another would be contrary to the average voter’s understanding of compact *634 ness and would be contrary to the usual and ordinary meaning of the word. In fact, using such a broad definition of this term would almost read out the requirement of compactness — enlarging this term to such a degree that it would frustrate the will of the people in passing this constitutional amendment. Accordingly, we hold that when reviewing compactness, the term should be construed to mean geographical compactness.
Our consideration of the term “compact” as a geographical concept raises the issues of how it is to be measured and how other constitutional considerations will impact that measurement. The Senate and the Attorney General again urge the Court not to undertake a compactness assessment because determining whether an apportionment plan complies with this principle exceeds the scope of this Court’s limited review. The Senate specifically contends that compactness has no precise definition and, further, that this Court is incapable of determining whether the shape of the district is irregular due to other considerations that must go into the apportionment process, like equal population, protecting minority voting rights, and utilizing geographical and political boundaries. Since all of these policies must be balanced, the Senate maintains, Florida courts should simply defer to the Legislature’s judgment.
Contrary to the Senate’s and the Attorney General’s assertions, compactness does not require such a unique and factual determination that appellate courts are completely unable to review the matter absent a trial record. A significant number of states mandate that during the apportionment process districts be drawn compactly, and at least fourteen of those states vest original jurisdiction to review legislative apportionment in the state supreme court.[33] Given that other state supreme courts have accomplished a similar task without much difficulty, we reject any suggestion that this Court lacks a similar ability to evaluate whether the Legislature complied with the compactness requirement in Florida. Having made that determination, we decide how this Court will go about measuring compactness.
As a geographical inquiry, a review of compactness begins by looking at the “shape of a district”; the object of the compactness criterion is that a district should not yield “bizarre designs.” Hickel, 846 P.2d at 45; see also Kilbury, 90 P.3d at 1077 (“[T]he phrase ‘as compact as possible’ does not mean ‘as small in size as possible,’ but rather ‘as regular in shape as possible.’ ”). Compact districts should not have an unusual shape, a bizarre design, or an unnecessary appendage unless it is necessary to comply with some other requirement. Hickel, 846 P.2d at 45 (“Compact districting should not yield ‘bizarre designs.’ ”); Schrage, 58 Ill.Dec. 451, 430 N.E.2d at 487 (“A visual examination of Representative District 89 reveals a tortured, extremely elongated form which is not compact in any sense.”); In re Livingston, 96 Misc. 341, 160 N.Y.S. 462, 469-70 (N.Y.Sup.Ct.1916) (noting that the challenged district was “most irregular in shape [and] really grotesque,” and holding *635 that “[i]f the constitutional provision relating to compactness means anything, this district, as laid out, manifestly does not conform to it”); see also Shaw, 509 U.S. at 635-36, 113 S.Ct. 2816 (describing a snakelike district that was drawn so bizarrely that it “inspired poetry: ‘Ask not for whom the line is drawn; it is drawn to avoid thee’ ” (quoting Bernard Grofman, Would Vince Lombardi Have Been Right If He Had Said: ‘When It Comes to Redistricting, Race Isn’t Everything, It’s the Only Thing’?, 14 Cardozo L.Rev. 1237, 1261 n. 96 (1993))).
In addition to a visual examination of a district’s geometric shape, quantitative geometric measures of compactness have been used to assist courts in assessing compactness.[34] In fact, there is commonly used redistricting software that includes tools designed to measure compactness. The House actually used two such measurements. First, the House utilized the Reock method (circle-dispersion measurement), which measures the ratio between the area of the district and the area of the smallest circle that can fit around the district. This measure ranges from 0 to 1, with a score of 1 representing the highest level of compactness as to its scale.
Second, the House used the Area/Convex Hull method in its analysis, which measures the ratio between the area of the district and the area of the minimum convex bounding polygon that can enclose the district. The measure ranges from 0 to 1, with a score of 1 representing the highest level of compactness. A circle, square, or any other shape with only convex angles has a score of 1. Both measures used by the House have gained relatively broad acceptance in redistricting.
Despite this Court’s use of visual and numerical measurements of geographic compactness, our review of that mandate cannot be considered in isolation. Other factors influence a district’s compactness, including geography and abiding by other constitutional requirements such as ensuring that the apportionment plan does not deny the equal opportunity of racial or language minorities to participate in the political process or diminish their ability to elect representatives of their choice.
The Florida Constitution does not mandate, and no party urges, that districts within a redistricting plan achieve the highest mathematical compactness scores. Given Florida’s unique shape, some of Florida’s districts have geographical constraints, such as those located in the Florida Keys, that affect the compactness calculations. Other times, lower compactness measurements may result from the Legislature’s desire to follow political or geographical boundaries or to keep municipalities wholly intact. See, e.g., Commonwealth ex rel. Specter v. Levin, 448 Pa. 1, 293 A.2d 15, 19 (1972) (“[A]ttempts to maintain the integrity of the boundaries of political subdivisions ... will in reality make it impossible to achieve districts of precise mathematical compactness. A great many if not most of the counties, cities, towns, boroughs, townships and wards in this Commonwealth *636 have a geographical shape which falls far short of ideal mathematical compactness.”).
Thus, if an oddly shaped district is a result of this state’s “irregular geometry” and the need to keep counties and municipalities whole, these explanations may serve to justify the shape of the district in a logical and constitutionally permissible way. Nevertheless, non-compact and “bizarrely shaped districts” require close examination. As explained by the Supreme Court of Alaska in Hickel, if
“corridors” of land that extend to include a populated area, but not the less-populated land around it, [the district] may run afoul of the compactness requirement. Likewise, appendages attached to otherwise compact areas may violate the requirement of compact dis-tricting.
Hickel, 846 P.2d at 45-46.
Since compactness is set forth in section 21(b), the criteria of section 21(a) must predominate to the extent that they conflict with drawing a district that is compact. However, if a district can be drawn more compactly while utilizing political and geographical boundaries and without intentionally favoring a political party or incumbent, compactness must be a yardstick by which to evaluate those other factors. Among the section 21(b) criteria, the standard for compactness is that the district “shall be compact” without qualification.
In sum, we hold that compactness is a standard that refers to the shape of the district. The goal is to ensure that districts are logically drawn and that bizarrely shaped districts are avoided. Compactness can be evaluated both visually and by employing standard mathematical measurements.
c. Utilizing Existing Political and Geographical Boundaries
In tandem with compactness, article III, section 21(b), requires that “districts shall, where feasible, utilize existing political and geographical boundaries.” Unlike the mandate of compactness, this requirement is modified by the phrase “where feasible,” suggesting that in balancing this criterion with compactness, more flexibility is permitted. We begin by interpreting the terms “political and geographical boundaries,” remaining mindful that, as with all of the constitutional provisions, our goal is to construe the provision in “such manner as to fulfill the intent of the people, never to defeat it.” Zingale, 885 So.2d at 282. Further, we construe the provision by looking to the “purpose of the provision, the evil sought to be remedied, and the circumstances leading to its inclusion in our constitutional document.” In re Apportionment Law-1982, 414 So.2d at 1048.
The interpretation given by a plurality of the Court explains the purpose of this provision and the proper interpretation:
The purpose of the standards in section (2) of the proposals is to require legislative and congressional districts to follow existing community lines so that districts are logically drawn, and bizarrely shaped districts — such as one senate district that was challenged in Resolution 1987, 817 So.2d at 824-25 — are avoided. Since the “city” and “county” terminology honors this community-based standard for drawing legislative and congressional boundaries, and further describes the standards in terms that are readily understandable to the average voter, we conclude that the use of different terminology does not render the summaries misleading.
Standards for Establishing Legislative Disk Boundaries, 2 So.3d at 187-88 (emphasis added). In that case, we accepted *637 the argument that the term “political boundaries” primarily encompasses municipal or county boundaries. The FDP likewise in its brief argues that the “basic purpose of this provision is to keep communities together and sensibly adhere to natural boundaries across the state.” Certainly, cities and counties would be existing political boundaries.
Consistent with this approach, the House in its brief emphasizes that the House plan was drawn with respect for county integrity, stating as follows:
[C]ounty lines were usually preferable to other boundaries, because county lines are the most readily understood, consistently compact, functional, and stable. County boundaries are substantially less likely to change than municipal boundaries, and — unlike municipalities — all counties are contiguous. Moreover, although all Floridians have a home county, millions live outside any incorporated area. Additionally, by using a strategy of keeping counties whole, the House Map necessarily keeps many municipalities whole within districts. And importantly, numerous Floridians advocated an emphasis on county boundaries at the twenty-six public meetings during the summer of 2011.
House Brief at 12-13 (footnotes omitted). The House additionally asserts that there is an advantage in using county lines in order to further other constitutional goals such as compactness:
[T]he House’s consistent respect for county boundaries provided the additional benefit of creating compact districts. And many testified to the Legislature that their idea of compactness supported preserving county integrity where practicable. Where county lines could not serve as the district line, the House relied on municipal boundaries and geographic boundaries such as railways, interstates, state roads, and rivers. Consistent with other public testimony, the House resolved to draw accessible districts with understandable shapes — without fingers, bizarre shapes, or “rat tails.”
Id. at 13-14 (citations omitted).
On the other hand, the Senate takes the position that the “political and geographical boundaries requirement directly presents the kind of ‘fact-intensive’ issues that cannot be meaningfully reviewed in this truncated proceeding.” Ironically, in contradiction to the position of the House, the Senate asserts that “it is a ‘plain fact’ that boundary requirements tend[] to conflict with compactness norms.” The Senate argues that the requirement of utilizing political boundaries is “internally inconsistent,” necessitating choices between political boundaries and geographical boundaries. Although the House in its brief points to the “numerous Floridians” who advocated an emphasis on county boundaries at the twenty-six public meetings, the Senate does not acknowledge that public viewpoint.[35]
The Senate argues that since Florida’s Constitution provides the Legislature with the choice of political or geographical boundaries, the choice of boundaries was a matter that should be left entirely to the discretion of the Legislature. During oral argument, counsel for the Senate further alleged that Florida was “unique among the fifty states to count geographical boundaries.” In actuality, many other states have constitutional requirements that require the consideration of geograph *638 ical boundaries.[36] Again, consistent with the holding of other states, this Court is likewise able to evaluate whether the Legislature complied with that requirement in Florida. Accordingly, we turn to our construction of the meaning of “political and geographical boundaries” as contained within our state constitution.
The Senate argues for a pick-and-choose legislative discretion regarding which boundaries to choose from, including a very broad list that encompasses not only easily ascertainable political boundaries, such as counties and municipalities, but extending even to “man-made demarcations,” such as “well-traveled roadways.” While discretion must be afforded to accommodate for well-recognized geographical boundaries, the decision to simply use any boundary, such as a creek or minor road, would eviscerate the constitutional requirement — as well as the purpose for the requirement, which is aimed at preventing improper intent.
The Senate’s approach that almost anything can be a “geographical boundary” may be why the opponents of the Senate’s plan criticize the Senate’s plan for not only lack of compactness but also for containing the same “finger-like extensions,” “narrow and bizarrely shaped tentacles,” and “hook-like shape[s],” which are constitutionally suspect and often indicative of racial and partisan gerrymandering.
We reject the Senate’s view because it would render the new constitutional provision virtually meaningless and stan-dardless. We accept the House’s view of geographical boundaries that are easily ascertainable and commonly understood, such as “rivers, railways, interstates, and state roads.” Together with an analysis of compactness, an adherence to county and city boundaries as political boundaries, and rivers, railways, interstates and state roads as geographical boundaries will provide a basis for an objective analysis of the plans and the specific districts drawn. In addition, we also reject the contention that following a municipal boundary will necessarily violate the compactness requirement. In a compactness analysis, we are reviewing the general shape of a district; if a district has a small area where minor adjustments are made to follow either a municipal boundary or a river, this would not violate compactness.
There will be times when districts cannot be drawn to follow county lines or to include the entire municipalities within a district. The City of Lakeland in its challenge to the Senate plan asserts a violation of this provision because the Senate plan splits the City of Lakeland into two state Senate districts. We will analyze this argument further, but certainly not every split of a municipality will violate this prohibition; the constitutional directive is only that “existing political and geographical boundaries” should be used “where feasible.”

3. How These Standards Interact

Having set forth the constitutional standards, we must now decide the appropriate framework in which to evaluate how these standards interact. This includes a determination of how best to approach challenges to the joint resolution of apportionment.
An examination of the explicit language used in the Florida Constitution is the *639 necessary starting point for any analysis of constitutional provisions. See Zingale, 885 So.2d at 282. The text of the constitution provides unambiguous direction for the analysis of how these constitutional standards interact. It provides that the tier-two standards are subordinate and shall give way where compliance “conflicts with the [tier-one] standards or with federal law.” Art. Ill, § 21(b), Fla. Const. Although the tier-two standards are subordinate to the tier-one requirements, the constitution further instructs that no standard has priority over the other within each tier. See art. Ill, § 21(e), Fla. Const. Consequently, the Legislature is tasked with balancing the tier-two standards together in order to strike a constitutional result, but this Court remains “sensitive to the complex interplay of forces that enter a legislature’s redistricting calculus.” Miller, 515 U.S. at 915-16, 115 S.Ct. 2475.
Florida’s tier-two standards — that districts shall be as nearly equal in population as is practicable, shall be compact, and shall utilize existing political and geographical boundaries where feasible — circumscribe the Legislature’s discretion in drawing district lines, requiring it to conform to traditional redistricting principles. See id. at 916, 115 S.Ct. 2475 (defining “traditional” redistricting principles to include “compactness, contiguity, and respect for political subdivisions”); Bush v. Vera, 517 U.S. 952, 959-60, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion) (noting federal district court’s conclusion that “traditional redistricting principles” include “natural geographical boundaries, contiguity, compactness, and conformity to political subdivisions”). Indeed, the extent to which the Legislature complies with the sum of Florida’s traditional redistricting principles serves as an objective indicator of the impermissible legislative purpose proscribed under tier one (i.e., intent to favor or disfavor a political party or an incumbent).
In other words, the goal of the tier-two requirements is “to guard, as far as practicable, under the system of representation adopted, against a legislative evil, commonly known as ‘gerrymander.’ ” Pearson, 359 S.W.3d at 38, 2012 WL 131425, at *2 (quoting Hitchcock, 146 S.W. at 61). There is no question that the goal of minimizing opportunities for political favoritism was the driving force behind the passage of the Fair Districts Amendment. See Standards for Establishing Legislative Dist. Boundaries, 2 So.3d at 181 (plurality) (“The overall goal of the proposed amendments is to require the Legislature to redistrict in a manner that prohibits favoritism or discrimination, while respecting geographic considerations.”).
Both the Coalition and the FDP maintain that Florida’s tier-two principles are not only independent constitutional requirements, but provide the Court with indicators of how well the Legislature complied with the tier-one criteria. They allege that population deviations, lack of compactness, and failure to utilize political and geographical boundaries serve as tools used by the Legislature to engage in the intentional act of favoring (or disfavoring) a political party or an incumbent. The House agrees with this position: “Indeed, the purpose of other standards — such as compactness, equal population, and adherence to political boundaries — was to prohibit political favoritism by constraining legislative discretion.” House Brief at 22.
Likewise, this Court held the new standards to have “a natural relation and connection,” all directed at the “overall goal of ... requiring] the Legislature to redistrict in a manner that prohibits favoritism or discrimination, while respecting geographic considerations.” Standards for Establishing Legislative Dist. Bound *640 aries, 2 So.3d at 181. We agree that in the context of Florida’s constitutional provision, a disregard for the constitutional requirements set forth in tier two is indicative of improper intent, which Florida prohibits by absolute terms. See Vieth, 541 U.S. at 335, 124 S.Ct. 1769 (Stevens, J., dissenting) (“[I]rrational shape can serve as an objective indicator of an impermissible legislative purpose.... ”); Schrage, 58 Ill.Dec. 451, 430 N.E.2d at 486 (“[Cjompactness is ‘almost universally recognized’ as an appropriate anti-gerrymandering standard.” (quoting James M. Edwards, The Gerrymander and “One Man, One Vote,” 46 N.Y.U. L.Rev. 879, 893 (1971))).
As was stated in Reynolds, 377 U.S. at 578, 84 S.Ct. 1362, a “desire to maintain integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory” undermines opportunities for political favoritism. Of course, the correlation between a lack of compliance with traditional redistricting principles and impermissible intent cannot be considered in isolation. In addition to prohibiting improper intent, tier one forbids the Legislature to draw districts that diminish minorities’ ability to elect representatives of choice or deny minorities an equal opportunity to participate in the political process. See art. Ill, § 21(a), Fla. Const. Given this requirement, efforts to preserve or create minority districts could be misinterpreted as an action intended to favor (or disfavor) a political party or an incumbent.
The challengers assert that minority protection has been used as a pretext for drawing districts with the intent to favor a political party or an incumbent. This is, of course, a troubling assertion because that would frustrate rather than further the overarching purpose of the Fair Districts Amendment.
In examining the reasoning behind drawing a district in a particular way, we remain cognizant that both federal and state minority voting-rights protections may require the preservation or creation of non-compact districts or may help to explain the shape of a challenged district. Therefore, the reason for drawing lines a certain way may be the result of legitimate efforts by the Legislature to comply with federal law or Florida’s tier-one imperative. Of. DOJ Guidance Notice, 76 Fed. Reg. 470 at 7472 (“[Cjompliance with Section 5 of the Voting Rights Act may require the jurisdiction to depart from strict adherence to certain of its redistricting criteria.”).
The fact that the tier-two principles expressly yield to this requirement in tier one demonstrates that the Florida Constitution specifically contemplates this need, but only to the extent necessary. Where it can be shown that it was possible for the Legislature to comply with the tier-two constitutional criteria while, at the same time, not diminishing minorities’ ability to elect representatives of choice or denying minorities an equal opportunity to participate in the political process, the Legislature’s plan becomes subject to a concern that improper intent was the motivating factor for the design of the district. It is critical that the requirement to protect minority voting rights when drawing district lines should not be used as a shield against complying with Florida’s other important constitutional imperatives; the Court’s obligation is to ensure that “every clause and every part” of the language of the constitution is given effect where “an interpretation can be found which gives it effect.” In re Apportionment Law-1972, 263 So.2d at 807.
Because compliance with the tier-two principles is objectively ascertainable, it provides a good starting point for analyz *641 ing challenges to the Legislature’s joint resolution. Where adherence to a tier-one requirement explains the irregular shape of a given district, a claim that the district has been drawn to favor or disfavor a political party can be defeated. Where it does not, however, further inquiry into the Legislature’s intent becomes necessary.
In determining whether the plans are constitutionally valid, we have considered the role of the alternative plans submitted by the Coalition. If an alternative plan can achieve the same constitutional objectives that prevent vote dilution and retrogression of protected minority and language groups and also apportions the districts in accordance with tier-two principles so as not to disfavor a political party or an incumbent, this will provide circumstantial evidence of improper intent. That is to say, an alternative plan that achieves all of Florida’s constitutional criteria without subordinating one standard to another demonstrates that it was not necessary for the Legislature to subordinate a standard in its plan.
It is with this global approach to determining the validity of the Legislature’s House and Senate apportionment plans in mind that we turn to the challenges raised to the apportionment plans before this Court.

C. Challenges to the Apportionment Plans

1. General Challenges

We next proceed to examine the Coalition’s and the FDP’s arguments that they claim demonstrate improper intent on the part of the Legislature in drawing the apportionment plans.
a. Partisan Imbalance as Demonstrative of Intent
At the time the apportionment plans were drawn in 2012, of the 120 seats in the House, 39 were held by Democrats and 81 by Republicans, and of the 40 seats in the Senate, 12 were held by Democrats and 28 by Republicans. The position of Governor was held by a Republican. The Coalition and the FDP essentially allege that with the Republicans in charge of drawing the apportionment plans, the plans were drawn with the intent to favor the Republican Party.
One of the primary challenges brought by the Coalition and the FDP is that a statistical analysis of the plans reveals a severe partisan imbalance that violates the constitutional prohibition against favoring an incumbent or a political party. The FDP asserts that statistics show an overwhelming partisan bias based on voter registration and election results. Under the circumstances presented to this Court, we are unable to reach the conclusion that improper intent has been shown based on voter registration and election results.
We further note that in the two cases cited by the FDP, Arizona Minority Coalition for Fair Redistricting v. Arizona Independent Redistricting Commission, 220 Ariz. 587, 208 P.3d 676 (2009), and Good v. Austin, 800 F.Supp. 557 (E.D.Mich.1992), the courts were discussing political fairness or competitiveness, not the intent of the drafting party to favor or disfavor a political party. As discussed in Arizona Minority Coalition, 208 P.3d at 687, the Arizona Constitution requires the commission drafting the plan to favor competitive districts when doing so is practicable and would not cause significant detriment to other goals. In Good, 800 F.Supp. at 561-62, a federal court tasked with drawing the congressional districts in Michigan outlined testimony given by dueling experts in a trial, which included descriptions of the statistical anal-yses done to determine whether a plan was politically fair; political fairness is one of *642 the many “relevant secondary criteria” recognized by federal courts in congressional apportionment. Here, although effect can be an objective indicator of intent, mere effect will not necessarily invalidate a plan. With this in mind, we review the FDP’s claim that the partisan imbalance of the Legislature’s plan reflects an intent to favor Republicans and to disfavor Democrats.
We first address voter registration and acknowledge the reality that based on the 2010 general election data, of the voters in the state who registered with an affiliation with one of the two major parties, 53% were registered as Democrats and 47% were registered as Republicans. The challengers point out that in contrast to the statewide statistics showing that registered Democrats outnumber Republicans, the Senate and House plans contain more districts in which registered Republicans outnumber registered Democrats than vice versa. As of 2010, in the Senate plan there were 18 of 40 Senate districts (45.0%) in which registered Democrats outnumbered registered Republicans, and 22 Senate districts (55.0%) in which registered Republicans outnumbered registered Democrats. In the House plan, there were 59 of 120 House districts in which the registered Democrats outnumber registered Republicans (49.2%), and 61 districts in which registered Republicans outnumber registered Democrats (50.8%).
While Democrats outnumber Republicans statewide in voter registration, this fact does not lead to the conclusions asserted by the challengers that these statistics demonstrate that the plans were drawn with intent to favor Republicans. Although there are more registered Democrats than Republicans, as of 2010, there were over 2.5 million voters who are not registered as Democrats or Republicans. Further, voter registration is not necessarily determinative of actual election results. The actual election results show that the existence of more registered Democrats than registered Republicans statewide has not necessarily translated into Democratic Party victories in statewide elections. To illustrate, Florida last elected a Democratic governor, Lawton Chiles, in 1994.
In further support of their argument that the apportionment plan shows partisan imbalance reflective of impermissible intent to favor a political party, the challengers rely on actual statewide election results. In the 2010 gubernatorial election, Governor Rick Scott, a Republican, received 48.7% of the overall vote and Alex Sink, a Democrat, 47.6% of the overall vote. Of the major-party-affiliated voters, Scott received 50.6% of the vote, and Sink 49.4%. However, under the Senate plan, Governor Scott would have won in 26 Senate districts (65.0%), and Sink in 14 Senate districts (35.0%). Similarly, under the House plan, Scott would have won in 73 House districts (60.8%), and Sink in 47 House districts (39.2%).
In the 2008 presidential election, President Barack Obama, a Democrat, received 50.9% of the overall state vote and Senator John McCain, a Republican, received 48.1% of the overall state vote. Of the major-party-affiliated voters, 51.4% voted for Obama and 48.6% for McCain. Yet in the Senate plan, Obama would have won in 16 Senate districts (40.0%), while McCain would have won in 24 Senate districts (60.0%). Likewise, in the House plan, Obama would have won in 53 House districts (44.2%), while McCain would have won in 67 House districts (55.8%).
We do not agree that the partisan imbalance in the Senate and House plans demonstrates an overall intent to favor Republicans in this case. Explanations other than intent to favor or disfavor a political party could account for this imbalance. *643 First, it has been observed that Democrats tend to cluster in cities, which may result in a natural “packing” effect, regardless of where the lines are drawn. A plurality of the United States Supreme Court has explained:
Whether by reason of partisan district-ing or not, party constituents may always wind up “packed” in some districts and “cracked” throughout others. See R. Dixon, Democratic Representation 462 (1968) (“All Districting Is ‘Gerrymandering’ ”); Schuck, 87 Colum. L.Rev. at 1359. Consider, for example, a legislature that draws district lines with no objectives in mind except compactness and respect for the lines of political subdivisions. Under that system, political groups that tend to cluster (as is the case with Democratic voters in cities) would be systematically affected by what might be called a “natural” packing effect. See Bandemer, 478 U.S. at 159 [106 S.Ct. 2797] (O’Connor, J., concurring in judgment).
Vieth, 541 U.S. at 289-90, 124 S.Ct. 1769 (plurality). Second, the imbalance could be a result of a legitimate effort to comply with VRA principles or other constitutional requirements. Although the FDP summarily argues that the partisan imbalance cannot be a result of such attempts, it fails to explain why.
We reject any suggestion that the Legislature is required to compensate for a natural packing effect of urban Democrats in order to create a “fair” plan. We also reject the suggestion that once the political results of the plan are known, the Legislature must alter the plan to bring it more in balance with the composition of voters statewide. The Florida Constitution does not require the affirmative creation of a fair plan, but rather a neutral one in which no improper intent was involved.
Although we have rejected the challenge that statewide voter registration and election results demonstrate an overall intent to favor the Republican party, we evaluate these statistics when examining individual districts.
b. History of Resistance to the Amendments
The Coalition next takes issue with the fact that the Legislature “attempted every possible legal maneuver to keep the Fair-Districts Amendments from becoming law” and then attempted to invalidate the congressional amendment in federal court. However, evidence that the Legislature resisted efforts to make the new constitutional standards enforceable law does not equate to evidence that the Legislature would then intentionally disregard that law once it was in effect.
c. “Gentlemen’s Agreement” as Indicative of Intent
The Coalition next points to a “gentlemen’s agreement” between the House and Senate, by which each chamber would “rubber stamp” the other chamber’s plan, allowing each to protect its own incumbents without interference from the other. Although the Joint Resolution was passed with both chambers voting to approve the other chamber’s plan, it is uncontroverted that each chamber agreed to draft its own plan without input from, debate from, or interference by the other. The challengers assert that this “gentlemen’s agreement” is indicative of improper intent. The fact that the House did not debate or amend the Senate’s plan or that the Senate did not debate or amend the House plan is legally irrelevant. From the beginning of the process, it was clear that each chamber would embark on its separate approach to redistricting, using different software and inputting different data. The fact that the process occurred on two different tracks without formal communication or coordina *644 tion between the two chambers or that there was a “gentlemen’s agreement” does not provide circumstantial evidence of improper intent.
d. Failure to Adopt the Coalition’s Alternative Plans
The Coalition takes issue with the Legislature’s treatment of its proposed alternative plans, which the Coalition also submitted to this Court. Specifically, the Coalition states that the Senate and House did not properly consider the Coalition’s plans, which the Coalition argued contained less population deviation, were more compact, and better utilized political and geographical 'boundaries. We do not consider the failure of the Legislature to adopt the Coalition’s alternative plans to be indicative of an improper intent,
e. Legislature’s Failure to Introduce Proposed Plans at Public Hearings
In this claim, the Coalition appears to ascribe improper motive to the failure of the Legislature to introduce proposed apportionment plans during the public hearings to ensure that the plans were fully aired in public. Although a review of the public hearing testimony reveals that many individuals were upset that the Legislature was soliciting their comments in the absence of a plan, some individuals recognized that there may be legitimate reasons for the Legislature’s approach. Compare Public Hrg. Tr. 1140 (“[W]hy couldn’t the Legislature have come up with a map that we could then look at and see how it affects Wakulla County and Lafayette County and then have them testify and see what is going on[?]”); Public Hrg. Tr. 1153-54 (“This process and these hearings are very troubling. The Legislature has invited the public to comment, but you don’t give us anything to comment on. Where are the maps? This isn’t a conversation.”); with Public Hrg. Tr. 1154-55 (“[I]f you would come in with maps drawn then we would be hearing from all of the naysayers that ... you met in a back room, smoke filled room and drew the maps yourself and now you are just wanting us to rubber stamp them.”); Public Hrg. Tr. 2798 (“You have correctly taken a common sense approach by seeking public input before the maps are drawn and not afterwards.”). More importantly, the Florida Constitution imposes no such requirement on the Legislature, and we conclude that this aspect of the process is not indicative of intent to produce partisan plans.
Having determined that none of the above general challenges should be used in this facial review of the validity of the House and Senate plans, we proceed to analyze the compliance of the House plan as a whole with the constitutional standards and then examine the challenges to the individual House districts. We then analyze the Senate plan and districts in the same manner.

2. The House Plan

a. Overall Challenges
Tier-One Requirements
Intent to favor or disfavor a political party or an incumbent. The first requirement that we address in looking at the overall plan is this important constitutional requirement, the purpose of which is to prevent the drawing of districts designed to protect a political party or an incumbent. We see no overall objective indicia of improper intent with respect to the House plan. It is undisputed that the House plan pits both Democratic and Republican incumbents against each other. While we recognize that the new districts on average retain 59.7% of the population of their predecessor districts, this fact standing alone does not demonstrate intent to favor incumbents.
*645 Finally, as discussed below, the House plan has complied with the tier-two standards, making improper intent less likely. Indeed, the purpose of the tier-two standards — equal population, compactness, and utilizing political and geographical boundaries — is to prohibit political favoritism by constraining legislative discretion.
Florida minority voting protection provision. The FDP generally alleges that the House plan improperly over-packs black voters into minority districts to dilute their vote elsewhere. To the extent this argument is made, it is without merit. Under the House plan, there are twelve black majority-minority districts[37] and sixteen Hispanic majority-minority districts.[38] None of the black majority-minority districts is a super-majority district requiring the Legislature to “unpack” it on this record. As to the sixteen Hispanic majority-minority House districts, eleven do have large percentages: District 103 (82.1%), District 105 (69.0%), District 110 (89.5%), District 111 (93.0%), District 112 (73.0%), District 113 (66.8%), District 114 (66.0%), District 115 (65.5%), District 116 (84.4%), District 118 (81.2%), and District 119 (86.8%). These high percentages could be explained by the fact that the Hispanic population in Miami-Dade County, where these districts are located, is densely populated. The challengers have failed to establish that another majority-minority district for either black or Hispanic voters potentially could have been created. We conclude that on this record, any facial claim regarding vote dilution under Florida’s constitution fails. While the Court does not rule out the potential that a violation of the Florida minority voting protection provision could be established by a pattern of overpacking minorities into districts where other coalition or influence districts could be created, this Court is unable to make such a determination on this record.
To the extent that the opponents contend that the overall House plan amounts to retrogression under the Florida Constitution, we conclude that this argument is also without merit. The record reveals that the House undertook a functional analysis when drawing its plan in order to guard against retrogression. As to black majority and crossover House districts, the fact that there is one fewer black crossover district as compared to the benchmark plan does not alter this conclusion because one additional black majority-minority district has emerged from a previously existing crossover district. Apportionment plans that increase minority voting strength are entitled to preclearance under Section 5, see Ashcroft, 539 U.S. at 477, 123 S.Ct. 2498, and we conclude that the same principle applies under Florida law.
With respect to House districts with sizeable Hispanic populations, we likewise conclude that there has been no unconstitutional retrogression under the Florida Constitution. Because three new Hispanic majority-minority districts have emerged *646 from previously existing influence or crossover districts, the Hispanic influence in the remaining number of districts has shifted. No challenger has established or alleged that this change has affected the Hispanic voters’ ability to elect a person of their choice in the respective districts.
Contiguity. No party challenges contiguity as to the House plan. Upon a review of the plan, we conclude that this plan does not violate the contiguity requirement under article III, sections 16(a) and 21(a), of the Florida Constitution.
Tier-Two Requirements
Equal population. In looking at this constitutional requirement, the 2010 census data shows that Florida has a total population of 18,801,310, and the ideal population for each House district is 156,678 individuals. The most populated district in the House plan is District 75, which has a population of 159,978 (an additional 3,300 individuals than the ideal, or a deviation of 2.11%), and the least populated district is District 76, which has a population of 153,-745 (2,933 fewer individuals than the ideal, or a deviation of -1.87%). Thus, the total deviation is 3.97%. This is 1.18% higher than the 2.79% population deviation the Court approved in 2002.
The House aptly acknowledges that “[e]onsiderations of compactness and emphasis on county integrity, of course, had to be weighed against other considerations, including population equality.” For example, the House explains that it set a population deviation upper limit that would allow Charlotte County, whose population deviated only slightly from the ideal, to remain whole.
Compactness. A visual inspection of the plan reveals that it as a whole appears to be compact and that only a few districts are highly irregular. A visual inspection of the plan reveals that there are districts that are clearly less compact than other districts, with visually unusual shapes. These include Districts 70, 88, and 117. Under the House plan, only three districts have significantly low compactness scores using both Reock and Area/Convex Hull: House Districts 88, 117, and 120. We note that Districts 70, 88, and 117 are majority-minority or minority-opportunity districts, and they are discussed more thoroughly below in conjunction with challenges to individual districts. We also note that District 120 includes the unusual geography of the Florida Keys and will therefore necessarily score low on the compactness scales.
Political and geographical boundaries. The House explains that in considering the appropriate balance of equal population, compactness, and adherence to existing boundaries, it emphasized county integrity while adhering to other tier-two standards. As explained in the House’s brief: “Where practicable, it sought to keep counties whole within districts, or to wholly locate districts within counties, depending on county populations. Where not feasible, the House sought to ‘anchor’ districts within a county — tying the geography representing a majority or plurality of the district’s residents to one county.” The House also considered municipal boundaries and geographical features, but decided that “county lines were usually preferable to other boundaries.” The underlying reason for this approach as expressed in the House’s brief was that
[cjounty boundaries are substantially less likely to change than municipal boundaries, and — unlike municipalities— all counties are contiguous. Moreover, although all Floridians have a home county, millions live outside any incorporated area. Additionally, by using a strategy of keeping counties whole, the House Map necessarily keeps many municipalities whole within districts. And importantly, numerous Floridians advo *647 cated an emphasis on county boundaries at the twenty-six public meetings during the summer of 2011.
(Footnote omitted.) A review of the House plan reveals that it consistently used county boundaries where feasible, leaving thirty-seven of sixty-seven counties whole.
The House further explained that “[w]here county lines could not serve as the district line, the House relied on municipal boundaries and geographic boundaries such as railways, interstates, state roads, and rivers.” As previously discussed, we have adopted the House’s view of geographical boundaries as those that are easily ascertainable and commonly understood (e.g., rivers, railways, interstates, and state roads).
Conclusion as to Overall Challenges to the House Plan
A review of the House plan and the record reveals that the House engaged in a consistent and reasoned approach, balancing the tier-two standards by endeavoring to make districts compact and as nearly equal in population as possible, and utilizing political and geographical boundaries where feasible by endeavoring to keep counties and cities together where possible. Although the House plan has a higher population deviation than in the past, the House has explained that this deviation was necessary to achieve other required objectives, such as consistent use of county boundaries. The House further asserts that its “consistent respect for county boundaries provided the additional benefit of creating compact districts.”
In addition, the House approached the minority voting protection provision by properly undertaking a functional analysis of voting strength in minority districts. A facial review of the House plan reveals no dilution or retrogression under the Florida Constitution. Further, we find no objec-five plan-wide indicia of improper attempt to favor or disfavor a political party or incumbent.
b. Challenges to Individual House Districts
We discuss the challenges to the individual House districts in turn. We conclude that the challengers have not demonstrated that any of these districts violate the Florida Constitution.
House District 38
The FDP summarily alleges that District 38 retains a high percentage of the population from its predecessor district in order to benefit the incumbent in that district. However, the FDP does not point to any additional indicators of improper intent, and we deny this claim.
House District 70
The FDP contends that District 70 is non-compact and fails to utilize boundaries because it cuts across four counties (Pinel-las, Hillsborough, Manatee, and Sarasota) as well as three major metropolitan areas (St. Petersburg, Bradenton, and Sarasota) and splits the town of Palmetto. The FDP also contends that District 70 is overly packed with minorities and that the House should have drawn the district with more natural boundary lines in order to allow those minorities to have a greater influence in neighboring District 71. The Coalition, on the other hand, raises no objection to this district.
District 70 is a black-opportunity district (black VAP of 45.1%; Hispanic VAP of 15.3%). It extends into four counties, taking in the areas with the highest concentration of minorities from St. Petersburg, Bradenton, and Sarasota. Significantly, part of District 70 extends into Hillsbor-ough County, which is a covered jurisdiction under Section 5 of the VRA, and must obtain preclearance from the DOJ. District 70 is depicted below.
*648 [[Image here]]
District 70 is strikingly similar to its predecessor district, old District 55, which has a black VAP of 49.4% and a Hispanic VAP of 13.6% and which also reached into St. Petersburg, Bradenton, and Sarasota. In adopting District 70, the Legislature stated that its intent was to comply with Section 5 of the VRA:
[I]t is the intent of the Legislature to establish State House District 70, which is consistent with Section 5 of the federal Voting Rights Act; does not deny or abridge the equal opportunity of racial or language minorities to participate in the political process or diminish their ability to elect representatives of their choice....
Fla. S.J. Res. 1176, at 22 (Reg. Sess. 2012) (SJR 1176).
Tier-two requirements must yield when necessary to comply with federal law (here, Section 5 of the VRA) and Florida’s minority voting protection provision. Although the FDP summarily asserts that District 70 is overly packed with minorities and that it could have been drawn differently to be more compact and to better utilize boundaries, the FDP has not demonstrated that this can be done without causing retrogression.
House District 88
The FDP contends that District 88, located near the east coast of Palm Beach County, was drawn to benefit the Republican Party under the guise of preserving that district as a black majority-minority district. To prove this point, the FDP claims that new District 88 is the least compact of all the House districts, asserting that non-compact districts are often a sign of partisan gerrymanders. The Coalition, on the other hand, does not challenge this district.
*649 District 88 is an odd-shaped, long, and thin district with jagged edges. It is contained entirely in Palm Beach County, running adjacent to coastal District 89 through the county, stretching from Lake Park and Riviera Beach south to Delray Beach,
[[Image here]]
District 88 is clearly visually non-compact, and the compactness measures confirm this with a Reock score of 0.08 and an Area/Convex Hull score of 0.34. Under either scale, this district has the lowest compactness measurements of all the districts in the 2012 House plan.
District 88 is a black majority-minority district, with a black VAP of 51.8%. The predecessor to District 88, old District 84 in the benchmark plan, was also a black majority-minority district, with a black VAP of 53.5%. This district was drawn differently in 2002, oriented westward and inland from West Palm Beach rather than southward.
The Legislature formed this district with the stated intent to preserve minority voting opportunities. The Legislature explained that its intent was
to establish State House District 88, which is consistent with Section 2 of the federal Voting Rights Act; does not deny or abridge the equal opportunity of racial or language minorities to participate in the political process or diminish their ability to elect representatives of their choice; is more compact than the comparable district in the benchmark plan; is nearly equal in population as practicable....
*650 SJR 1176 at 27. The House Staff Analysis further explains that “Palm Beach County has produced a majority-minority Black district in years past and this district recreates that opportunity. However, this district does it in a different manner than the current district.” Fla. H. Comm, on Reapp., CS/HJR 6011 (2012) Staff Analysis at 33-84 (Jan. 30, 2012) (House Staff Analysis).
The tier-two requirement of compactness must yield if it conflicts with the requirement to adhere to Florida’s minority voting protection provision. Here, the record reflects that the House considered this interplay. When questioned about whether this district violated the compactness requirement, the record shows the House determined that the configuration of District 88 was more compact than the configuration of its predecessor district and more compact than two potential alternatives. Further, the House conducted an analysis of the voting behavior of minority districts. The FDP does not assert or demonstrate that the district can be drawn more compactly while also adhering to Florida’s minority voting protection provision. Accordingly, this claim fails.
House District 99
The Coalition alleges that the Legislature drew District 99 with the intent to disfavor a black Democratic incumbent who currently represents District 93 under the 2002 House plan, a black majority-minority district with a black VAP of 50.9%. Old District 93 is now the equivalent of District 94, which remains a black majority-minority district (black VAP of 54.6%) under the 2012 House plan. The Coalition contends that the incumbent’s residence was intentionally placed one block outside of his current district and instead placed in District 99, which neighbors new District 94 to the south, to pit him against another Democratic incumbent. Our review reveals that he has indeed now been drawn into District 99, a majority-white district (white VAP of 54.3% and Hispanic VAP of 29.1%).
However, this may be incidental to wide-sweeping changes made by the House in this region of the state. As compared to the 2002 plan, the 2012 House plan is much more compact with respect to District 94 and its neighboring districts. The 2002 and 2012 plans for this region of the state are depicted below.
*651 2002:
[[Image here]]
2012;
[[Image here]]
The Coalition does not contend that the districts violate the standards of equal population, compactness, or utilizing political and geographical boundaries. We conclude that there are no objective indicia of intent to disfavor an incumbent on this record.
House Districts 100, 101, 102, 103, and 105
The FDP generally alleges that Districts 100, 101, 102, 103, and 105 do not utilize political boundaries because they cut through various cities in Miami-Dade County. The FDP also alleges that District 105 divides three counties and therefore fails to utilize political boundaries. The area is depicted below:
*652 [[Image here]]
While these House districts do cut through multiple cities, they keep other cities intact. Importantly, this area of Miami-Dade County is heavily and densely populated with numerous cities adjacent to each other.
Moreover, the minority voting protection provision comes into play, because several of the objected-to districts are minority districts. District 101 is a black and Hispanic coalition district (black VAP of 36.4% and Hispanic VAP of 33.7%). District 102 is a black majority-minority district with a black VAP of 52.1%. District 103 is a Hispanic majority-minority district with a Hispanic VAP of 82.1%. The FDP has not shown that it was feasible for the Legislature to keep more municipalities together in this heavily populated area while comporting with Florida’s minority voting protection provision.
District 105 is located in Collier, Bro-ward, and Miami-Dade Counties; it is a Hispanic majority-minority district with a Hispanic VAP of 69.0%. The predecessor to District 105 (old District 112) was also a Hispanic majority-minority district with a Hispanic VAP of 71.4%. Collier County, a county in which part of District 105 is located, is one of the five Florida counties that must obtain preclearance from the DOJ under Section 5 of the VRA. As previously explained, Section 5 prohibits diminishing a minority group’s ability to elect the representative of its choice; however, it differs from Florida’s minority voting protection provision in terms of territory covered. It therefore alters the geographical scope of the retrogression analysis. Because Section 5 applies only to the five covered counties, it protects *653 from retrogression minority voting strength in only those counties. See 42 U.S.C. § 1973c. Therefore, Section 5 is violated unless the ability of a minority group to elect a representative of its choice in that covered county does not diminish. District 105⅛ predecessor also included portions of Collier County and drew from Hispanic populations in Miami-Dade and Broward Counties. As explained by the House Staff Analysis: “A similarly built district [to District 105] has been a majority-minority Hispanic district in years past and this district recreates that opportunity.” House Staff Analysis at 35.
The FDP has not demonstrated that it was feasible for the Legislature to configure District 105 differently while comporting with Section 5 of the VRA and Florida’s minority voting protection provision.
House Districts 115 and 117
The FDP summarily alleges that Districts 115 and 117, both of which are located in Miami-Dade County, are non-compact and do not utilize political and geographical boundaries. Districts 115 and 117 are Hispanic majority-minority districts, with Hispanic VAPs of 65.5% and 55.2%, respectively. District 117 also has a black VAP of 37.0%. We have recognized that the tier-two requirements of compactness and utilizing existing political and geographical boundaries must yield when necessary in order to avoid conflict with tier-one requirements. The FDP does not allege how either district could be drawn differently to be more compact without violating Florida’s minority voting protection provision. Accordingly, the FDP has failed to satisfy its burden of proof with respect to these two districts.
c. Conclusion as to the House Plan
We conclude that the Coalition and the FDP have not successfully demonstrated that the House plan violates one or more of the constitutional standards. In making this determination, we have reviewed the challenges to. the House plan as a whole and the challenges to individual districts. Based on the nature of the review that this Court is able to perform in a facial challenge, we find that there has been no demonstrated violation of the constitutional standards in article III, section 21, and we conclude that the House plan is facially valid.

3. The Senate Plan

a. Overall Challenges
In reviewing the Senate plan, we begin by evaluating overall adherence to the constitutional requirements. Then we evaluate a claim that the Senate plan was renumbered for the purpose of favoring incumbents by allowing them to be eligible to serve for longer than they would have otherwise. Finally, we consider the challenges to individual districts brought by the Coalition, the FDP, and the City of Lakeland. We emphasize that our analysis takes into consideration both the overall challenges and the results of our analysis of challenges to individual districts. In addition, in looking at the approach used in developing the Senate plan, where appropriate, we compare it to the approach used in developing the House plan, which we have upheld. We make that comparison not because the process used by the House and its approach on compliance with the standards is the only way to approach apportionment, but because overall the House’s approach to ensuring compactness and utilizing consistent political and geographical boundaries led to a plan that has withstood the challenges to its validity. Further, the House’s use of political and elections data to engage in protecting minority districts allowed the House to engage in the appropriate functional analysis of the districts. Finally, we *654 note that the process employed by the House included openly considering different plans that the Redistricting Subcommittee analyzed for factors such as compactness and note the fact that the House plan pits incumbents against one another.
Tier-One Requirements
Intent to favor or disfavor a political party or an incumbent. In evaluating the Senate plan, we first address this important constitutional requirement, the purpose of which is to prevent the drawing of a plan or districts designed to protect a political party or an incumbent. We conclude that the Senate plan is rife with objective indicators of improper intent which, when considered in isolation do not amount to improper intent, but when viewed cumulatively demonstrate a clear pattern.
First, the Coalition alleges that the Senate plan does not pit incumbents against each other, and the Senate has not contested this. This Court was provided with the addresses of 21 incumbents and has confirmed that of the addresses provided, none of the incumbents would run against another incumbent.
Second, the new districts on average are composed of 64.2% of their predecessor districts. While this percentage is just an average, our below analysis of the individual district challenges reveals that at least some incumbents appear to have been given large percentages of their prior constituencies. These percentages are of even greater concern given that the 2002 Senate plan was drawn at a time when intent to favor a political party or an incumbent was permissible and there were no requirements of compactness or utilizing existing boundaries.
Third, as discussed further below, the Senate admittedly renumbered the Senate plan in order to allow incumbents to be eligible to serve longer than they would have otherwise. Not only do we conclude that this renumbering was improper as it was intended to favor incumbents, but we note that the renumbering process indicates that the Senate specifically considered incumbent information when renumbering the districts.
Fourth, although we do not consider the partisan balance of the plan as evidence of intent, the FDP alleges that the 2012 Senate plan has two fewer Democratic districts than the 2002 plan based on voter registration. However, because voter registration alone is not an accurate measure of how districts perform, we do not consider this as conclusive evidence of improper intent.
Fifth, the majority (70.0%) of underpopulated districts are Republican-performing districts when the 2010 gubernatorial and 2008 presidential elections are considered. Population deviations are at the heart of the requirement of one-person, one-vote, which generally requires that district populations be nearly equal to ensure that every individual’s vote counts as much as any other’s. Underpopulated districts are comparatively over-represented. Thus, it appears that under the Senate plan, individuals residing in Republican-performing districts are over-represented as compared to individuals living in Democratic-performing districts.
Florida’s minority voting protection provision. The FDP and the Coalition contend that the Senate’s overall plan amounts to vote dilution and retrogression under the Florida Constitution. The Coalition further asserts that when engaging in its retrogression analysis, the Senate interpreted Florida’s provision too strictly by limiting the data upon which it relied and failing to conduct the required functional analysis. While this failure is relevant to other defects in the plan, we con- *655 elude on this record that the Senate plan does not facially dilute a minority group’s voting strength or cause retrogression under Florida law.
No opponent has demonstrated that the Senate plan facially dilutes minority voting strength as a whole under the Florida Constitution. The FDP has not submitted any alternative plans, and the Coalition’s alternative Senate plan does not demonstrate that an additional majority-minority district can be created. While the Court does not rule out the potential that a violation of the Florida minority voting protection provision could be established by a pattern of overpacking minorities into districts where other coalition or influence districts could be created, this Court is unable to make such a determination on this record.
Nor has any challenger demonstrated that the Senate plan retrogresses as a whole under Florida law. There are as many Senate minority districts as there were under the 2002 Senate benchmark plan with what appears to be commensurate voting ability. Although there is one fewer Hispanic influence district, there are now two additional Hispanic majority-minority districts when compared to the 2002 benchmark. Districts that increase minority voting strength when compared to the benchmark are entitled to preclearance under Section 5, see Ashcroft, 539 U.S. at 477, 123 S.Ct. 2498, and we conclude that the same principle applies under Florida law.
Contiguity. The FDP contends that the Senate plan “stretches [contiguity] to its limits,” but notably does not argue that any of districts under the Senate plan are not contiguous. In looking at the Senate plan, it is clear that this plan does not violate the contiguity requirement under article III, sections 16(a) and 21(a), of the Florida Constitution.
Tier-Two Requirements
Equal population. In looking at this constitutional requirement, the 2010 census data shows that Florida has a total population of 18,801,310, and the ideal population for each Senate district is 470,033 individuals. The most populated district in the Senate plan is District 3, which has a population of 474,685 (an additional 4,652 individuals, or a deviation of 0.99%), and the least populated district is District 23, which has a population of 465,343 (4,690 fewer individuals or a deviation of -1.00%). Thus, the total deviation is 1.99%. As to Florida’s standard, we must view the population deviation in conjunction with the other tier-two standards.[39]
Compactness. The Senate contends that the Court should find that the Senate plan is facially compact because the plan is now more compact than the 2002 plan. We reject this comparison as evidence of compliance because the 2002 Senate plan had no requirement for compactness and thus *656 cannot serve as an adequate benchmark in establishing adherence to the newly added compactness requirement.
A visual inspection of the plan reveals a number of districts that are clearly less compact than other districts, with visually bizarre and unusual shapes. These districts include Districts 1, 3, 6, 9, 10, 12, 14, 19, 27, 29, 30, and 34. Districts with the lowest Reock and Area/Convex Hull scores are Districts 1, 6, 12, 19, 34, and 40. As explained above in our discussion of the standards, we reject the Senate’s definition of compactness as including communities of interest.
Political and geographical boundaries. Unlike the House, the Senate did not use any consistent definition of political and geographical boundaries. Some districts adhere to county boundaries (e.g., District 5), while others freely split counties and follow a variety of roads and waterways, including minor residential roads and creeks (e.g., District 1). In some districts, the Senate constantly switched between different types of boundaries within the span of a few miles.
Conclusion as to Overall Challenges to the Senate Plan
We recognize that the Senate did not have the benefit of our opinion when drawing its plan. However, it is clear from a facial review of the Senate plan that the “pick and choose” method for existing boundaries was not balanced with the remaining tier-two requirements, and certainly not in a consistent manner. We again note that while the existing boundaries requirement is stated as “where feasible” and the equal population requirement is stated in terms of “as is practicable,” the compactness requirement does not contain those modifiers; rather, the constitutional expression is that “districts shall be compact.” The concept of “communities of interest” is not part of the constitutional term “compactness.”
Although we hold that the Senate plan does not facially dilute or retrogress under Florida law as a whole, we further conclude that the Senate failed to conduct a functional analysis as to retrogression in order to properly determine when, and to what extent, the tier-two requirements must yield in order to avoid conflict with Florida’s minority voting protection provision. Although the Senate touts its adherence to the recommendations of the Florida NAACP and LatinoJustice PRLDEF regarding minority districts, this does not absolve the Senate of its independent responsibility to draw an apportionment plan that adheres to all of the constitutional requirements.
The record is clear that in drawing districts for the 2012 apportionment cycle, the Senate employed an incorrect and incomplete retrogression analysis. Based on the record, the Senate formulated its apportionment plan without reference to election results or voter-registration and political party data; instead, it relied on voting-age population data and attempted to maintain the core of a new Senate district’s predecessor district (which the Senate apparently knew had performed for a certain minority group in the past).[40] Although it *657 was acknowledged during the February 9, 2012, Senate floor debate that the use of voter and election performance data to safeguard minority voting opportunities is consistent with accepted practice in other states and is a data set that the DOJ uses when evaluating whether to preclear a covered jurisdiction under Section 5 of the VRA, it was also stated that the Senate need not rely on such data when undertaking its retrogression analysis. Not only does this position ignore the DOJ’s guidance on this issue requiring a functional approach, see DOJ Guidance Letter, at 7471 (“[Cjensus data alone may not provide sufficient indicia of electoral behavior to make the requisite determination.”), but it has been squarely rejected by at least one federal court. See Texas, 831 F.Supp.2d at 260, 2011 WL 6440006, at *12 (“[Sjimple voting-age population analysis cannot accurately measure minorities’ ability to elect and, therefore, Texas misjudged which districts offer its minority citizens the ability to elect their preferred candidates in both its benchmark and proposed Plans.”). As a result, the Senate did not properly consider when tier-two requirements must yield in order to avoid conflict with Florida’s minority voting protection provision.
Finally, applying expansive definitions to the tier-two standards and failing to follow a consistent approach in applying the standards undermine the purpose of article III, section 21, which was intended to restrict legislative discretion in an effort to level the playing field and to prevent gerrymandering. See Pearson, 359 S.W.3d at 38, 2012 WL 131425, at *2 (explaining that the purpose of constitutional requirements that districts be contiguous, compact, and nearly equal in population is “to guard, as far as practicable, under the system of representation adopted, against a legislative evil, commonly known as ‘gerrymander’ ” (quoting Hitchcock, 146 S.W. at 61)).
A review of the individual districts, discussed below, reveals constitutional violations. These districts illustrate the Senate’s inconsistent approach as to the tier-two standards and the ramifications of the failure to conduct a functional analysis as to retrogression.
b. Numbering Scheme
We first address the numbering of the Senate plan. With respect to numbering, the Florida Constitution states only that Senate districts shall be “consecutively numbered.” Art. Ill, § 16(a), Fla. Const. However, because the Constitution requires that Senate terms must be staggered, the number of a Senate district determines the years in which elections must be held for that district. See art. Ill, § 15(a), Fla. Const. Here, the issue we must address is whether the Senate districts were renumbered with the intent to favor incumbents, in violation of article III, section 21(a). Specifically, the Coalition contends that by renumbering the apportionment plan so that incumbents eligible for reelection in 2012 would receive a chance to serve for a maximum of ten years, rather than eight, the Senate plan violates the prohibition on favoring incumbents.
*658 Unquestionably, the numbering of a Senate district, whether given an odd or even number, directly affects the length of time a senator may serve. See art. Ill, § 15(a), Fla. Const. Article III, section 15(a), provides for staggered Senate terms. In accordance with that requirement, the constitution requires Senate elections to occur in particular districts in alternating general election years, with the year of the election to be determined by whether the district is designated by an odd or even number. Id. (“Senators shall be elected for terms of four years, those from odd-numbered districts in the years the numbers of which are multiples of four and those from even-numbered districts in even-numbered years the numbers of which are not multiples of four.”). The constitution further provides that at the election next following a reapportionment, some senators shall be elected for terms of two years when necessary to maintain staggered terms. Id.
Moreover, any senator who represents a district where a change in the district lines has resulted in a change in constituency must stand for reelection in the next general election after reapportionment. In our decision on the validity of the apportionment plan in 1982, we addressed the effect of reapportionment on “holdover Senate terms” as part of our “jurisdiction to resolve all issues ... arising under Article III, section 16(c).” In re Apportionment Law-1982, 414 So.2d at 1045. In that case, senators in several odd-numbered districts were elected to four-year terms in 1980. The question before this Court was whether the provisions of article III, section 15(a), required that the terms of these senators be truncated to two years or whether the terms would hold over until the next scheduled election for those districts in 1984. Id. at 1046. We concluded that “the Florida Constitution, by its provisions, requires, upon reapportionment, that senate terms be truncated when a geographic change in district lines results in a change to the districts constituency.” Id. at 1047-48. Our conclusion was based on the language of article III, section 1, which mandates that senators be elected from the districts they represent, as well as the final clause of article III, section 15(a). Id. at 1050. Thus, whether a Senate district is given an even or odd number determines both whether a senator will serve a two-year term or a four-year term prior to reapportionment and whether the senator will serve a two-year term upon election following the reapportionment.
In 2002, the Court rejected the argument of several challengers who asserted that “the newly created Senate districts are invalid because the Legislature changed the numbering of the newly created Senate districts from the existing Senate districts in order to circumvent the constitutional legislative term limit provisions.” In re Apportionment Law-2002, 817 So.2d at 831. In rejecting the claim, the Court “conclude[d] that the theoretical possibility that some current senators may be able to serve ten years in the Florida Senate is not a sufficiently important dependent matter arising under article III, section 16, Florida Constitution, that we should address it at this time.” Id
The question we must first answer is whether, as a result of the new requirements in article III, section 21(a), prohibiting apportionment plans that have the intent of favoring incumbents, the numbering of Senate districts is now a matter for this Court’s review under article III, section 16. In light of the addition of the article III, section 21(a), provision that no “apportionment plan ... shall be drawn with the intent to favor or disfavor ... an incumbent,” the challengers assert that the Senate’s apportionment plan was renumbered for the benefit of incumbents, in *659 violation of the Florida Constitution. The Senate has asserted that the provisions of article III, section 21, apply only to the drawing of district lines and not the numbering scheme.
We reject the Senate’s assertion that numbering is excluded from the evaluation under the standards set forth in article III, section 21. This Court “endeavors to construe a constitutional provision consistent with the intent of the framers and the voters.” Zingale, 885 So.2d at 282; see also Gray, 125 So.2d at 852. “Moreover, in construing multiple constitutional provisions addressing a similar subject, the provisions ‘must be read in pari materia to ensure a consistent and logical meaning that gives effect to each provision.’ ” Caribbean Conservation Corp., 838 So.2d at 501 (quoting Advisory Op. to the Governor-1996 Amendment 5 (Everglades), 706 So.2d 278, 281 (Fla.1997)).
While the introductory clause of article III, section 21, states that the provision applies “[i]n establishing legislative district boundaries,” subsection (a) then states that “no apportionment plan or district shall be drawn with the intent to favor or disfavor ... an incumbent.” (Emphasis added.) The numbers of the Senate districts are unquestionably part of the “apportionment plan” for purposes of reviewing whether the plan is designed with the intent to favor or disfavor an incumbent. The Joint Resolution necessarily defines the boundaries of each district by its number. See, e.g., SJR 1176 at 52 (“District 1 is composed of: (a) That part of Escambia County consisting of: 1. All of voting tabulation districts 15, 18, 19, 20, 21.... ”). Further, the numbering of the districts determines the length of the terms senators will serve following apportionment, see art. Ill, § 15(a), Fla. Const., as well as the maximum length of time each senator will be eligible to serve, see art. VI, § 4(b)(l)-(2), Fla. Const. Thus, not only is it a matter for our review in determining the validity of the apportionment plan in light of the addition of article III, section 21, but the Legislature is prohibited from numbering the districts with the intent to favor or disfavor an incumbent. See art. Ill, 21(a), Fla. Const.
In this case, the clear intent of the constitutional provisions is to prevent the Legislature from passing an apportionment plan that has a built-in bias favoring an incumbent. Adopting a renumbering system that significantly advantages incumbents by increasing the length of time that they may serve by two years most assuredly favors incumbents. Further, purposefully manipulating the numbering of the districts in order to allow incumbents to serve in excess of eight years would also appear to frustrate the intent of the voters when the term limits amendment was adopted. See Advisory Op. to Atty. Gen-Ltd. Political Terms in Certain Elective Offices, 592 So.2d 225, 228 (Fla.1991) (discussing the purpose of the term limit amendment prior to its placement on the ballot).[41]
We now turn to the Coalitions allegation that the Senate plan was in fact renumbered to benefit incumbents. Clearly, the *660 numbering of a district determines not only the length of each senators individual term, but also determines the length of the maximum consecutive period of time a senator will be eligible to serve in the Senate. Under article VI, section 4(b), of the Florida Constitution, “No person may appear on the ballot for re-election” to the office of Florida senator “if, by the end of the current term of office, the person will have served (or, but for resignation, would have served) in that office for eight consecutive years.” It should first be emphasized that the Florida Constitution does not limit senators to a maximum of eight consecutive years. Rather, the constitution prohibits anyone who has already served for eight years from standing for reelection. Conversely, any senator who has served for less than eight years is not prohibited from seeking reelection.
The interaction between the term-limit provision of article VI, section 4(b), and the staggering of Senate terms under article III, section 15(a), determines the overall length of time a senator will be eligible to serve. Under these provisions, most senators who are first elected in general election years as scheduled by article III, section 15(a), will be eligible to serve for a maximum of eight consecutive years in the Senate. An exception applies to senators who are first elected to two-year terms in the election following reapportionment; these senators, if subsequently reelected, will have served only six years at the conclusion of their second terms, making them eligible for reelection to a third term of four years, thereby allowing them to serve up to ten years. A senator may also be eligible to serve longer than eight years if the senator was first elected in a special election. See § 100.101, Fla. Stat. (2011) (providing that a special election or special primary election shall be held “[i]f a vacancy occurs in the office of state senator or member of the state house of representatives”).
The Coalition’s claim is based on the fact that by altering the district numbers of certain incumbents during reapportionment, the Senate has changed the year certain senators must stand for reelection, the length of the terms of office these senators will serve, and, ultimately, the maximum length of time such senators will be eligible to serve. Thus, a senator elected in an even-numbered district in 2006 would, if subsequently reelected in 2010 and 2012,[42] serve a final term of two years from 2012 to 2014. By changing the district number from even to odd, that senator’s final term would not expire until 2016, allowing the senator to serve for a maximum of ten years. Similarly, a senator elected from an odd-numbered district in 2008, by running in an even-numbered district in 2012, would be eligible to serve for a maximum of ten years. Without the reversal of numbers from odd to even, or from even to odd, each of these senators would have served for a maximum of eight years.
In this case, there is no question that district numbers were assigned with the intent to favor incumbents. The Senate Committee on Reapportionment published its first proposed plan on November 28, 2011. The plan was formally introduced at the committee’s next meeting on December 6, 2011, as Senate Joint Resolution 1176. In this version of the Senate plan, the distribution of district numbers across the state was essentially unchanged from *661 the 2002 Senate plan. Under that original numbering, at least 16[43] out of the 29 non-term-limited incumbents would have been eligible to serve a maximum of eight years and three incumbents would have been eligible to serve a maximum of nine years.
On December 30, 2011, however, the Committee on Reapportionment published a Committee Substitute to the plan proposed on November 28. Under the new plan, 89 districts were assigned new numbers. The Coalition asserts that as a result of the renumbering, 28 out of 29 incumbents would be eligible for ten- or eleven-year terms. Because the Court was not provided the addresses for every incumbent senator, the Court cannot verify the correctness of that statement although it does not appear to be a disputed fact. We can verify that at least the 16 senators that were previously eligible for eight years will now be eligible to serve a maximum of ten years, and the three incumbents originally eligible for nine years will be eligible to serve for eleven years.[44] None of the senators for whom this Court was provided addresses will be limited to a maximum of eight years under the new numbering scheme.
In the bill analysis attached to the Committee Substitute, Senate staff wrote that the changes in numbering were based on whether each senator had served a two-year or a four-year term prior to redistricting. Specifically, staff wrote that the Committee Substitute “[a]ssigns odd-numbered districts in a manner equitable to senators elected to terms of two years or less prior to redistricting and assigns even-numbered districts in a manner equitable to senators elected to four year terms prior to redistricting.” Fla. S. Comm, on Reapp., CS for SJR 1176 (2012), Staff Analysis 13 (rev. Jan. 16, 2012). In a section entitled “Effect of Proposed Changes,” the analysis stated:
Reapportionment in 2012 will change the constituencies of all senate districts, and many senate terms will be truncated. Twenty-five (25) senators elected in 2010, or in special elections thereafter, will have served terms shortened to two years or less. Two of those 25 senators not only will get truncated terms but also will be disqualified from appearing on the ballot for reelection (Senator from the 26th District and Senator from the 34th District).
An equitable method for numbering would be to assign odd numbers to districts represented by senators serving shortened two-year terms prior to redistricting; allowing them to seek election to full four-year terms after redistricting. Such a balance avoids the inequity of some senators having terms shortened to two years (or less) both before and after redistricting, while others have the opportunity to serve full four-year terms both before and after redistricting. Only 20 odd numbers are available, however, and assigning 23 is not possible.

To reconcile the provisions cited above and achieve an equitable result, professional staff considered not only the incidence of shortened senate terms but also when senators were first elected to the Senate (and when they would be disqualified from appearing on the ballot for reelection).

Id. at 10-11 (emphasis added).
Article III, section 21(a), prohibits any apportionment plan from being drawn with *662 the intent to favor an incumbent. The Senate has argued that the renumbering of its plan does not in fact “favor” incumbents; rather, the Senate maintains that the result of the numbering was merely to compensate certain incumbents who served truncated, two-year terms prior to redistricting by allowing them to serve longer terms if they are reelected. As the Senate conceded in a prior reapportionment case, however, “elected officials have no property rights to the office to which they have been elected.” In re Apportionment Law-1982, 414 So.2d at 1046. To the contrary, it is the voters who have the rights in the process by which their representatives are elected.
The Senate’s plan plainly favors certain incumbents by renumbering districts to allow them to serve longer than they would otherwise be eligible to serve. Because we conclude that the plan was drawn with the intent to favor incumbents, in violation of article III, section 21(a), we declare the renumbering in the apportionment plan to be invalid.
c. Challenges to the Senate Districts
We now turn to an examination of the challenges raised as to specific Senate districts. We first discuss the districts that we find to be in violation of the Florida Constitution. Then we discuss the district challenges that the Court rejects. Finally, we discuss the challenge brought by the City of Lakeland.
Northwest Florida: Senate Districts 1 and 3
The FDP and the Coalition contend that Districts 1 and 3 in the Panhandle violate the constitutional standards of compactness, utilizing political and geographical boundaries where feasible, and no intent to favor incumbents. Our facial review of both of these districts confirms that at least two constitutional standards were violated: compactness and utilizing existing political and geographical lines where feasible. The Senate’s failure to adhere to these constitutional standards appears to be based on the erroneous belief that, in the drawing of the districts, the factor of “communities of interest” could be elevated above the constitutional mandates.
Although the Senate’s stated motivation was a desire to keep coastal communities together and separate from rural communities, it is also significant that District 1 keeps 86.1% of its predecessor district (old District 4), and District 3 keeps 82.6% of its predecessor district (old District 2). Both of these percentages are far greater than the average for the Senate plan (64.2%). Because there is no constitutionally valid justification for the deviation from the constitutional standards, we are obligated to declare these districts invalid.
As the below map shows, Districts 1 and 3 are horizontal districts in northwest Florida. District 1 stretches east to west through the coastal areas of five counties, and District 3 takes in the non-coastal areas to the north of District 1.
*663 [[Image here]]
Both districts contain a majority-white voting-age population.[45] Thus, no considerations with respect to Florida’s minority voting protection provision come into play.
Both districts are visually non-compact as they stretch through the Panhandle, and the compactness measures confirm this. District 1 received a Reock score of 0.12 (closer to 1 is better), and an Area/Convex Hull score of 0.46 (closer to 1 is better). District 3 received a 0.24 Reock score and a 0.74 Area/Convex Hull score.
The districts are bounded to the east by Gulf, Calhoun, and Gadsden Counties. The more critical and constitutionally suspect boundary is the boundary between Districts 1 and 3, which follows no consistent political or geographical boundary. Instead, the district dividing line follows a variety of boundaries, switching between major roads (Interstate 10), minor roads, county lines, city boundaries, major waterways, rivers, and even creeks. It is evident that although the Senate followed numerous different boundaries when drawing Districts 1 and 3, often switching between different types of boundaries within the span of a few miles, it sacrificed compactness not to comply with the requirements of equal population or utilizing political or geographical boundaries, but rather to create a coastal district and an inland rural district.
In passing the Joint Resolution, the Legislature stated its intent was to “establish Senate District 1, which ties coastal communities of the Florida Panhandle in Escambia, Santa Rosa, Okaloosa, Walton, and Bay Counties,” and to “establish Senate District 3, which ties rural Panhandle communities in Escambia, Santa Rosa, Okaloosa, Walton, Bay, Washington, Holmes, and Jackson Counties.” SJR 1176 at 38. The Senate staff analysis indicates that the coastal and rural districts were created based on public testimony received by the Legislature.[46]
*664 Although the Senate staff analysis points to selected testimony in favor of the horizontal orientation, a review of the public hearings demonstrates that the public testimony in support of horizontal coastal and rural districts was by no means unanimous. While members of the public testified that they wanted coastal areas together and separate from rural areas because of common interests, other members of the public testified in support of vertical districts that would unite counties.
We commend the Legislature for holding multiple public hearings and obtaining public input. However, the Legislature is required to follow the requirements in the constitution, including the requirements that districts be drawn “as nearly equal in population as is practicable,” to be “compact,” and to “where feasible, utilize existing political and geographical boundaries.” Art. Ill, § 21(b), Fla. Const. While the equal population and political and geographical boundaries requirements are stated in terms of “as nearly as is practicable” or “where feasible,” the compactness requirement is not modified by such qualifiers but framed in terms of “shall.” As explained above, maintaining communities of interest is not a constitutional requirement, and comporting with such a principle should not come at the expense of complying with constitutional imperatives, such as compactness.
A review of the Coalition’s alternative plan reveals that it was possible to draw districts in the Panhandle that are more visually compact and keep more counties together; only one county, Okaloosa County, is split in the Coalition’s plan. Further, when drawing the districts to be compact and utilize consistent political boundaries, the Coalition districts also retain less of the core population of predecessor districts — 66.2% and 58.4% — closer to the average (64.2%) of the Senate plan.
The orientation of Districts 1 and 3 is in fact very similar to the composition of Districts 2 and 4 in 2002, depicted below. Although part of Okaloosa County is now included in District 1, that area consists in large part of the Eglin Air Force Base. The incumbents in Districts 1 and 3 both live in Okaloosa County and would represent largely the same constituencies as they did under the 2002 plan.
*665 [[Image here]]
The drawing of the districts sacrificed compactness — a constitutional imperative — in order to keep coastal communities together. Further, although the Senate followed numerous different boundaries when drawing Districts 1 and 3, often switching between different types of boundaries within the space of a few miles, it sacrificed compactness, not in a reasoned balancing effort to comply with the requirements of equal population or to utilize political or geographical boundaries such as municipal or county boundaries, but rather to create a coastal district and an inland rural district.
We also consider it significant that in doing so, a high percentage of population from predecessor districts was retained to the benefit of the incumbents. While it is not only the fact that the districts maintained overwhelming percentages of the former core constituencies in isolation, in the context of our overall analysis of this district, it is significant. There is no valid constitutional justification for the decision to draw Districts 1 and 3 in this configuration, and we conclude that Districts 1 and 3 are constitutionally invalid.
Northeast Florida: Senate Districts 6 and 9
The FDP and the Coalition challenge District 6 on the grounds that the Senate used Florida’s minority voting protection provision as a pretext for partisan favoritism and violated the requirements of compactness and utilizing political and geographical boundaries. Based on the objective data before this Court, we conclude that District 6 violates constitutional mandates by sacrificing compactness and utilizing boundaries when not necessary to do so to avoid conflict with the minority voting protection provision.
District 6 begins at the northern edge of Duval County, meanders through Jacksonville, and then stretches southward across five counties to Daytona Beach, with arms to Palatka and St. Augustine. District 6 is adjacent to neighboring District 9, which stretches along the coast from north of Jacksonville Beach to South Daytona with District 6 on its western border. Districts 6 and 9 are depicted below.
*666 [[Image here]]
District 6 is not compact visually, and the mathematical measures of compactness confirm this. District 6 received a Reock score of 0.12 (closer to 1 is better), and an Area/Convex Hull score of 0.43 (closer to 1 is better). Although part of District 6’s western border follows the St. Johns River, it is evident that its non-compactness is not a result of attempting to utilize an existing political or geographical boundary. Neighboring District 9 is also visually not compact as a result of having District 6 on its western border, and it received a Reock score of 0.15 and an Area/Convex Hull score of 0.61.[47]
The stated justification for the configuration of District 6 is minority voting protection. As we have explained previously, because the Senate never performed an appropriate functional analysis, the reliability of this justification is questionable. District 6 is a black opportunity district, with a black VAP of 47.7%. District 6 is not a majority-minority district, and neither was its predecessor in the benchmark *667 Senate plan. The benchmark district, old District 1, had a black VAP of 46.9%. In short, this is not a district where the Senate’s goal was to create a majority-minority district.
While the percentage falls short of a majority, District 6 is one in which an analysis of voting behavior that this Court is able to perform using the House’s redistricting software and the House’s voter registration and election data reveals that black voters are likely able to elect their representative of choice. District 6 would perform Democratic; it would have voted 58.7% for Sink (D) in the 2010 gubernatorial election, 63.3% for Obama (D) in the 2008 presidential election, and 52.0% for Davis (D) in the 2006 gubernatorial election. Democrats would make up 58.0% of registered voters, and 69.4% of the registered Democrats would be black (showing opportunity for black voters among Democrats). Further, 87.2% of the black voters would be registered Democrats (showing voting cohesion among black voters in general). As to the registered voters who actually voted in the 2010 general election, the numbers would be quite similar: Democrats would make up 57.6% of registered voters, 69.2% of the Democrats would be black, and 92.2% of the black voters would be Democrats. Black voters would have also controlled the Democratic primary, with 67.3% of the Democrats voting in the primary being black. This analysis indicates that the district will likely afford black voters the ability to elect candidates of their choice.
The Legislature formed this district with the stated intent to preserve minority voting opportunities. The Legislature stated that it intended to “tie[ ] communities of similar socioeconomic characteristics in the northeastern portion of the state from the St. Johns River basin to Interstate 95 between Daytona Beach and Jacksonville, consistent with traditional, race-neutral redistricting principles” and to create a district with “a near majority black voting-age population, comparable to that of the existing district.” SJR 1176 at 39.[48] District 6 retains 70.3% of its predecessor district (old District 1). However, as discussed above, the Senate in drawing this district did not perform a functional analysis, but rather focused on keeping the core of old District 1. Old District 1, however, was drawn at a time when compactness was not a constitutional imperative. Because compactness is now a requirement, the Legislature is permitted to -violate compactness only when necessary to avoid conflict with tier-one standards, including the minority voting protection provision.
In support of its argument, the Coalition submitted a proposed alternative plan that includes a black opportunity district contained entirely within Duval County (Coalition District 1). That district is depicted below.
*668 [[Image here]]
Coalition District 1 has a black VAP of 42.4%. While we recognize that this is lower than the black VAP of the benchmark District 1 (which has a black VAP of 46.9%), our inquiry does not end there. An examination of voting strength must be conducted. The equivalent district under the Coalition’s alternative plan would perform Democratic; it would have voted 57.3% for Sink (D) in the 2010 gubernatorial election, 61.0% for Obama (D) in the 2008 presidential election, and 49.1% for Davis (D) in the 2006 gubernatorial election. Democrats would make up 56.1% of registered voters, and 66.4% of the registered Democrats would be black (showing opportunity for black voters among Democrats). Further, 86.8% of the black voters would be registered Democrats (showing voting cohesion among black voters in general). As to the registered voters who actually voted in the 2010 general election, the numbers would be quite similar: Democrats would make up 55.8% of registered voters, 65.8% of the Democrats would be black, and 91.6% of the black voters would be Democrats. Black voters would have also controlled the Democratic primary, with 64.3% of the Democrats voting in the primary being black. This analysis indicates that the district will likely afford black voters the ability to elect candidates of their choice.[49]
*669 Thus, the Coalition has demonstrated that District 6 can be drawn much more compactly and remain a minority-opportunity district. In addition to being much more visually compact, the compactness measurements are much better. Coalition District 1 scores a 0.32 on Reock and a 0.66 on Area/Convex Hull, compared to Senate District 6, which scores a 0.12 on Reock and 0.48 on Area/Convex Hull.
We recognize that our role is not to select the “best plan.” However, the Coalition’s plan demonstrates that Senate District 6 violates the constitutional standards of compactness and utilizing existing political and geographical boundaries. The alternative plan shows how political and geographical boundaries can be better utilized and demonstrates how District 6 can be made more compact by placing it entirely within Duval County rather than stretching southward across five counties to Daytona Beach, without violating Florida’s minority voting protection provision.
Further, although adjoining District 9, standing alone, is not invalid, the reason for its lack of compactness and failure to utilize political and geographical boundaries was its location adjacent to District 6. As a result of District 6 being made more compact, District 9 becomes more compact as well.
The Senate violated the compactness standard in drawing Districts 6 and 9, and it failed to perform the functional analysis necessary to properly determine when compactness should yield because of a conflict with the tier-one standard of minority voting protection. This is also indicative of intent to favor incumbents and a political party. By keeping District 6 in the same configuration of old District 1, the Senate retained a high percentage of the population of predecessor districts not only for new District 6, which retains 70.3%, but for new District 9, which retains 69.7%. Moreover, the configuration of District 6 draws in Democratic neighborhoods that would otherwise be contained in the surrounding districts. There is no valid justification for Districts 6 and 9. Contrary to any arguments presented either in the Senate’s briefs or during oral argument, there is no constitutional impediment to the alternatives set forth in the Coalition plan, which comply with the constitutional requisites. Accordingly, we conclude that Districts 6 and 9 are constitutionally invalid.
Central Florida: Senate Districts 10 and 12
The Coalition next asserts that District 10 was drawn to favor an incumbent, and the FDP contends that District 12 uses Florida’s minority voting protection provision as a pretext for partisan favoritism. While the challenges are based on different grounds, we consider these claims in tandem because the Senate justifies the boundaries of District 10 based in part on its assertion that it was required to draw District 12 in the manner that it did in order to ensure minority voting protection. Thus, we start with District 10, then review District 12, and conclude that District 10, as drawn, violates the constitution.
The Coalition asserts that District 10 violates article III, section 21, because this district was gerrymandered into a bizarre shape in order to include a particular incumbent’s residence and provide him with a safe Republican seat. The Coalition further asserts that the district barely misses another incumbent’s residence that is located on the border between District 10 and District 13, preventing two incumbent Republicans from running against each other.
A visual examination of the challenged districts is set forth below:
*670 [[Image here]]
As shown in the above map, District 10 is located mostly on the west side of Orlando, and this portion of the district is fairly compact, following county lines on its west and south sides, continuing until it reaches District 12 on the eastern side, and District 14, which is a Hispanic majority-minority district, on the southeastern side. At that point, District 10 squeezes in between Districts 12 and 14 through a small stretch of land less than half of a mile wide in order to create an odd-shaped appendage that reaches out toward District 13, picking up Belle Isle, Edgewood, and Winter Park. The appendage is approximately 12 miles long at its longest portion and 8.5 miles wide at its widest, with the majority of the portion being between two and five miles in width. Based on undisputed information provided to this Court in conjunction with this review, an incumbent lives in the appendage.[50] The district line between Districts 10 and 13 stops just short of another Republican incumbent’s residence by following the boundary between the cities of Winter Park and Mait-land for approximately 3.5 miles.
Although the compactness measures for District 10 reflect that the district is, overall, relatively compact (Reock: 0.36; Area/Convex Hull: 0.75), District 10 is visually non-compact as a result of the bi *671 zarrely shaped appendage. See, e.g., Hickel, 846 P.2d at 46 (“[A]ppendages attached to otherwise compact areas may violate the requirement of compact districting.”).[51]
The dividing line between the District 10 appendage and surrounding Districts 12, 13, and 14 does not consistently follow any particular political or geographical boundary, sometimes following parts of the city boundaries for Belle Isle, Winter Park, and Edgewood, but other times constantly shifting from major roads to minor roads to railroad tracks. In looking to the population deviation, we note that District 10 is one of the most populated districts with 3,995 people above the ideal population.
Of course, tier-two standards must yield if the Legislature cannot comply with the requirements of both tier one and tier two. The Legislature asserts that District 10 was drawn in this manner because of Districts 12 and 14. District 14 is a new Hispanic majority-minority district with a Hispanic VAP of 50.5%; there was no predecessor Hispanic majority-minority district in the 2002 Senate plan. District 12 is a coalition district with a 40.0% black VAP and 20.9% Hispanic VAP. Notably, District 12 is not a black majority-minority district, nor was its predecessor in the benchmark Senate plan.
District 12, which is located in the western and northern portions of the Orlando area, takes in the areas with the highest concentration of black residents from Orlando, Ocoee, Winter Garden, Apopka, Maitland, Winter Park, and Sanford. It is not a visually compact district, and the compactness measures confirm this (Reock: 0.24; Area/Convex Hull: 0.41). It extends into two counties, running in a relatively narrow path on the west end of Orlando and extending upwards and to the east, hugging the top of the area, with a few portions reaching out.
The Legislature formed this district with the stated intent to preserve minority voting opportunities. The Legislature explained that its intent was to “tie[ ] urban communities of similar socioeconomic characteristics in Orange and Seminole Counties, consistent with traditional, race-neutral redistricting principles” and create a district with “a majority-minority voting-age population, comparable to that of the existing district.” SJR 1176 at 41. The predecessor to District 12 was old District 19, a coalition district with a black VAP of 33.1% and a Hispanic VAP of 35.5%. District 12 retained 49.0% of its predecessor district.
As discussed above, the Senate in drawing this district did not perform a functional analysis. Here, the Senate in essence asserts that the districts in the Orlando area do not need to be compact because of a focus on increasing minority voting strength. However, the Senate failed to consider whether this goal could be obtained by performing an analysis that adheres to all of the constitutional criteria.[52]
In reviewing both Districts 10 and 12, we conclude that District 10, which is visually non-compact and clearly encompasses an incumbent in an appendage, is constitutionally defective. Although the Legislature contends that District 10 was drawn because of concerns of not diluting minority voting strength in surrounding districts or causing unlawful retrogression, the Senate never performed the functional analysis necessary to ensure that the reasoning was constitutionally valid. Nothing in the *672 record reflects that the process of drawing the districts in this area recognized the importance of balancing the constitutional values.
After reviewing the compactness of District 10, as well as its failure to observe boundaries and the location of incumbents in this area, and in light of the Senate’s failure to conduct a functional analysis as to District 12, we conclude that there is no valid constitutional justification for District 10. Based on the objective data before this Court, we conclude that District 10 violates constitutional mandates because it is visually non-compact with an appendage that reaches out to clearly encompass an incumbent, and this bizarre shape cannot be justified based on concerns pertaining to ensuring minority voting strength. District 10 is constitutionally invalid.
Southwest Florida: Senate District 30
The FDP argues that District 30 was drawn with the intent to favor an incumbent in violation of the Florida Constitution. As evidence, the FDP points to the fact that District 30 contains a high percentage of its former constituency, is non-compact, and fails to utilize political and geographical boundaries. After examining all the constitutional requirements, we conclude that the district as drawn violates the Florida constitutional standards that districts “shall be compact” and utilize political and geographical boundaries where feasible. Further, the failure to comply with the tier-two standards, in the absence of any constitutionally valid justification, objectively indicates intent to favor an incumbent.
District 30 is located in Collier and Lee Counties. It stretches from Cape Coral, extends over water to Sanibel Island and back over water to Fort Meyers Beach, and then travels down the west coast all the way to the Everglades, encompassing Naples and Marco Island as it winds its way down. The map of District 30, below, best shows its odd-shaped configuration, which resembles an upside-down alligator.
[[Image here]]
*673 District 30 is a white-majority district (white VAP of 78.4%). District 30 retains 84.9% of its constituency from old District 37 and a shape nearly identical to its predecessor district. It is visually non-compact, and the mathematical measures of compactness support this conclusion, with a Reock score of 0.18 and an Area/Convex Hull score of 0.56 (closer to 1 is better).
In terms of political and geographical boundaries, District 30 is bounded to the north and south by county lines, but the district cuts through the city of Bonita Springs, and the mainland’s only connection to Sanibel Island is a bridge that is cut in half by the district line. Thus, in addition to being non-compact, District 30 splits counties, municipalities, and geographical features.
In passing the joint resolution, the Legislature stated its intent with respect to this district was to “tie[ ] coastal communities in Lee and Collier Counties.” SJR 1176 at 47. The Senate districts surrounding coastal District 30 are Districts 23, 28, and 40. Districts 23 and 28 are both white-majority districts (white VAPs of 75.2% and 87.9%, respectively). They are visually and numerically much more compact than District 30[53] and do not need to comply with Florida’s minority voting protection provision. District 40, on the other hand, is in a covered county under Section 5 of the VRA.
With the exception of the boundary it shares with District 40, District 30 does not need to be configured to avoid diminishing minority voting strength, and thus the Legislature is required to draw District 30 to be “as nearly equal in population as is practicable,” to be “compact,” and to “where feasible, utilize existing political and geographical boundaries.” Art. Ill, § 21(b), Fla. Const.
The aforementioned stated legislative intent demonstrates that in creating District 30, the Legislature intended to tie coastal communities together. However, as we have discussed in analyzing the constitutional phrase “compactness” and our discussion of Districts 1 and 3, maintaining communities of interest is not required by the constitution, and comporting with such a principle must not come at the expense of complying with constitutional imperatives. We also consider it significant that District 30 maintained a large percentage of the same constituency as the predecessor district. On this record, there is no valid constitutional justification for the Legislature’s decision to draw District 30 in this manner. District 30 is constitutionally invalid.
Southeast Florida: Senate Districts 29 and 34
The FDP and the Coalition contend that Districts 34 and 29 are not compact. Additionally, the Coalition argues that the Senate plan keeps the black voting-age population in District 34 the same as it was in the predecessor district, without undertaking the required functional analysis. The Coalition argues that the Senate included as many Democrats as possible into this district in order to dilute their votes elsewhere. The Coalition asserts that this evidences intent to favor an incumbent and a political party. Specifically, the Coalition contends that the decision to draw District 34 this way was a ploy to keep the neighboring Republican incumbent seat safe in District 29 by using minority protection as a pretext for partisan favoritism. We conclude that both districts are constitutionally invalid because they are not compact, do not utilize political and geographical boundaries where feasible, and *674 appear to have been drawn with the intent to favor an incumbent and a political party.
District 34 is a narrow district stretching approximately fifty miles from Riviera Beach and Lake Park in Palm Beach County southwards in a narrow strip to Fort Lauderdale in Broward County. At its narrowest point, which is in Boca Ra-ton, District 34 is less than a mere tenth of a mile wide, connected by the 1-95 corridor. Following a jagged path south, District 34 slices through cities and neighborhoods, often gathering up residents on one side of a residential street but not the other.
District 29, which is adjacent to District 34, is a long and narrow coastal district that snakes along the outer banks and eastern shoreline to the east of District 34. District 29 begins in Jupiter, wraps around the top of District 34 to take in Palm Beach Gardens, then travels south in a narrow sliver along the coast through Lake Worth, Palm Beach, Boca Raton, and Pompano Beach to Fort Lauderdale. These districts are depicted in the map below.
[[Image here]]
Districts 34 and 29 are clearly not compact, and the mathematical measurements confirm this. Under the Reock method of measurement, District 34 scores a low 0.05 (closer to 1 is better) — the least compact of all of the Senate districts; District 34 does not fare much better under the Area/Convex Hull method of measurement, scoring 0.25 (closer to 1 is better). As a result of the shape of District 34, District 29 is also visually non-compact, and it has a Reock score of just 0.15 and an Area/Convex Hull *675 score of 0.56. In addition, these districts do not adhere to a consistent boundary as they travel through counties and cities.
Unquestionably, minority protection was an important factor in considering how to draw District 34 because it is a black majority-minority district with a black YAP of 55.8%. As it travels down the coast, the district takes in the neighborhoods with the highest concentrations of black residents in Broward and Palm Beach Counties. The incumbent for this district is a Democrat. In the benchmark plan, the predecessor to District 34 (old District 29) was also a black majority-minority district, having a black voting-age population of 60.7%.[54] District 34’s shape is similar to the shape it had under the 2002 Senate plan, and the district retains 79.4% of its prior population.
Neighboring District 29’s shape is also similar to the shape it had under the 2002 Senate plan, and it retains 82.1% of its prior population. The incumbent for this district is a Republican. It is a white-majority district, having a white VAP of 79.4%. Its predecessor (old District 25) was also a white-majority district under the 2002 benchmark plan, having a white VAP of 78.0%.
The Legislature’s stated intent with respect to District 34 was to preserve minority voting opportunities. The Legislature explained that its intent was to “tie[ ] communities of similar socioeconomic characteristics along Interstate 95 and U.S. 1 in Palm Beach and Broward Counties, consistent with traditional, race-neutral redistricting principles” and to create the district with “a majority black voting-age population, comparable to that of the existing district.” SJR 1176 at 48. The Senate staff analysis further explains that the configuration of District 34 “preserves the core of a district that has consistently elected candidates preferred by minority voters.” Senate District Descriptions at 1014. Under the 2012 Senate plan, District 34 would be solidly Democratic, and an analysis of voting behavior indicates that the district will likely afford black voters the ability to elect candidates of their choice.[55]
As to District 29, the Senate acknowledged that the district was adjacent to a minority-opportunity district, stating that it was creating a district that “ties the coastal communities of Broward and Palm Beach Counties; is equal in population to other districts; follows political and geographical boundaries; [and] is adjacent to a minority-opportunity district to its west and the Atlantic Ocean to the east.” SJR 1176 at 46 (emphasis added).[56]
Of course, the requirement of compactness must yield when necessary to avoid a conflict with the tier-one standard of protecting minority voting. However, as we *676 have previously discussed, the Senate in drawing minority districts did not perform a functional analysis, but rather focused on keeping the core of the minority districts under the 2002 Senate plan. The 2002 Senate plan, however, was drawn at a time when compactness was not a constitutional imperative.
We also consider the partisan favoritism claim. Every Senate district immediately surrounding District 34 (Districts 27, 31, 32, and 36), except for District 29, is a majority-white district that would perform Democratic.[57] Unlike the surrounding districts, District 29 would remain competitive, but lean Republican in terms of election results,[58] and the incumbent in this district is a Republican. The challengers essentially maintain that District 34 was drawn to take Democratic voters out of District 29 to keep it competitive under the guise of maintaining District 34 as a black majority-minority district. The current configuration would, in effect, favor a Republican incumbent.
The Coalition has submitted an alternative plan that shows a different configuration for this area that is more compact overall.
*677 [[Image here]]
For a point of reference, the Coalition District 29 is equivalent to the Senate District 34 (black majority-minority districts under both plans with black VAPs of 55.7% and 55.8%, respectively), and an analysis of voting behavior likewise reveals that Coalition District 29 will likely afford black voters the ability to elect candidates of their choice.[59] We note that the non-diminishment standard does not prohibit any change to existing boundaries or to population percentages of a previously existing black majority-minority district. The Coalition’s plan makes the area, as a whole, more compact than the corresponding area under the Senate plan.
Under the Senate plan, the districts surrounding District 34 have the following compactness measurements (closer to 1 is better): District 27 (Reock: 0.23; Area/Convex Hull: 0.82); District 29 (Reock: 0.15; Area/Convex Hull: 0.56); District 31 (Reock: 0.43; Area/Convex Hull: 0.85); District 32 (Reock: 0.49; *678 Area/Convex Hull: 0.92); and District 36 (Reock: 0.25; Area/Convex Hull: 0.63). Including the scores for District 34, the average Reock score of these districts is 0.27, and the average Area/Convex Hull score is 0.67.
As a comparison, under the Coalition’s plan, the districts surrounding its District 34 equivalent (Coalition District 29), including that district itself, have the following compactness measurements: District 25 (Reock: 0.32; Area/Convex Hull: 0.67); District 29 (Reock: 0.42; Area/Convex Hull: 0.76); District 30 (Reock: 0.37; Area/Convex Hull: 0.77); District 31 (Reock: 0.18; Area/Convex Hull: 0.77); District 32 (Reock: 0.35; Area/Convex Hull: 0.75); and District 35 (Reock: 0.38; Area/Convex Hull: 0.78). These districts in the Coalition’s plan have, on average, a Reock score of 0.34 and an Area/Convex Hull score of 0.75, improving upon the Senate plan’s compactness. While the role of alternative plans is not to select the “best plan,” the Coalition’s plan demonstrates that the Senate was able to draw districts in this region of the state to better comply with Florida’s compactness requirement while, at the same time, maintaining a black majority-minority district.
In order to evaluate the partisan favoritism claim, we further evaluate the effect of this more compact configuration on the political composition of the districts. As a result of the black Democratic voters in the long narrow strip of District 34 between West Palm Beach and Pompano Beach being dispersed into surrounding districts under the Coalition’s plan, rather than being concentrated in District 34, the equivalent to District 29 in the Coalition plan — Coalition District 31 — becomes Democratic.[60] The Coalition’s plan creates five Democratic districts in this area, as opposed to the four Democratic districts in the 2012 Senate plan.[61] The Democratic voters in this area of the state are concentrated and the area is largely Democratic; the Coalition’s plan does not appear to purposefully draw Democratic districts but rather to draw logical, compact districts in a neutral manner.
We conclude that the Senate’s decision to draw this region in a less compact manner is indicative of intent to favor an incumbent and a political party by keeping District 29 essentially the same as its predecessor district. Further, in drawing this area of the state, the Senate violated the compactness requirement by simply keeping the cores of the previously existing districts without performing a functional analysis and endeavoring to draw compact districts that also adhere to Florida’s minority voting protection provision.
There is no constitutionally valid justification for Districts 29 and 34. Although the Senate’s stated intent in drawing these districts was also to “tie[ ] communities of similar socioeconomic characteristics along *679 Interstate 95 and U.S. 1 in Palm Beach and Broward Counties,” SJR 1176 at 48, there is no demonstrated community of interest that is being maintained, and, importantly, utilizing political and geographical boundaries and mandating compactness are constitutional requirements, whereas maintaining communities of interest is not. In this case, we conclude that the only reason for maintaining this configuration based on the 2002 Senate plan was to benefit an incumbent and a political party in general. Districts 29 and 34 are constitutionally invalid.
Remaining Challenged Districts
We now briefly discuss the remaining challenged districts, all of which we reject because no constitutional violation has been shown.
Senate District 4. The FDP summarily challenges District 4, alleging that it could have been drawn in a manner such that the district lines crossed fewer county boundaries. District 4 includes all of Nassau County and then reaches into Duval County twice, stopping at the Duval county line and including any portions of Duval County that are not within Districts 6 or 9. However, in order to satisfy the equal population requirement, the district cannot be contained entirely within Nassau County. Thus, this claim fails.
Senate District 15. The Coalition challenges District 15 on the basis that it was configured to favor an incumbent by removing from his district parts of Hillsbor-ough County because he is unpopular in that county. Regardless of whether the facts relied upon by the Coalition are true, there are simply no objective indicators of improper intent. District 15 is not oddly shaped or strangely contorted and the objected — to portion of the district now follows a county boundary where it did not before. The Coalition has failed to carry its burden with respect to this district.
Senate Districts 25 and 26. The FDP summarily asserts that Districts 25 and 26 fail to utilize political and geographical boundaries, because they split multiple counties and cities and because District 26 extends across most of the peninsula from near the Atlantic Ocean to near the Gulf of Mexico. While it may be possible that Districts 25 and 26 could have been drawn to split fewer counties and cities while adhering to the remaining constitutional requirements, the FDP does not demonstrate that this can be done.
Senate Districts 28 and 33. The FDP summarily alleges that Districts 28 and 33 retain high percentages of the populations from their predecessor districts in order to benefit the incumbents in those districts. In challenging these districts, the FDP does not point to any other indicators of improper intent, and we deny these challenges.
Senate District 38. The Coalition argues that the Legislature over-packed this district with Democrats in order to dilute the Democratic vote elsewhere. District 38 is a black majority-minority district located in Miramar, Miami Gardens, and North Miami with a black VAP of 58.3%. Its predecessor district under the 2002 benchmark plan (old District 33) is also a black majority-minority district with a black VAP of 59.2%. District 38 is visually compact, and the compactness measurements reflect this with a Reock score of 0.55, and an Area/Convex Hull score of 0.83 (closer to 1 is better). The comparable district under the Coalition’s alternative plan, Coalition District 33, is not a black majority-minority district, containing a black VAP of just 48.3%, and is visually less compact, with correspondingly lower compactness scores (Reock: 0.33; Area/Convex Hull: 0.69). The Coalition has not carried its burden to demonstrate *680 that District 38 violates constitutional mandates.
Senate Districts 35 and 36. The Coalition contends that Districts 35 and 36 were both drawn to protect the incumbents in those districts in that the Senate plan consolidates black and Hispanic voters into neighboring districts in order to retain in Districts 35 and 36 much of the same population the incumbents in these districts now serve. We conclude that the Coalition has not satisfied its burden of proof, as it appears there could be valid justifications for the shape of each district. Both districts are defined by their surrounding districts, which include minority districts. Further, neither district is contorted or strangely shaped given these considerations.
District 35 is a coastal district bounded to the east by the Atlantic Ocean and to the west by two majority-minority districts, District 37 (Hispanic VAP of 83.7%), and District 38 (black VAP of 58.3%), as well as District 40, which has a black VAP of 35.1% and a Hispanic VAP of 39.8%. The predecessors to Districts 37 and 38 are also majority-minority districts in the benchmark plan,[62] and District 40’s predecessor in the benchmark plan, old District 39, contains similar voting-age populations with a black VAP of 29.1% and a Hispanic VAP of 43.0%. Significantly, District 40 includes three covered counties (Monroe, Collier, and Hendry Counties) for purposes of Section 5 preclearance under the VRA. District 40 reaches around District 37 and District 35 and necessarily affects the configuration of the districts in the Miami-Dade County area.
District 36 is bounded to the east by the Atlantic Ocean, to the north by District 34, a black majority-minority district (black VAP of 55.8%), and to the south by District 38, black majority-minority district (black VAP of 58.3%). As discussed in more detail above, the predecessor districts to Districts 34 and 38 were also black majority-minority districts. However, as previously discussed, although the Coalition offers an alternative configuration for this area, the corresponding district to District 38 in the Coalition’s plan reduces the black VAP below that of a majority and makes the district less compact. We conclude that the Coalition has not carried its burden of proof with respect to these districts.
d. City of Lakeland
In the final individual challenge to the 2012 Senate plan, the City of Lakeland alleges that the Legislature violated the requirement of article III, section 21(b), to utilize existing political boundaries where feasible. Lakeland claims that the Senate plan ignored Lakeland’s municipal boundaries and bifurcated the city into two Senate districts, District 24 and District 16. Lakeland contends that the record of legislative proceedings is devoid of any factual predicate upon which the Senate could have relied when it determined that it was not feasible to utilize Lakeland’s existing municipal boundaries.[63] In contrast to other areas of the state where the splitting of municipalities was necessitated by population sizes and the close proximity between major municipalities, Lakeland has asserted that such a justification does not apply to it because of its location.
*681 As argued by Lakeland, the Senate’s failure to utilize Lakeland’s municipal boundary split the city into two pieces. Lakeland asserts that the western piece consists of approximately 40.9 square miles, contains 68,292 citizens, and is included in District 24 (old District 21). The eastern piece consists of approximately 38.8 square miles, contains 34,130 citizens of Lakeland and is included in District 16 (old District 16). In addition, the southwest portion of Lakeland also borders District 26 (old District 17), but that district does not dissect any part of Lakeland.
The below map from the Lakeland’s brief depicts graphically the split of Lake-land:
[[Image here]]
As described in Lakeland’s brief:
Senate District 24 includes portions of western Polk and eastern Hillsborough counties, along with a substantial majority of Manatee County. Beginning in the northwest corner of the district in eastern Hillsborough County, the district includes all of the municipal boundaries of Plant City. Heading approximately ten (10) miles east from Plant City into western Polk County, the northeastern comer of the district boundaries cuts directly through the center of the City of Lakeland, taking the more 'populated southwestern portion of the City, while leaving the northeastern half behind. Heading south from Plant City and Lakeland, the district captures an approximately fifteen (15) to twenty (20) mile wide swath of mostly rural land in eastern Hillsbor-ough and western Polk counties, widening on the Hillsborough side just before the Manatee County border. Upon *682 reaching the southern borders of Polk and Hillsborough counties, the district expands to include virtually all of Manatee County. The district boundaries follow the entire eastern, western, and southern borders of Manatee County, with only a small portion in the northwest of the county omitted from this district. Along the Manatee County coast, the district captures the entire city limits of several beachfront cities, including Anna Maria, Holmes Beach, and Bradenton Beach, and the vast majority of Bradenton and Palmetto. Overall, Senate District 24 is approximately forty-five (45) miles wide at its widest point (the entirety of Manatee County), with a maximum height of approximately fifty-five (55) miles (from Lakeland to the southern border of Manatee County).
The below map depicts the City of Lake-land in context of the surrounding districts (Lakeland is on the border between Districts 16 and 24, near the center of the map):
[[Image here]]
While Lakeland asserts that the Senate plan does not comply with article III, section 21(b), because it failed to utilize its municipal boundary, the Florida Constitution does not require the Legislature to use every municipal boundary. The requirement of section 21(b) is that the Legislature should utilize political and geographical boundaries where feasible.
As we discussed in our analysis of this standard, unlike the House’s approach, the Senate failed to adhere to any consistent definition of “political and geographical boundary.” This is especially evident because in the case of District 24, the Senate placed part of inland Lakeland with the coastal communities of Manatee County, whereas in Districts 1 and 3, the Senate justified the split of five counties by claiming it wanted to keep the coastal communities together.
*683 The only explanation for the splitting of Lakeland on this record occurred during the Senate floor debate when a senator inquired as to why the City of Lakeland had been divided. In response, the Chair of the Senate Committee on Reapportionment replied that the Senate’s first consideration was creating two minority districts in Orlando and one minority district in Tampa and from there, he described the various boundaries of the district including those places where the political and geographical boundaries were utilized. He concluded, stating:
In redistricting as you have suggested in your question requires us to balance priorities and this area of the state as you have suggested does represent a convergence and a reconciliation of many different priorities.... And I think you make an excellent argument ... that we could have done that, but at this point any change to this part of the region would have ripple [effects] throughout the entire area and in the bordering districts, and we believe that this arrangement that is in the proposal represented the best reconciliation of priorities.
Because the Senate operated under an inconsistent definition of “political and geographical boundaries” and did not have the benefit of this Court’s interpretation of this important constitutional requirement, we conclude that when the Senate drew this portion of the plan, it did so with an incorrect understanding of both compactness and utilizing political and geographical boundaries. Also, to the extent that the ripple effect referred to was a result of concerns for minority protection, because no functional voting analysis was undertaken, the Senate’s conclusions as to that constitutional principle are questionable. Because we are declaring the Senate plan invalid based on a number of reasons, the Senate will have the opportunity to review Districts 16 and 24 and, after applying the correct definitions of these terms, determine whether it is feasible to utilize the municipal boundaries of Lakeland.
e. Conclusion as to the Senate Plan
We hold that the Senate plan is invalid. In doing so, we consider the fact that the Senate failed to conduct a functional analysis as to regression in order to properly determine when, and to what extent, the tier-two requirements must yield to avoid conflict with Florida’s minority voting protection provision. Moreover, as to the requirements of compactness and utilization of existing boundaries, the Senate’s expansive interpretations — interpretations we reject — and inconsistent use of these standards undermined the purpose of these requirements. Additionally, we conclude that the Senate plan is rife with objective indicators of improper intent.
We have examined and declared Senate Districts 1, 3, 6, 9, 10, 29, 30, and 34 to be in violation of constitutional requirements. We have also expressed our concerns with respect to the City of Lakeland. Finally, we declare the numbering scheme to be invalid because it was intended to benefit incumbents by making them eligible to serve for longer periods of time than they would have otherwise been eligible to serve. Accordingly, the Senate plan does not pass constitutional muster, and it is our duty under the Florida Constitution to declare it invalid.
IV. CONCLUSION
The Fair Districts Amendment changed the constitutional framework for apportionment, introducing significant reforms in the drawing of legislative districts. Before the passage of the Fair Districts Amendment in 2010, there is no question that the House and Senate plans would have passed constitutional muster and *684 both would have been validated by this Court.
The citizens, through our state constitution, have now imposed upon this Court a weighty obligation to measure the Legislature’s Joint Resolution with a very specific constitutional yardstick. The constitutional imperatives set forth in article III, sections 16 and 21, of the Florida Constitution are the instructions given to the Legislature by the citizens, mandating how apportionment plans are to be drawn. These instructions are a further expression of the will of this state’s citizens to ensure that their right to elect representatives is not frustrated as a result of partisan favoritism or incumbent protection.
The citizens have expressed their will, requiring the Legislature to “redistrict in a manner that prohibits favoritism or discrimination, while respecting geographic considerations” and “to require legislative districts to follow existing community lines so that districts are logically drawn, and bizarrely shaped districts ... are avoided.” Standards for Establishing Legislative Dist. Boundaries, 2 So.3d at 181, 187-88 (plurality opinion). The new constitutional provisions seek to level the playing field in how legislative districts are drawn. These mandates are specific, and the citizens of this state have entrusted to the Supreme Court of Florida the constitutional obligation to interpret the constitution and ensure that legislative apportionment plans are drawn in accordance with the constitutional imperatives set forth in article III, sections 16 and 21. A failure to define these constitutional imperatives in a manner consistent with the will of the voters would frustrate the intended purpose of this new amendment.
We conclude that the challengers have demonstrated that the Senate plan, but not the House plan, violates the constitutional requirements. We therefore declare the Senate plan constitutionally invalid and the House plan constitutionally valid. The language of Senate Joint Resolution 1176 establishes that the Legislature intended the Senate and House plans to be severa-ble from each other in the event either plan was held invalid. See SJR 1176, § 7, at 669.
The Court recognizes that this opinion represents the first time since the passage of the Fair Districts Amendment that this Court has judicially interpreted the newly added constitutional provisions of article III, section 21. While we commend the Legislature for its efforts to interpret these standards, we also acknowledge that the Legislature lacked the benefit of our guiding construction. This Court understands that its obligations are not just to rule on the facial validity of the standards in this case, but to ensure that this decision charts a reliable course for the Legislature and the judiciary to follow in the future.
We have interpreted each of the new standards in this opinion, which are set forth in the two tiers of article III, section 21(a), (b). The first tier, contained in section 21(a), lists the following three requirements: (1) no apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent; (2) districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and (3) districts shall consist of contiguous territory. We have explained as follows with respect to these standards. The Florida Constitution prohibits drawing a plan or district with the intent to favor or disfavor a political party or incumbent; there is no acceptable level of improper intent. By its express terms, Florida’s *685 constitutional provision prohibits intent, not effect, and applies to both the apportionment plan as a whole and to each district individually. The minority voting protection provision imposes two requirements that plainly serve to protect racial and language minority voters in Florida: prevention of impermissible vote dilution and prevention of impermissible diminishment of a minority group’s ability to elect a candidate of its choice. Finally, districts must be contiguous.
The second tier, contained in section 21(b), lists the following three requirements: (1) districts shall be as nearly equal in population as is practicable; (2) districts shall be compact; and (3) districts shall utilize existing political and geographical boundaries where feasible. These requirements circumscribe the Legislature’s discretion in drawing district lines to guard against gerrymandering, requiring it to conform to traditional redistricting principles. The Legislature is required to make districts as nearly of equal population as is practicable, but deviations from equal population may be based on compliance with other constitutional standards. Compactness refers to the shape of the district; the goal is to ensure that districts are logically drawn and that bizarrely shaped districts are avoided. Compactness can be evaluated both visually and by employing standard mathematical measurements. As to utilizing political and geographical boundaries, we accept the House’s view of geographical boundaries as those that are easily ascertainable and commonly understood, such as “rivers, railways, interstates, and state roads.” Strict adherence to these standards must yield if there is a conflict between compliance with them and the tier-one standards. Importantly, the extent to which the Legislature complies with the requirements contained in tier two serves as an objective indicator of impermissible legislative purpose proscribed under tier one (e.g., intent to favor or disfavor a political party or an incumbent).
Because we have now defined Florida’s new constitutional standards through this opinion, this Court has provided the Legislature with parameters for the application of the standards to the apportionment plan. Through our interpretation and review, we have attempted to provide the Legislature with direction as to the specific constitutional problems that we conclude have been proven and to the general problems with the entire Senate plan, including the renumbering of the districts. As the next phase of this apportionment process begins, we are confident the Legislature will apply these standards in a manner consistent with the interpretation we have heretofore provided, keeping as its goal a Senate plan that would pass constitutional muster. The Court views its constitutional obligation of drawing a plan to be the course of last resort.
In accordance with article III, section 16(d), the Governor and the Legislature must now follow the procedures enumerated therein, which govern the process that ensues when the Supreme Court of Florida declares an apportionment plan to be constitutionally invalid. The Legislature is now tasked by the Florida Constitution with adopting a new joint resolution of apportionment conforming to the judgment of this Court. Because we have declared the House’s apportionment plan to be valid, the only plan that needs to be redrawn by the Legislature is the Senate plan.[64]
*686 The Coalition has requested that this Court provide “clear instructions as to how to remedy the breach” if the Court were to find the plans to be “non-eompliant.” However, the Court’s role at this time is not to dictate the apportionment plan that the Court would draw, but to provide the Senate with sufficient guidance in our interpretation of the standards and our application of those standards.
We have held that Senate Districts 1, 3, 6, 9, 10, 29, 30, and 34 are constitutionally invalid. The Legislature should remedy the constitutional problems with respect to these districts, redrawing these districts and any affected districts in accordance with the standards as defined by this Court, and should conduct the appropriate functional analysis to ensure compliance with the Florida minority voting protection provision as well as the tier-two standards of equal population, compactness, and utilization of existing political and geographical boundaries. As to the City of Lake-land, the Legislature should determine whether it is feasible to utilize the municipal boundaries of Lakeland after applying the standards as defined by this Court. In redrawing the apportionment plan, the Legislature is by no means required to adopt the Coalition’s alternative Senate plan. Finally, we have held that the numbering scheme of the Senate plan is invalid. Accordingly, the Legislature should renumber the districts in an incumbent-neutral manner.
Given the absolute urgency in complying with the strict time limits set forth in article III, section 16(c), stating that this Court “shall enter its judgment” within thirty days from the filing of the Attorney General’s petition, our prior practice when determining the validity of the Legislature’s joint resolution of apportionment has been to not allow a motion for rehearing.
In accordance with article III, section 16(c), of the Florida Constitution, the Court enters this declaratory judgment declaring the apportionment plan of the House of Representatives as contained in Senate Joint Resolution 1176 to be constitutionally valid under the Florida Constitution and declaring the apportionment plan of the Senate as contained in Senate Joint Resolution 1176 to be constitutionally invalid under the Florida Constitution. As contemplated by the Florida Constitution, in accordance with article III, section 16(d), the Legislature now has the task to “adopt a joint resolution conforming to the judgment of the supreme court.” Art. III, § 16(d), Fla. Const.
No motion for rehearing shall be entertained. This case is final.
It is so ordered.
LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs with an opinion.
LABARGA, J., concurs with an opinion.
PERRY, J., concurs with an opinion.
CANADY, C.J., concurs in part and dissents in part with an opinion, in which POLSTON, J., concurs.

. Amendment 6 adopted identical standards for congressional redistricting. The Legislature’s congressional redistricting plan is not currently before us.

. The House and Senate submitted briefs in support of the Joint Resolution. Briefs in opposition to the Joint Resolution were submitted by the following entities: (1) the League of Women Voters of Florida, the National Council of La Raza, and Common Cause Florida (together “the Coalition”); (2) the Florida Democratic Party (FDP); and (3) the City of Lakeland. The Attorney General filed a brief, which did not take a position on whether the plans should be approved, but instead argued for an extremely limited review and for allowing all fact-based challenges to be brought subsequently in a trial court. The Florida State Conference of NAACP Branches, which did not take a position for or against the Joint Resolution, directed its comments solely to the interpretation of the Federal Voting Rights Act and Florida's constitutional minority voting protection provision. Finally, the Florida State Association of Supervisors of Elections filed a comment to make the Court aware of the qualifying deadlines for the Florida Legislature and Congress under the Florida Statutes.

. This constitutional provision is still in effect and has not been changed, other than a minor revision in subsections (b) and (f) to provide that if the Court is required to apportion the state, it must file “an order making such apportionment" with the custodian of state records.

. See In re Apportionment Law-1972, 263 So.2d 797 (Fla.1972); In re Apportionment Law-1982, 414 So.2d 1040; In re Senate Joint Resolution 2G, Special Apportionment Session 1992 (In re Apportionment Law-1992), 597 So.2d 276 (Fla.1992); In re Apportionment Law-2002, 817 So.2d at 832. In In re Constitutionality of House Joint Resolution 25E, 863 So.2d 1176 (Fla.2003), this Court was required to determine the validity of a Fiouse Joint Resolution after the House redrew districts in response to the Department of Justice’s objection that one of those districts was retrogressive within the meaning of Section 5 of the Voting Rights Act with respect to Hispanic voters.

. There is a difference between the Court's role in reviewing a legislative apportionment plan to determine compliance with constitutionally mandated criteria and the Court's role in interpreting statutes; this Court has stated its responsibility in construing statutes differently. For example, in Tyne v. Time Warner Entertainment, 901 So.2d 802, 810 (Fla.2005), in upholding a statute as constitutional, the Court stated that it had "an obligation to give a statute a constitutional construction where such a construction is possible.” This Court has stated that it is committed to the fundamental principle that it has the duty if reasonably possible, and consistent with constitutional rights, to resolve doubts as to the validity of a statute in favor of its constitutional validity and to construe a statute, if reasonably] possible, in such a manner as to support its constitutionality — to adopt a reasonable interpretation of a statute which removes it farthest from constitutional infirmity.
Id. (quoting Corn v. State, 332 So.2d 4, 8 (Fla.1976)).

. According to the comment filed on behalf of the Florida State Association of Supervisors of Election, the qualifying date for all federal, state, county, and district candidates is between June 4 and June 8, 2012, pursuant to section 99.061, Florida Statutes.

. See, e.g., Lightbourne v. McCollum, 969 So.2d 326, 329 (Fla.2007) (relinquishing in an all writs original proceeding to the trial court for that court to make factual findings on lethal injection and to then file those findings with this Court so this Court could make the ultimate determination).

. See, e.g., State ex rel. Clark v. Klingensmith, 126 Fla. 124, 170 So. 616, 618 (1936).

. See Milton v. Smathers, 351 So.2d 24 (Fla.1977).

. After the deadline for the submission of briefs and alternative plans had passed, the Coalition sought to file a supplemental appendix, including a revised alternative House plan. The Court denied that request, and the supplemental appendix was stricken. See In re Joint Resolution of Legislative Apportionment, No. SC12-1 (Fla. Sup.Ct. order filed Feb. 22, 2012).

. In 1982, this Court concluded that because the proceeding was limited to reviewing the facial constitutional validity of the joint resolution, "the suggestion that we should adopt an alternative plan [was] not permissible in these proceedings.” In re Apportionment Law-1982, 414 So.2d at 1052. We did not conclude that alternative plans were impermissible for the purposes of constitutional comparison. With the advent of the new amendment codified in article III, section 21, of the Florida Constitution, portions of which bear a striking resemblance to the Federal Voting Rights Act, we deem it necessary, as we did in 1992, to review alternative apportionment plans to assess effect and intent. See In re Apportionment Law-1992, 597 So.2d at 282 n. 7 (permitting all interested parties to file alternative apportionment plans in support of their arguments with respect to whether or not the Joint Resolution impermissibly discriminated against a minority group).

. We ordered the production of the incumbents' addresses upon which the opponents rely in their arguments. See In re Joint Resolution of Legislative Apportionment, No. SC12-1, Order on Incumbents’ Addresses (Fla. Sup.Ct. order filed Feb. 21, 2012). The Attorney General, Florida Senate, and Florida House of Representatives were given the opportunity to advise the Court regarding whether any of the addresses were inaccurate and, if so, to provide the correct address.

. In that regard, although the Court did not strike the affidavit of the Florida Democratic Party's expert, as requested by the House and Senate, the Court did not rely on that affidavit, instead conducting its own independent analysis using objective data.

. The voting-age population numbers contained in MyDistrictBuilder were consistent with those contained in District Builder. With respect to the Legislature's apportionment plans, these voting-age population numbers were also consistent with the Attorney General’s appendix.

. The House recognized that this data was required in order to evaluate compliance with Florida’s minority voting protection provision as well as the Federal Voting Rights Act, and it included the data in MyDistrictBuilder. See Open Data and Code for MyDistrictBuilder, http://mydistrictbuilder.wordpress.com/open data (last visited Mar. 6, 2012) ("Elections data is required to comply with: Sections 2 and 5 of the federal Voting Rights Act; and Florida's Constitution, Article III, Sections 20(a) and 21(a), which both read, 'districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice’ ”). The Senate chose to omit this data from District Builder. The District Builder Help Manual states: “Recent changes to the Florida Constitution require that districts not be 'drawn with the intent to favor or disfavor a political party or an incumbent.' ... With this new language, the mere presence of political metrics in the interface for building districts could create a perception, unsubstantiated and inaccurate though it may be, that partisan factors influenced how districts were drawn. The Senate, in an abundance of caution, therefore departed from traditional practice and chose to omit voter registration counts and election results from District Builder’s dashboard.” District Builder Help Manual, https://db 10.flsenate.gov/db 1/help (last visited Mar. 6, 2012).

. See Ark. Const, art. VIII, § 5; Cal. Const, art. XXI, § 3(b); Colo. Const, art. V, § 48(e); Conn. Const, art. Ill, § 6(d); Haw. Const, art. IV, § 10; Idaho Const, art. Ill, § 2(5); Ill. Const, art. IV, § 3(b); Iowa Const, art. Ill, § 36; Kan. Const, art. X, § 1(b); Mass. Const, amend, art. Cl, § 3; Me. Const, art. IV, pt. 1, § 3; Md. Const, art. Ill, § 5; Mich. Comp. Laws §§ 3.71, 4.262; N.J. Const, art. II, § 2, ¶ 7; Ohio Const, art. XI, § 13; Or. Const, art. IV § 6(3)(b); Pa. Const, art. II § 17(d); Vt. Stat. Ann. tit. 17, § 1909(a), (f); Wash. Rev. Code § 44.05.130.

. Compare In re Reapportionment of Colo. Gen. Assembly, No. 11SA282, 2011 WL 5830123, — P.3d - (Colo. Nov. 15, 2011) (invalid); Twin Falls Cnty. v. Idaho Comm’n on Redistricting, No. 39373, 2012 WL 130416, 152 Idaho 346, 271 P.3d 1202 (Idaho Jan. 18, 2012) (invalid); Schrage v. State Bd. of Elections, 88 Ill.2d 87, 58 Ill.Dec. 451, 430 N.E.2d 483 (1981) (invalid); In re Legislative Districting of Gen. Assembly, 193 N.W.2d 784 (Iowa 1972) (invalid); In re Legislative Districting of the State, 370 Md. 312, 805 A.2d 292 (2002) (invalid); Hartung v. Bradbury, 332 Or. 570, 33 P.3d 972 (2001) (invalid); Holt v. 2011 Legislative Reapportionment Comm’n, No. 7 MM 2012, 2012 WL 360584, - Pa. -, 38 A.3d 711 (Pa.2012) (invalid); In re Reapportionment of Towns of Hartland, Windsor and W. Windsor, 160 Vt. 9, 624 A.2d 323 (1993) (invalid), with Harvey v. Clinton, 308 Ark. 546, 826 S.W.2d 236 (1992) (valid); Wilson v. Eu, 1 Cal.4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545 (1992) (valid); In re Reapportionment of the Colo. Gen. Assembly, 46 P.3d 1083 (Colo.2002) (valid); Fonfara v. Reapportionment Comm’n, 222 Conn. 166, 610 A.2d 153 (1992) (valid); Kawamoto v. Okata, 75 Haw. 463, 868 P.2d 1183 (1994) (valid); Bonneville Cnty. v. Ysursa, 142 Idaho 464, 129 P.3d 1213 (2005) (valid); Beaubien v. Ryan, 198 Ill.2d 294, 260 Ill.Dec. 842, 762 N.E.2d 501 (2001) (valid); In re Legislative Districting of Gen. Assembly, 196 N.W.2d 209 (Iowa 1972) (valid); In re Stovall, 273 Kan. 731, 45 P.3d 855 (2002) (valid); In re 2003 Legislative Apportionment of House of Representatives, 827 A.2d 810 (Me.2003) (valid); Legislative Redistricting Cases, 331 Md. 574, 629 A.2d 646 (1993) (valid); McClure v. Sec’y of the Commonwealth, 436 Mass. 614, 766 N.E.2d 847 (2002) (valid); Leroux v. Sec’y of State, 465 Mich. 594, 640 N.W.2d 849 (2002) (valid); In re Reapportionment of Towns of Woodbury & Worcester, 177 Vt. 556, 861 A.2d 1117 (2004) (valid).

. We have previously interpreted "consecutively numbered” to not require districts to be consecutively numbered such that each district is adjacent to the next numbered district. See In re Apportionment Law-1982, 414 So.2d at 1050.

. States that share a similar constitutional provision include California and Washington. See, e.g., art. XXI, § 2(e), Cal. Const.; Wash. Const, art. II, § 43(5). Idaho, Iowa, Montana and Oregon codify similar provisions by statute. See Idaho Code § 72-1506; Iowa Code § 42.4(5); MontCode § 5-1-115; Or.Rev. Stat. § 188.010(2).

. The observation made by journalist Bill Cotterell highlights past redistricting practices by quoting a politically powerful Democratic senator and Senate president: "The legendary Senator Dempsey Barron once said running redistricting was like owning a prized hunting dog about to have puppies.” Bill Cotterell, A Process Free of Politics (Wink, Wink), Tallahassee Democrat (Feb. 22, 2012), *616 available at http://www.tallahassee.com/ article/20120223/COLUMNIST03/202230328/ BillCotterell-process-free-politics-wink-wink.

. See, e.g., Ariz. Const, art. IV, pt. 2, § 1(3) (added by initiative measure in 2000); Cal. Const, art. XXI, § 2 (added by initiative measure in 2008); Idaho Const, art. Ill, § 2(2) (created in 1994); Wash. Const, art. II, § 43 (added by constitutional amendment in 1982).

. A "Sisyphean" task is one synonymous with futile and endless labor. The term “Sisyphean” derives from "Sisyphus,” a "cruel King of Corinth condemned forever to roll a huge stone up a hill in Hades only to have it roll down again on nearing the top.” The American Heritage Dictionary of the English Language (4th ed. 2000). A “Sisyphean task,” then, is one that is "[e]ndlessly laborious or futile.” Id.

. Several jurisdictions require the state’s redistricting body to expressly comply with the VRA when drawing district lines. See Ariz. Const, art. IV, pt. 2, § 1(14)(A); Cal. Const, art. XXI, § 2(d)(2).; Colo.Rev.Stat. § 2-1-102(1 )(a)(II); 10 Ill. Comp. Stat. 120/5-5(a), (d); Iowa Code § 42.4; Mich. Comp. Laws § 3.63(b)(ii); Mich. Comp. Laws § 4.261a; Mont.Code Ann. § 5-1-115(2); N.C. Gen.Stat. § 163-132. lB(a); Or.Rev.Stat. § 188.010; Tenn.Code Ann. § 3-1-103(6). Courts interpreting these standards have not departed from prevailing United States Supreme Court precedent. See, e.g., Vandermost v. Bowen, 53 Cal.4th 421, 137 Cal.Rptr.3d 1, 269 P.3d 446, 447 n. 39 (2012) (relying on Supreme Court precedent to discuss Sections 2 and 5 in relation to state provision requiring compliance with the VRA).

. Like Florida's, the District of Columbia's provision does not expressly reference the VRA, but the District of Columbia’s appellate court has construed it in conformity with Section 2 of the VRA. See Kingman Park Civic Ass'n v. Williams, 924 A.2d 979, 987 (D.C.2007) (relying on Section 2 precedent from the Supreme Court to review a claim under *621 provision disallowing redistricting plans that have “the purpose and effect of diluting the voting strength of minority citizens” (quoting D.C. Code § 1-1011.01(g))).

. The United States Supreme Court has recognized that vote dilution claims can be brought separate and apart from statutory claims based on the VRA. The Equal Protection Clause prohibits racial vote dilution where the plaintiff establishes that the electoral scheme was adopted with the intent to racially discriminate. See City of Mobile v. Bolden, 446 U.S. 55, 62, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality opinion); see also Clark v. Putnam Cnty., 293 F.3d 1261, 1266 (11th Cir.2002) (citing Bolden for the proposition that "[i]n order to state a racial vote dilution claim under the Constitution, intent to racially discriminate must be shown”).

. While Florida’s provision borrows language from Section 5, it does not incorporate the portion of Section 5 placing the burden of proof on the covered jurisdiction to establish the requirements necessary to obtain pre-clearance.

. The Court utilized the House political data and software in analyzing all of these figures.

. Section 16(a) specifically requires that that districts be "of either contiguous, overlapping or identical territory.” Neither of the latter two requirements in this standard, that districts must be of overlapping or identical territory, is at issue in the instant petition. This Court has never defined the term "overlapping,” and it has never come into play under the Constitution of 1968. The phrase "identical territory” refers to multi-member districts. See In re Apportionment Law-1972, 263 So.2d at 806-07. A multimember district *628 is a district in which the same voters elect more than one representative to serve a geographical area that could be divided into several areas, each represented by a single person. See Whitcomb v. Chavis, 403 U.S. 124, 142, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). As has been, the case since 1982, the 2012 apportionment plan consists solely of single-member districts as to both the House and Senate plans.

. Congressional districts fall under a stricter standard under the federal constitution. Any variance, no matter how small, must be justified, unless it can be shown that the variance occurred despite an effort to achieve precise mathematical equality. Karcher v. Daggett, 462 U.S. 725, 730, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). The United States Supreme Court has noted that "congressional districts are not so intertwined and freighted with strictly local interests as are state legislative districts and that, as compared with the latter, they are relatively enormous.” White v. Weiser, 412 U.S. 783, 793, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973).

. States that constitutionally require compactness during reapportionment include Alaska, California, Colorado, Hawaii, Illinois, Maine, Maryland, Missouri, Montana, Nebraska, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, South Dakota, Vermont, Washington, West Virginia, and Wisconsin. See Alaska Const, art. VI, § 6; Ariz. Const, art. IV, pt. 2, § 1(14); Cal. Const, art. XXI, §§ 2(d), (e); Colo. Const, art. V, § 47; Haw. Const, art. IV, § 6(4); Ill. Const, art. IV, § 3(a); Me. Const, art. IV, pt. 1, § 2; Md. Const, art. Ill, § 4; Mo. Const, art. Ill, § 2; Mont. Const, art. V, § 14(1); Neb. Const, art. Ill, § 5; N.J. Const, art. IV, § 2; N.Y. Const, art. Ill, § 4; Ohio Const, art. XI, § 9; Pa. Const, art. II, § 16; R.I. Const, art. VII, § 1; art. VIII, § 1; S.D. Const, art. Ill, § 5; Vt. Const, ch. II, §§ 13, 18; Va. Const, art. II, § 6; Wash. Const, art. II, § 43(5); W.V. Const, art. VI, § 4; Wis. Const, art. IV, § 4.

. States that codify a compactness requirement by statute include Idaho, Michigan, Minnesota, Mississippi, New Mexico, and North Dakota. See Idaho Code Ann. § 72-1506; Iowa Code § 42.4(4); Mich. Comp. Laws § 4.261; Minn.Stat. § 2.91(2); Miss. Code Ann. § 5-3-101; N.M. Stat. §§ 2-8D-2, 2-7C-3; N.D. Cent. Code Ann. § 54-03-01.5. The District of Columbia also statutorily requires compactness in redistricting. See D.C.Code § 1-1011.01.

. Wilson v. Eu, 1 Cal.4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545, 552 (1992); In re 2003 Legislative Apportionment of House of Representatives, 827 A.2d 810, 815 (Me.2003); In re Legislative Districting of State, 475 A.2d at 443; Schneider v. Rockefeller, 31 N.Y.2d 420, 340 N.Y.S.2d 889, 293 N.E.2d 67 (1972); Paretla v. Montalbano, 899 A.2d 1226, 1252 (R.I.2006); In re Reapportionment of Towns of Hartland, Windsor & W. Windsor, 160 Vt. 9, 624 A.2d 323, 330-31 (1993).

. States requiring compactness and that vest original jurisdiction in the Supreme Court include California, Colorado, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Michigan, New Jersey, Ohio, Pennsylvania, Vermont, and Washington. See Cal. Const, art. XXI, § 3(b); Colo. Const, art. V, § 48(e); Haw. Const, art. IV, § 10; Idaho Const, art. Ill, § 2(5); Ill. Const, art. IV, § 3(b); Iowa Const, art. Ill, § 36; Me. Const, art. 4, pt. 1, § 3; Md. Const, art. Ill, § 5; Mich. Comp. Laws §§ 3.71, 4.262; NJ. Const, art. II, § 2, ¶7; Ohio Const, art. XI, § 13; Pa. Const, art. II § 17(d); Vt. Stat. Ann. tit. 17, § 1909(a), (f); Wash. Rev.Code § 44.05.130.

. See, e.g., League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 455 n. 2, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) (Stevens, J., concurring in part and dissenting in part) ("[T]wo standard measures of compactness are the perimeter-to-area score, which compares the relative length of the perimeter of a district to its area, and the smallest circle score, which compares the ratio of space in the district to the space in the smallest circle that could encompass the district.”); Vieth, 541 U.S. at 348, 124 S.Ct. 1769 (Souter, J., dissenting) ("[Cjompactness ... can be measured quantitatively in terms of dispersion, perimeter, and population ratios, and the development of standards would thus be possible.”).

. At each of the twenty-six hearings held at different locations around the State, the public gave recommendations for the House, Senate, and congressional plans, and preserving county boundaries was a common request.

. At least five state constitutions require geographical boundaries or features to be considered, including Alaska, Arizona, Hawaii, Maryland, and Washington. See, e.g., Alaska Const, art. VI, § 6; Ariz. Const, art. IV, pt. 2, § 1(14); Haw. Const, art. IV, § 6; Md. Const, art. Ill, § 4; Wash. Const, art. II, § 43(5). In all except Hawaii, the state constitutions also require consideration of political or county boundaries.

. These House districts, with their corresponding black voting-age populations (VAPs) are as follows: District 8 (50.0%), District 13 (50.7%), District 14 (50.7%), District 46 (52.1%), District 61 (51.3%), District 88 (51.8%), District 94 (54.6%), District 95 (57.7%), District 102 (52.1%), District 107 (56.9%), District 108 (62.9%), and District 109 (50.6%).

. These House districts, with their corresponding Hispanic voting-age populations are as follows: District 43 (54.9%), District 48 (53.0%), District 62 (51.9%), District 87 (50.0%), District 103 (82.1%), District 105 (69.0%), District 110 (89.5%), District 111 (93.0%), District 112 (73.0%), District 113 (66.8%), District 114 (66.0%), District 115 (65.5%), District 116 (84.4%), District 117 (55.2%), District 118 (81.2%), and District 119 (86.8%).

. Citing Larios v. Cox, 300 F.Supp.2d 1320, 1339 (N.D.Ga.2004), aff'd, 542 U.S. 947, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004), the FDP also raises a separate claim as to equal population, arguing that the Senate plan deviates from equal population not to serve any rational purpose, but rather to discriminate against Democrats, minorities, and certain regions of the state. The FDP argues that this is done by systematically over-populating Democratic and minority districts. Having examined the numbers, we conclude that the FDP has not established a violation of the equal population provision on this basis alone. This case stands in contrast to Larios, where the population deviations were only barely within the 10% overall range and the evidence was clear that the deviation was the result of the Legislature's belief that the 10% overall range was a "safe harbor,” within which it could engage in a systematic and express strategy to over-represent rural areas and Democrats, the party in power.

. See Senate Brief at 1 ("Staff prepared the proposal without reference to election results [or] voter-registration data....”); id. at 4 ("The Senate also formulated the Senate Plan without reference to political party [or] voter registration ... data....”); Senate Comm, on Reapportionment Hrg. Tr. 6323-26 (Dec. 6, 2011) (explaining the use of voting-age population, but not the use of data regarding registered voters or election results); Senate Floor Debate Tr. 6613 (Jan. 17, 2012) (statement by the Chair of the Senate Committee on Reapportionment that to prevent backsliding, the Senate looked at the 2002 Senate plan and used voting-age population numbers to maintain majority-minority districts); id. at *657 6758 (statement by the Senate reapportionment committee chair that voting-age population rather than voting performance data were used); Senate Floor Debate Tr. 6831-33 (Feb. 9, 2012) (acknowledging that House used voter performance data to create effective minority-opportunity districts, but stating that the Senate "saw no need for this type of information” because it "know[s] that [its] minority opportunity districts do not dimmish minority voting strength” by (1) preserving minority opportunity districts with little statistical/geographical change to ensure continued undiminished ability, and (2) following the districts proposed by the Florida NAACP and LatinoJustice organizations).

. Article VI, section 4(b)(l)-(2), is the current term limit provision of the Florida Constitution and was adopted by citizen initiative in 1992. The initiative petition itself stated:
The people of Florida believe that politicians who remain in office too long may become preoccupied with re-election and become beholden to special interests and bureaucrats, and that present limitations on the President of the United States and Governor of Florida show that term limitations can increase voter participation, citizen involvement in government, and the number of persons who will run for elective office.
Political Terms in Certain Elective Offices, 592 So.2d at 226.

. As all of the district lines for each Senate district have changed in the 2012 Senate plan, resulting in a change in constituency, all senators must stand for reelection in the next general election after the 2012 reapportionment. See In re Apportionment Law-1982, 414 So.2d at 1047-48.

. This Court was provided with the addresses for only 21 of the 29 non-term-limited senators.

. Two senators were eligible to serve for 10 years under the November 28 numbering. The district numbers for those incumbents have not changed from odd to even, and they remain eligible to serve for 10 years.

. The voting-age populations of the two districts are as follows. District 1: black VAP 12.5%; Hispanic VAP 5.2%; white VAP 77.5%. District 3: black VAP 14.4%; Hispanic VAP 3.5%; white VAP 78.1%.

. See New Senate Districts, District Descriptions (S000S9008) (Senate Staff Document), in Petition for Declaratory Judgment, Appendix at 1006, In re Senate Joint Resolution of Legislative Apportionment 1176, No. SC12-1 (Fla. Feb. 10, 2012) (Senate District Descriptions) ("The committee heard testimony at the ... public hearings and at the October 5, 2011, Senate Reapportionment Committee meeting that rural and agricultural interests in the northern part of the Panhandle have different traditions and representational needs than the urban and tourism interest in the southern part of the Panhandle. Additionally, the committee heard testimony point *664 ing out that commerce and communication flow east and west along the main transportation corridors of the region, Interstate 10 and U.S. Highway 98, not north and south... id. (“District 1 is supported by the same testimony as District 3. Its horizontal configuration recognizes the differences between the rural North and the urban South. District 1 honors the request of members of the public who called for representation that reflects their distinct communities.”).

. Newly created District 9 would perform Republican; it would have voted 57.5% for Scott (R) in the 2010 gubernatorial election, 57.2% for McCain (R) in the 2008 presidential election, and 59.6% for Crist (R) in the 2006 gubernatorial election. Of the registered voters in District 9, 44.5% would be Republican.

. The Senate staff analysis further explains that “District 6 preserves the core of an existing district that has long elected an African-American member to the Senate. The district connects communities in the northeastern portion of the state from the St. Johns River basin to Interstate 95 between Daytona Beach and Jacksonville.” Senate District Descriptions at 1007.

. Contrary to the Senate’s representations at oral argument, the federal district court order in Martinez v. Bush, 234 F.Supp.2d 1275, 1298-99 (S.D.Fla.2002), does not require this Court to reach an opposite conclusion. Martinez involved Section 2 vote dilution claims based on the Legislature's 2002 House, Senate, and congressional apportionment plans; it did not address claims regarding Section 5 diminishment. See id. at 1298-1324. The district court in Martinez most certainly never found that reducing the black voting-age population from 46.9% (the percentage under the 2002 benchmark) in District 6 to 42.4% (the percentage in the equivalent district under the Coalition's alternative plan) would diminish the ability of black voters in this part of the state to elect candidates of choice. The Senate's after-the-fact reliance on Martinez to justify its decision to draw District 6 in this manner is therefore unavailing.

. When a senator asked during the January 17, 2012, floor debate if any incumbent lived in the appendage of newly numbered Senate District 10, the response given was that if an incumbent lived there it was “news to me,” even though the incumbent who lived there was present during the debate.
The incumbent addresses provided to the Court verify that an incumbent does in fact live in the part of District 10 that we refer to as the appendage.

. The rest of the district is relatively compact, which is reflected in the compactness scores.

. While no party challenges District 14, the Senate likewise should perform the necessary analysis on that district as well.

. District 23 has a Reock score of 0.45 and an Area/Convex Hull score of 0.81. District 28 has a Reock score of 0.37 and an Area/Convex Hull of 0.89.

. The opponents do not contend that the change from 60.7% to 55.8% resulted in retrogression under Florida law.

. District 34 would have voted 82.1% for Sink (D) in the 2010 gubernatorial election, 84.9% for Obama (D) in the 2008 presidential election, and 77.0% for Davis (D) in the 2006 gubernatorial election. Democrats would make up 67.7% of registered voters, 67.0% of the Democrats would be black (showing opportunity for black voters among Democrats), and 85.2% of black voters in this district would be Democrats (showing voting cohesion among black voters in general). As to the registered voters who actually voted in the 2010 general election, the numbers would be quite similar: Democrats would make up 73.1% of voters; 69.7% of the Democrats would be black (opportunity); and 90.9% of the black voters would be Democrats (cohesion).

.The Senate staff analysis likewise recognizes that District 29 “is adjacent to a minority-opportunity district (District 34) to its west.” Senate District Descriptions at 1012.

. District 27 has a white VAP of 65.9% and would perform Democratic. District 31 has a white VAP of 53.3% and would perform Democratic. District 32 has white VAP of 57.7% and would perform Democratic. District 36 has a white VAP of 50.7% and would perform Democratic.

. District 29 would have voted 47.7% for Sink (D) and 49.9% for Scott (R) in the 2010 gubernatorial election, 51.0% for Obama (D) and 48.2% for McCain (R) in the 2008 presidential election, and 48.7% for Davis (D) and 49.1% for Crist (R) in the 2006 gubernatorial election.

. Coalition District 29 would be Democratic and would have voted 79.8% for Sink (D), 82.6% for Obama (D), and 75.1% for Davis (D) in the 2010 gubernatorial, 2008 presidential, and 2006 gubernatorial elections, respectively. In that district, 68.3% of registered voters would be Democrats, 65.5% of registered Democrats would be black (showing opportunity among black voters), and 85.1% of registered black voters would be Democrats (showing cohesion among black voters). In terms of actual voters based on 2010 general election data, Democrats would make up 73.0% of voters, 68.2% of the Democrats who voted would be black (opportunity); and 90.5% of the black voters would be Democrats (cohesion).

. Coalition District 31 would be solidly Democratic and would have voted 54.9% for Sink (D), 58.2% for Obama (D), and 56.5% for Davis (D).

. The comparable districts surrounding Coalition District 29 (Coalition Districts 25, 30, 31, 32, and 35) are majority-white districts (white VAP of 71.0%, 55.9%, 61.2%, 68.0%, and 56.0%, respectively). Each of these districts would be solidly Democratic. The election results for these districts are as follows: Coalition District 25 (61.4% Sink (D), 36.0% Scott (R); 63.3% Obama (D), 36.0% McCain (R); 63.4% Davis (R), 34.6% Scott (R)); Coalition District 30 (55.7% Sink, 41.6% Scott; 60.0% Obama, 39.3% McCain; 56.6% Davis, 41.2% Crist); Coalition District 31 (54.9% Sink, 42.7% Scott; 58.2% Obama, 41.0% McCain; 56.5% Davis, 41.2% Crist); Coalition District 32 (56.7% Sink, 40.9% Scott; 59.9% Obama, 39.5% McCain; 58.6% Davis, 39.6% Crist); Coalition District 35 (59.8% Sink, 37.8% Scott; 61.4% Obama, 37.8% McCain; 60.1% Davis, 38.0% Crist).

. Old District 36 with a Hispanic VAP of 79.2% and old District 33 with a black VAP of 59.2%.

. Although the City of Lakeland also claims that the Senate plan favors incumbents by giving each incumbent a protected district, it does not rely on any specific allegations regarding the two districts in which Lakeland is split. Instead, it relies on an argument made by the Coalition, which does not reference Lakeland specifically.

. Accordingly, any ultimate responsibility of the Court regarding reapportionment would be limited to the redrawing of the Senate plan, and this would occur only if the revised Senate apportionment plan is declared to be invalid. See art. Ill, § 16(f), Fla. Const.